IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division

| | | |
|---|---|---|
| **CYNTHIA L. HARKNESS,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 1:08-CV-00231-CCB |
| | ) | |
| **C-BASS DIAMOND, LLC,** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**[1]

Defendant C-Bass Diamond LLC hereby files this Statement of Material Facts not in Dispute in support of its Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

**Fieldstone and Harkness**

1.   In 2004, Fieldstone Investment Company ("Fieldstone") was a non-publicly traded company whose stockholders included outside investors who had purchased shares via a private placement. (Transcript of Deposition of Michael Sonnenfeld[2] at 14) Fieldstone then served as a holding company and supplied management services to its wholly owned subsidiary, Fieldstone Mortgage Company ("FMC"). (See id.) FMC was the operating arm of the business and funded residential mortgage loans in various states across the country. (See First Amended Complaint [Doc 22] ("Complaint") at ¶ 14)

---

[1] Simultaneously with this Statement of Material Facts not in Dispute, Defendant files its Motion for Summary Judgment and Memorandum of Points and Authorities in Support, and its tabbed, indexed Appendix of Exhibits in Support of Defendant's Motion for Summary Judgment. In this Statement of Material Facts not in Dispute, Defendant will refer to Exhibits in the Appendix as "Ex. __".

[2] Cited portions of the transcript of Michael Sonnenfeld's deposition are attached as Ex. A, and will hereafter be cited as "Ex. A, Sonnenfeld Tr. at ___".

2.   Fieldstone applied with the Securities and Exchange Commission to become a publicly traded company in 2004. (Ex. A, Sonnenfeld Tr. at 14; Ex. B, Excerpt from Fieldstone Form S-11 (Registration Statement) submitted April 23, 2004 (title page identifying filer and SEC notice as to date))

3.   Also in 2004, Fieldstone adopted a voluntary, internal Code of Business Conduct of the type used by publicly traded companies. It included a provision that prohibited employees from disclosing material, non-public information about the company. (See Ex. C, January 26, 2005 Memorandum[3], p. 3 at ¶¶ 11 (a) and (b))

4.   Also in 2004, Fieldstone began creating and implementing internal control procedures and systems of the type required to be utilized by publicly traded companies under the Sarbanes-Oxley Act, including the creation of an Audit Committee comprised of independent directors. (See Transcript of Deposition of Jonathan Michael[4] at 16-17; Transcript of Deposition of Matthew Gagnon[5] at 39-40)

5.   Fieldstone's application to become a publicly traded company was approved on or about February 2, 2005. (Transcript of Deposition of Plaintiff Cynthia Harkness at 116-117[6]; see Complaint at ¶¶ 9, 30)

6.   At all times prior to approval of its application, Fieldstone was not a publicly traded company. (Id.)

---

[3] The January 26, 2005 Memorandum was prepared by Cynthia Harkness for the Chair of Fieldstone's Audit Committee at his request, and completed by her on or about that date. (See Ex. F, excerpts of Transcript of Deposition of Plaintiff Cynthia Harkness, at 120) At her deposition in this matter, Ms. Harkness affirmed that the document was accurate to the best of her knowledge and understanding when prepared by her. (Id.)
[4] Cited portions of the transcript of Jonathan Michael's deposition are attached as Ex. D, and will hereafter be cited as "Ex. D, Michael Tr. at ___".
[5] Cited portions of the transcript of Mathew Gagnon's deposition are attached as Ex. E.
[6] Cited portions of the transcript of Cynthia Harkness' deposition are attached as Ex. F, and will hereafter be cited as "Ex. F, Harkness Tr. at ___".

7.       Cynthia Harkness ("Harkness") is a lawyer.  (Ex. F, Harkness Tr. at 15-16)  She served as General Counsel of Fieldstone from her hire in 2004 until termination of her employment with the company on January 15, 2007.  (See Complaint at ¶¶ 15, 40)

8.       At all times prior to approval of Fieldstone's application on or about February 2, 2005, Harkness knew that Fieldstone was not a publicly traded company.  (Ex. F, Harkness Tr. at 116-117; see Complaint at ¶¶ 9, 30)

9.       One of Harkness' duties as General Counsel for Fieldstone was to bring it into full compliance with applicable securities regulations and filing procedures to enable it to successfully become a publicly traded company.  (Complaint at ¶ 17)

10.      Harkness' expertise as a lawyer is in transactional law, not securities law.  (Ex. F, Harkness Tr. at 19)  During the time that Fieldstone was in registration with the SEC, she had no more than a passing familiarity with securities laws.  (Ex. F, Harkness Tr. at 115, 137)

11.      During the time that Fieldstone was in registration with the SEC, Harkness did not know whether or not certain rules and regulations of the SEC relating to the disclosure obligations of public companies apply to companies that have applied to be registered but are not yet approved, specifically including Regulation FD as to dissemination of material, non-public information about the company.  (Ex. F, Harkness Tr. 137, 139-40)

12       During the time that Fieldstone was in registration with the SEC, Harkness took no steps to determine whether certain rules and regulations of the SEC relating to the disclosure obligations of public companies apply to companies that have applied to be registered but are not yet approved, specifically including Regulation FD as to dissemination of material, non-public information about the company.  (Id.)

## The Events of January 2005

13.     At the close of business on January 14, 2005, Fieldstone issued a press release stating that it was restating its earnings for certain prior periods in order to resolve a dispute with the SEC over accounting treatment of certain transactions.  (January 26, 2005 Memorandum at p. 1, ¶ 1)

14.     On January 14, 2005, Michael Sonnenfeld ("Sonnenfeld"), the CEO of Fieldstone, informed its CFO, Rob Partlow ("Partlow"), and Harry Argires ("Argires"), the Audit Partner from its outside audit firm, that he had spoken with one of the company's stockholders about its plan to restate earnings, a topic considered to be material information to investors.  (January 26, 2005 Memorandum at p. 1, ¶ 2)

15.     Upon learning this, Partlow and Argires informed Sally LaFond ("LaFond"), an attorney who worked in Fieldstone's legal department.  (January 26, 2005 Memorandum at p. 1, ¶ 2)

16.     At the time she spoke with Argires and Partlow, LaFond did not know whether Sonnenfeld's conversation had taken place before or after issuance of the press release covering the same information.  (January 26, 2005 Memorandum at p. 1, ¶ 2)

17      In turn, LaFond informed Harkness.  (January 26, 2005 Memorandum at p. 1, ¶ 3)

18.     They discussed the matter and determined that their next course of action was to determine what their own obligations were under the Sarbanes Oxley Act, based on the incorrect assumption that Sonnenfeld may have violated Regulation FD.  (Ex. F, Harkness Tr. 124, 129; January 26, 2005 Memorandum at p. 1, ¶¶ 3, 12)

19.     LaFond and Harkness did not research Regulation FD or consult with Fieldstone's outside securities counsel (Hogan & Hartson) to test their assumption that Sonnenfeld may have violated Regulation FD, to determine what factual circumstances might implicate a concern, or

4

determine what Fieldstone might be obliged to do if Regulation FD had been violated. (Ex. F, Harkness Tr. at 128, 130-31, 133, 134)

20.     On January 17, 2005, LaFond and Harkness met again and decided to interview Partlow and Argires to confirm the applicable facts. (January 26, 2005 Memorandum at p. 1, ¶ 4)

21.     Harkness and LaFond then met separately with Partlow and Argires. Each related what Sonnenfeld had said to them, including that he had spoken with the investor on January 13 and that he had told the investor the information was non-public and he could not do anything with it. (January 26, 2005 Memorandum at p. 2, ¶ 5(c)-(e)) Each reported to her that he was shocked that Sonnenfeld had given the investor non-public information and added that "if Fieldstone were [a] public [company], this would/might be a violation of Regulation FD." (January 26, 2005 Memorandum at p. 2, ¶ 5(f))

22.     After meeting with Partlow and Argires on January 17, and despite having heard from these sources that Regulation FD did not apply to Fieldstone because it was not then public, Harkness still took no steps to inform her judgment as a lawyer as to whether Regulation FD applied and advise her client accordingly. (Ex. F, Harkness Tr. at 128, 131, 133, 134) In particular, she did not research Regulation FD, consult with Fieldstone's outside securities counsel, nor direct LaFond (or any other person) to take these steps, or any other steps. (Id.)

23.     Instead, Harkness called Jonathan Michael ("Michael"), the Chair of Fieldstone's Audit Committee. (January 26, 2005 Memorandum at p. 2, ¶ 6) Her purpose was to seek his guidance as to how she should proceed prior to taking her next anticipated step of interviewing Sonnenfeld, in case he wanted her to proceed differently. (Id.) She reported to him the facts related to her by Partlow and Argires and told him she thought there may have been a violation of Regulation FD. (Id.; Ex. F, Harkness Tr. at 129; Ex. D, Michael Tr. at 29) Michael told her

that he wanted her legal opinion and directed her to interview Sonnenfeld.  (Ex. D, Michael Tr. at 30)

24.     Audit Chair Michael was an outside director of Fieldstone and the CEO of a publicly traded company known as RLI.  (Ex. D, Michael Tr. at 8, 16)  He is a Certified Public Accountant.  (Id.)

25.     Harkness interviewed Sonnenfeld the same day, then reported the interview to Michael.  (January 26, 2005 Memorandum at p. 2, ¶¶ 8, 9)

26.     On January 19, 2005, Michael informed Harkness that he had spoken with his company's securities counsel, who was of the opinion that no securities laws had been violated, and in particular that Regulation FD did not apply to Fieldstone because it was not yet public, and even if it did, based on the facts related, Sonnenfeld had not violated Regulation FD because of conditions he placed on the disclosure.  (January 26, 2005 Memorandum at pp. 2-3, ¶ 10; Ex. D, Michael Tr. at 34-35)

27.     Michael directed Harkness to prepare a statement of facts concerning her investigation, and identify for him what sections of the Company's Code of Business Conduct may have been breached by Sonnenfeld's conduct and what provisions of Regulation FD might have been violated if Fieldstone's shares were publicly registered.  (January 26, 2005 Memorandum at pp. 2-3, ¶ 10)

28.     Harkness then had LaFond review Regulation FD.  (January 26, 2005 Memorandum at p. 4, ¶ 12)

29.     Harkness prepared a letter report to Michael as requested, dated January 26, 2005.  (Ex. F, Harkness Tr. at 120; Ex. D, Michael Tr. 31; Complaint at ¶ 26; see also January 26, 2005 Memorandum at p. 1, ¶ 1)  The report includes a section reviewing the sections of the Code of

Business Conduct applicable to Sonnenfeld's actions. (January 26, 2005 Memorandum at p. 4, ¶ 11) The report also includes the following statements:

> In response to your request, Sally reviewed Regulation FD and believes that, **if Fieldstones shares were publicly registered, and therefore Fieldstone was subject to Regulation FD** … Failure to simultaneously publicly disclose this information would subject the Company and Michael to possible SEC enforcement action.

(January 26, 2005 Memorandum at p. 5, ¶ 12) (emphasis added)

30. The January 26 letter was presented to the entire Fieldstone board, including Sonnenfeld, on February 23, 2005. (Ex. D, Michael Tr. 44) At that time the Audit Committee directed that additional training be provided to senior staff concerning the Code of Business Conduct. (Id.; Ex. G, Excerpt of Minutes of February 23, 2005 Meeting of Audit Committee at 2)

### Employment Issues in 2005 and 2006 Concerning Harkness

31. From her engagement as General Counsel until early 2006, Harkness reported directly to Sonnenfeld. (See Complaint at ¶ 32 (reporting structure changed in or about January 2006))

32. During 2005, in addition to managing the Legal Department, Harkness was also responsible for the Human Resources Department and the Quality Control/Regulatory Compliance Department. (See Complaint at ¶ 18)

33. On at least three occasions, February 22, 2005, April 6, 2005 and May 20, 2005, Sonnenfeld and Harkness met in the presence of a senior human resources officer to discuss disagreements and complaints concerning her conduct, his management of her and their working relationship. (Transcript of Deposition of Carol Ballentine[7] at 40-43 (confirming meeting held in February and identifying notes of same), 56-59 (confirming background for April 6 meeting and

---

[7] Cited portions of the transcript of Carol Ballentine's deposition are attached as Ex. H, and will hereafter be cited as "Ex. H, Ballentine Tr. at ___" or "Ex. H, Ballentine Tr.2 at __." Ballentine's deposition was recorded in two transcripts, one for portions initially designated as confidential (herein, "Ex. H, Ballentine Tr.") and the remainder (herein, "Ex. H, Ballentine Tr.2") The portions cited herein from the former are no longer designated confidential and, accordingly, have not been filed under seal.

identifying notes and talking points for same), 84-85 (addressing meeting held in May and identifying notes of same); Ex. I (human resources notes of February 22 meeting); Ex. J (human resources notes of April 6 meeting and accompanying "talking points"); Ex. K (human resources notes of May 20 meeting))

34. The respective issues and concerns reviewed during these ongoing meetings included: Harkness' concerns that Sonnenfeld had made sexist remarks about her and was discriminating against her or treating her disparately based on her sex, including with respect to her compensation, mutual difficulties with effective communication, and that she was disappointed in her review; and Sonnenfeld's concerns that Harkness had gone around him to the Board's Compensation Committee to complain about her pay; that she should raise issues personal to her with him rather than with the Board; that she needed to be more of a team player, that he did not like subordinates who did not let him know when something was bothering them, mutual difficulties with effective communication, and that she had made a poor selection on a choice of outside legal counsel. (Id.)

35. On March 9, 2005, Fieldstone's two most senior human resource officers, Jean Slone and Carol Ballentine, consulted with outside employment counsel, Tom Dowd, about risks attendant to a proposal to change the reporting relationship of the Human Resources Department so that the Senior Vice President for HR (Slone) would report to Sonnenfeld instead of Harkness. Ex. L, Declaration of Thomas P. Dowd ("Dowd Declaration") at ¶¶ 3-9; Ex. M (Dowd e-mail dated March 9 summarizing conversation); Ex. N (Dowd billing records) at invoice for March 2005) They consulted with outside counsel because they wanted advice about the potential that this decision could be characterized as retaliation because Harkness had complained about a statement made by Sonnenfeld during her January performance review that she considered sexist

and that she was underpaid due to her sex, and because of Harkness reporting Sonnenfeld to the Audit Chair for his conversation with the investor. (Ex. L, Dowd Declaration at ¶¶ 10-13) This request for advice did not include advice concerning termination. (Ex. L, Dowd Declaration at ¶ 14; see Ex. M (Dowd e-mail))

36.     As of the April 6, 2005 meeting between Harkness and Sonnenfeld, Ballentine did not understand Harkness to be under threat of termination. (Ex. H, Ballentine Tr. at 59)

37.     Outside employment counsel Dowd was next consulted about Harkness by Slone and Ballentine on April 26, 2005. (Ex. H, Ballentine Tr. at 59-60; Ex. L, Dowd Declaration at ¶ 16; Ex. N (Dowd billing records) at invoice for April 2005) At the time, they recapped with him the prior conversation and related more recent events, including that Harkness had complained to the Board about her compensation and that she had informed the Board that in her opinion, Sonnenfeld had a conflict of interest in insisting that the company hire a long-time acquaintance as outside counsel to defend a lawsuit. (Ex. H, Ballentine Tr. at 63-64; Ex. O (Ballentine notes of telephone conference with Dowd at 1-2; Dowd Declaration at ¶ 16) The trigger for this call was Sonnenfeld's irritation with the report to the Board by Harkness about his having bypassed her to hire an outside counsel. (Ex. H, Ballentine Tr. at 62; Dowd Declaration at ¶ 16) During this meeting, they solicited from Dowd his advice concerning a range of options as to Harkness' employment, including that she might be terminated if the situation did not improve. (Ex. O at 3-4; Ex. H, Ballentine Tr. at 73; Ex. L, Dowd Declaration at ¶ 16)

38.     On the two days following this conference, Dowd spoke with Sonnenfeld, Ballentine and Slone about the same topics, and then met with them. (Ex. L, Dowd Declaration at ¶ 16; Ex. N (Dowd billing records) at invoice for April 2005)

39.     In or about May 2005, Dowd was again consulted by Slone and Ballentine for input about talking points for a possible meeting between a member of the Compensation Committee of the Board and Harkness about her taking directly to the Board issues that were instead issues for management (i.e., Sonnenfeld), such as her compensation.  (Ex. L, Dowd Declaration at ¶ 17; Ex. N (Dowd billing records) at invoice for May 2005; Ex. P (Dowd May 12 e-mail regarding review of draft talking points)

40.     Dowd was consulted again in July concerning another employment conflict that Human Resources was reviewing as to Harkness.  (Ex. L, Dowd Declaration at ¶ 17; Ex. N (Dowd billing records) at invoice for July 2005)  Dowd continued to provide employment law services to Fieldstone but was not contacted again about Harkness until after she was terminated from employment in 2007 and had filed her claim of retaliation with the Department of Labor.  (Ex. L, Dowd Declaration at ¶ 17)

41.     In January 2006, the reporting structure for Human Resources was changed so that the manager of human resources reported directly to Sonnenfeld and not to Harkness.  (Ex. F, Harkness Tr. at 82-83, 114)  Harkness did not claim this action to be discrimination or illegal retaliation at the time, despite an affirmative obligation to do so if she held this belief.  (Ex. F, Harkness Tr. at 81, 82-83)

42.     In March 2006, Harkness' own reporting structure was changed so that she was no longer a direct report to Sonnenfeld and instead reported to the company's new Chief Financial Officer, Nayan Kisnadwala.  (Sonnenfeld Transcript at 24, 145; Ex. Q, Declaration of Nayan Kisnadwala at ¶¶ 1-2); Ex. F, Harkness Tr. at 110)  Harkness did not claim this to be discrimination or illegal retaliation at the time despite an affirmative obligation to do so if she held this belief.  (See Ex. F, Harkness Tr. at 81, 82-83)

43. In connection with Harkness' mid-year performance review with Kisnadwala in July 2006, he suggested to her that because of her poor relationship with Sonnenfeld, she should look for another job. (Ex. F, Harkness Tr. at 111-12; Ex. Q, Declaration of Nayan Kisnadwala at ¶ 3)

44. On several occasions in 2005 and 2006, outside director and then Chairman of the Board Thomas Eckert advised Sonnenfeld that he should terminate Harkness and replace her with more competent counsel. (Ex. R, Declaration of Thomas Eckert at ¶¶ 1-4) Eckert made these recommendations based upon his own observations and dealing with Harkness, which led him to conclude that she lacked the maturity of judgment and discretion for the position of general counsel, and because she did not handle issues adequately as they arose. (Ex. R, Declaration of Thomas Eckert at ¶¶ 2-3)

45. On at least two occasions in the last quarter of 2006, Sonnenfeld made clear his extreme disappointment with Harkness' job performance. (See Ex. A, Sonnenfeld Tr. at 71-72, 83-84; Ex. F, Harkness Tr. at 155, 162) In the first incident, Harkness failed to deliver what Sonnenfeld considered a definitive legal opinion about whether modest plaques proposed to recognize brokers would violate HUD regulations prohibiting lenders from giving things of value to loan brokers, instead saying whether to give the plaques was a "business decision." (Ex. A, Sonnenfeld Tr. at 83-85, 88-89; see also Ex. D, Michael Tr. at 58-59; Ex. F, Harkness Tr. at 162) In the second incident, the Harkness-managed Compliance Department did not complete its final review of model loan documents in time for the scheduled December 1 rollout of a high-profile, nationwide project known as Empower, and Sonnenfeld did not believe there was any good excuse for her failure to deliver on what he considered a mission critical project. (Ex. A, Sonnenfeld Tr. at 58; Ex. F, Harkness Tr. at 155; see Ex. D, Michael Tr. at 60) Under pressure, she told Sonnenfeld to proceed with the rollout even though her team would not timely complete

its final review as all other departments had. (Ex. A, Sonnenfeld Tr. at 74-75, 80; Ex. F, Harkness Tr. at 154) The review was finished the next day and no changes were recommended to the documents. (Ex. A, Sonnenfeld Tr. at 79-80; Ex. F, Harkness Tr. at 155)

### Termination of Harkness' Employment with Fieldstone

46. On or about December 12, 2006, Harkness met with Kisnadwala and informed him that if the company was prepared to offer her an acceptable severance package, she would resign. (Ex. F, Harkness Tr. at 87-88) That day or the next, Harkness met with Andy Goresh, the Vice President for Human Resources, about ending her employment. (Ex. F, Harkness Tr. at 88)

47. At or about the same time, Eckert again asked Sonnenfeld why he had not terminated Harkness from employment as his General Counsel. Sonnenfeld responded that he had already made his decision to do so and would implement it soon. (Ex. A, Sonnenfeld Tr. at 47)

48. Harkness took leave after the Goresh meeting. (Ex. F, Harkness Tr. at 105) On her return on December 29, 2006, they met again. (Id.) At this meeting, Goresh presented her with a termination letter and proposed severance package. (Id.) She objected to the former as being effective too soon and the latter as being too little. (Ex. F, Harkness Tr. at 105-106) Harkness and Goresh worked out an understanding to extend the effective date of her departure to January 15, 2007. (Ex. F, Harkness Tr. at 69, 106-107) Harkness and Fieldstone did not come to agreement regarding a severance package. (Complaint at ¶ 41)

### Harkness' Duty to Report any Illegal Acts or Violations of the Law Known to Her

49. After Fieldstone's shares became publicly registered with the SEC on February 2, 2005, Fieldstone commenced an internal reporting regime whereby select employees, including Harkness, prepared quarterly reports and certifications in support of the Company's public disclosure obligations and compliance efforts. (Ex. F, Harkness Tr. at 45)

50.     Among Harkness' obligations and undertakings in this regard were the following quarterly written reports:

1. To certify that she had disclosed any fraud involving management

2. To complete a questionnaire by stating whether she was aware of **any illegal acts** committed by the Company or management

3. To complete a questionnaire by stating whether she was aware of **any fraud or other improper activity** by a member of management

(Ex. F, Harkness Tr. at 45; see also certification forms (Ex. S-Y) and disclosure questionnaire excerpts (Ex. Z-EE for the period from the first quarter of 2005 thought the third quarter of 2006[8])

51.     From the inception of her reports in the first quarter of 2005 through December 26, 2006, the date Harkness was notified that her employment with Fieldstone was being terminated: (1) she never disclosed any act of fraud involving management, and always certified that she had disclosed any of which she was aware; (2) she always reported that she was **not** aware of any illegal acts committed by the Company or management; and (3) she always reported that she was **not** aware of any fraud or other improper activity by a member of management.  (Ex. F, Harkness Tr. at 52-54 (1st quarter 2005), 54-55 (2nd quarter 2005), 55-56, 58-59 (3rd quarter 2005), 60-62 (4th quarter 2005), 62-64 (1st quarter 2006), 64- 66 (2nd quarter 2006), 66-68 (3rd quarter 2006); see also Ex. S-DD at highlighted text)

52.     Harkness understood these reports to be cumulative, and would have updated the information for a prior period if she was aware of different information when she made a subsequent report.  (Ex. F, Harkness Tr. at 46)

---

[8] For the convenience of the reviewer, the relevant representation on each certification and disclosure questionnaire form is highlighted on each respective Exhibit.

13

53.     Harkness took her obligation to make accurate reports seriously, performed her obligations in this regard diligently and stands by the accuracy of these reports today based upon the knowledge she had as of the date she submitted each report.  (Ex. F, Harkness Tr. at 45-46)

54.     Harkness was not aware of any acts by the Company or its managers that she considered to be fraudulent, or violations of the law, or otherwise improper within the bounds of the disclosure obligations of a public company through the date her reporting obligations ended with the reports she submitted in September and November 2006 (Ex. S-EE; Ex. F, Harkness Tr. at 68-69)

## The Audit Committee Meeting of December 5, 2006

55.     At most regular meetings of the Fieldstone Audit Committee, Harkness met with the Committee in executive session in her capacity as general counsel.  (Ex. F, Harkness Tr. at 22-23)  When the Committee met in executive session, only the Committee members and the reporting employee were present, and ordinarily no notes were kept.  (Ex. F, Harkness Tr. at 23-24, 95-96)

56.     Harkness met with the Committee in executive session during its meeting on December 5, 2006.  (Complaint ¶ 39; Ex. F, Harkness Tr. at 92)

57.     At the time of this executive session, Harkness had no knowledge of any actual violations of law by Fieldstone.  (Ex. F, Harkness Tr. at 100)  During the course of this executive session, Harkness complained to the Committee: (1) that the departments reporting to her were understaffed and her requests for more staff or outside resources were being ignored, which gave her concern that the company could be in violation of lending practice laws and she would not know it; and (2) that she was being excluded from some senior level meetings and events at the company, which gave her concern that she and her staff could not be certain that disclosures

made in public filings were accurate or that the "tone at the top" of the Company exhibited a commitment to compliance. (Ex. F, Harkness Tr. at 97-98, 100, 101; Complaint at ¶¶ 38-39; Ex. FF, Declaration of Cynthia Harkness ("Harkness Declaration") at ¶ 6); Ex. D, Michael Tr. at 72, 74; see also Ex. HH (Notes jotted down by Plaintiff in her notebook as talking points for her December 5 meeting); Ex. GG, Declaration of Celia Martin ("Martin Declaration") at ¶ 2) (tenor of complaint was that Harkness felt she was not being used by CEO Sonnenfeld the way other companies use their general counsel))

58.     After Harkness stated her complaints, one of the committee members asked her specifically if she was aware of any illegal actions by the Company. (Ex. FF, Harkness Declaration at ¶ 6; Ex. F, Harkness Tr. at 99-100; Ex. D, Michael Tr. at 78, 80; Ex. GG, Martin Declaration at ¶ 3) Harkness stated that she was not. (Id.)

59.     Harkness reiterated to the Committee that her concern was rather that she felt that there might be violations of law of which she was unaware because she lacked resources and her staff did not have the type of access that she believed was necessary for them to do their jobs. (Ex. FF, Harkness Declaration at ¶ 6; Ex. F, Harkness Tr. at 100-101; Ex. D, Michael Tr. at 78, 80; Ex. GG; see also Ex. HH (Notes jotted down by Plaintiff in her notebook as talking points for her December 5 meeting), Martin Declaration at ¶ 2 (tenor of complaint was that Harkness felt she was not being used by CEO Sonnenfeld the way other companies use their general counsel)) In the main, the violations of law Harkness was concerned might exist due to understaffing went to the adequacy of loan documentation used in the Company's mortgage lending business, and, as a corollary to this main concern, to the Company's representations in its SEC filings that it was in compliance with such requirements. (Ex. F, Harkness Tr. at 102)

60. As of the date Harkness was notified of her termination at her meeting with Goresh on December 29, 2006, she had never reported any incident of fraud committed by a member of management, including Sonnenfeld. (Ex. F, Harkness Tr. at 75) As of the date Harkness was notified of her termination at her meeting with Goresh on December 29, 2006, she had never reported any illegal act by Fieldstone or a member of management, including Sonnenfeld. (Ex. F, Harkness Tr. at 75-76[9])

61. Thereafter, in a disclosure questionnaire for the fourth quarter of 2005 that Harkness submitted to Fieldstone in January 2006, she reported her belief that the Company was in violation of law for terminating her employment based upon retaliation or sex discrimination, but did not identify any other violation by the Company or its managers. (Ex. F, Harkness Tr. 78-79)

August 28, 2009

Respectfully submitted,

/s/ Joseph E. Schuler
Joseph E. Schuler (Fed. Bar #04360)
Matthew F. Nieman (Fed. Bar #17558)
JACKSON LEWIS LLP
10701 Parkridge Boulevard, Suite 300
Reston, VA  20191
schulerj@jacksonlewis.com
niemanm@jacksonlewis.com

---

[9] For completeness' sake, Defendant notes that at the cited portion of the deposition transcript, Plaintiff asserts that she considers her January 26, 2005 report to be a report of illegal activity by Sonnenfeld. (See Ex. F, Harkness Tr. at 75-76) However, Plaintiff's January 26, 2005 report does not characterize the conduct as illegal (exactly the opposite – it says the regulation was not violated) and Harkness herself never included this allegation in her Disclosure Questionnaires (see Facts 50-54, above). Furthermore, Plaintiff's securities law expert and Defendant's securities law expert both agreed that Sonnenfeld's actions were not in violation of Regulation FD, the law that Plaintiff believed at the time may have been implicated by her report.

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 28h day of August, 2009, the foregoing *Defendant's Statement of Material Facts not in Dispute* was served was served via the courts electronic filing system upon:

>Joseph B. Espo, Esq.
>BROWN, GOLDSTEIN & LEVY, LLP
>120 E. Baltimore Street, Suite 1700
>Baltimore, MD 21202-6701
>
>*Attorneys for Plaintiff*

>/s/ Joseph E. Schuler
>Joseph E. Schuler