# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Northern Division

CYNTHIA L. HARKNESS,

        *Plaintiff,*

*v.*                                  Civil Action No.: 1:08-CV-00231-CCB

C-BASS DIAMOND, LLC

        *Defendant.*

---

# MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Joseph E. Schuler (Fed. Bar #04360)
Matthew F. Nieman (Fed. Bar #17558)
JACKSON LEWIS LLP
10701 Parkridge Boulevard, Suite 300
Reston, VA  20191
(703) 483-8300
*Attorneys for Defendant*

# TABLE OF CONTENTS

I.   INTRODUCTION AND SUMMARY OF ARGUMENT ........................................... 1

II.  GENERAL BACKGROUND AND PROCEDURAL HISTORY ................................ 3

III. ARGUMENT ........................................................................................................... 5

   A.   Summary Judgment Standard ................................................................. 5

   B.   The Sarbanes-Oxley Act And Whistleblower Protection ........................ 6

   C.   Plaintiff's December 5, 2006 Meeting With The Audit Committee
        Was Not "Protected Activity" ................................................................ 8

   D.   Plaintiff's January 2005 Reports To The Audit Chair Were Not
        "Protected Activity" ............................................................................. 13

        1.   The Act does not apply because Fieldstone was not a publicly
             traded company .......................................................................... 13

        2.   Plaintiff did not report a violation of relevant law, and had no
             subjective belief that she was reporting a violation ..................... 14

        3.   Plaintiff's belief that she was reporting a possible violation of
             Regulation FD does not qualify under the Act and was not
             objectively reasonable ................................................................ 15

        4.   Plaintiff's and Defendant's experts ............................................. 20

        5.   Plaintiff's January 2005 reports are too remote in time to permit
             an inference of causation, and Plaintiff has no other evidence of
             causation .................................................................................... 25

        6.   Carol Ballentine's Declaration in the OSHA proceeding ............. 30

IV.  CONCLUSION ..................................................................................................... 34

# TABLE OF AUTHORITIES

## Cases

*Adalman v. Baker, Watts & Co.,* 807 F.2d 359 (4th Cir. 1986) ................................................. 21
*Allen v. Admin. Review Bd.,* 514 F.3d 468 (5th Cir. 2008) .............................. 7, 9, 11, 19
*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) .......... 6
*Bouchat v. Baltimore Ravens Football Club, Inc.,* 346 F.3d 514 (4th Cir. 2003) ....................... 6
*Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) ................. 6
*Clark County School District v. Breeden,* 532 U.S. 268, 121 S. Ct. 1508, 149 L. Ed. 2d 509
(2001) ........................................................................................................................... 21
*Cleary v. Green,* 2008 U.S. Dist. LEXIS 91834 (D. Md.) .................................................... 6
*Day v. Staples, Inc.,* 555 F.3d 42 (1st Cir. 2009) .............................................................. 12
*Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639 (4th Cir. 2002) ...................... 6
*Gallagher v. Granada Entertainment USA,* 2004-SOX-74 (ALJ April 1, 2005) ....................... 13
*Gould v. Davis,* 165 F.3d 265 (4th Cir. 1998) ................................................................. 16
*Hughes v. Derwinski,* 967 F.2d 1168 (7th Cir. 1992) ...................................................... 25
*Jordan v. Alternative Resources Corp.,* 458 F.3d 332 (4th Cir. 2006) ............................... 16
*Livingston v. Wyeth, Inc.,* 520 F.3d 344 (4th Cir. 2008) .............................. 7, 8, 12, 14, 16, 18, 21
*O'Neal v. Ferguson Constr. Co.,* 237 F.3d 1248 (10th Cir. 2001) ..................................... 25
*Platone v. FLYI, Inc.,* ARB Case No. 04-154, 2006 WL 3246910 (ARB Sept. 29, 2006) ............. 8
*Platone v. U.S. Dept. of Labor,* 548 F.3d 322 (4th Cir. 2008) ................................... 8, 12
*Richmond v. Oneok, Inc.,* 120 F.3d 205 (10th Cir. 1997) ................................................ 25
*The Santissima Trinidad,* 20 U.S. 283 (1822) ................................................................. 32
*U.S. v. Barile,* 286 F.3d 749 (4th Cir. 2002) ................................................................... 21
*Welch v. Chao,* 536 F. 3d 269 (4th Cir. 2008) .............................. 7, 8, 9, 12, 14, 16, 18

## Statutes

15 U.S.C. § 7201(7) ........................................................................................................ 13
15 U.S.C. § 7212 ............................................................................................................. 14
15 U.S.C. § 7233 ............................................................................................................. 14
15 U.S.C. § 7243 ............................................................................................................. 14
15 U.S.C. § 78l ............................................................................................................... 16
15 U.S.C. § 78o(d) .......................................................................................................... 16
18 U.S.C. § 1514A(a)(1) ......................................................................... 1, 7, 15, 17, 21
18 U.S.C. § 1514A(b) ........................................................................................................ 7
49 U.S.C. § 42121(b) (2000) ............................................................................................. 7

## Rules and Regulations

17 C.F.R. § 243, Regulation FD .............................................................................. 16, 19, 20
29 C.F.R. § 1980.104(b)(1) (2007) ..................................................................................... 7
Adopting Release for Regulation FD, 65 FR 51738 (August 24, 2000) ................................. 19
Fed. R. Civ. P. 56 ......................................................................................................... 5, 6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division

| | | |
|---|---|---|
| CYNTHIA L. HARKNESS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 1:08-CV-00231-CCB |
| | ) | |
| C-BASS DIAMOND, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT[1]

Plaintiff Cynthia L. Harkness ("Harkness" or "Plaintiff") claims Defendant C-Bass Diamond LLC ("Defendant") terminated her employment as Defendant's General Counsel in violation of the employee protection provisions of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A(a)(1) ("the Act"). Based on undisputed material facts, Plaintiff's claim does not meet the elements for a cause of action under the Act and Defendant is entitled to summary judgment as a matter of law.

## I. Introduction and Summary of Argument

In her First Amended Complaint[2] [Doc 22] ("Complaint"), Plaintiff identifies two instances of "protected activity" under the Act: one arising from an incident in January 2005,

---

[1] Simultaneously with this Memorandum, Defendant files its Statement of Material Facts not in Dispute, which is incorporated herein by reference, and its tabbed, indexed Appendix of Exhibits in Support of Defendant's Motion for Summary Judgment. In this Memorandum, Defendant will refer to the numbered paragraphs of its Statement of Material Facts not in Dispute as "Defendant's Facts at __" and to Exhibits in the Appendix as "Ex. __."

[2] Plaintiff filed her First Amended Complaint, in part, to effect the substitution of C-Bass Diamond LLC as defendant in place of Fieldstone Investment Corporation because Fieldstone had merged with and into C-BASS Diamond LLC, with the latter as the surviving entity. Because Plaintiff's Complaint continues to refer in the main to "Fieldstone" as to events prior to the merger, because relevant documentary evidence refers to "Fieldstone," and because the parties have adopted that form of reference for purposes of depositions, Defendant uses that name in this Memorandum for convenience and consistency of reference.

before Defendant was publicly traded, when Plaintiff reported her mistaken belief that the CEO had violated a regulation of the Securities and Exchange Commission ("SEC") by discussing non-public information with an investor (see Complaint at ¶¶ 24-27); and the other arising from a report made by Plaintiff in December 2006, when Defendant was a publicly traded company, to its Audit Committee, where she expressed concern that the Company did not have a sufficient commitment to compliance with its legal obligations because her requests for more compliance staff and resources had been turned down. (See Complaint at ¶¶ 38-39)

As discussed in the following sections of this memorandum, the facts show that Defendant did not retaliate against Plaintiff in violation of the Act when it terminated her employment. The December 2006 incident, which occurred several weeks before Defendant terminated Plaintiff's employment, cannot qualify as protected activity because she did not report any fraud or other illegal conduct by the Company or its management. To the contrary, as a regular part of her job, Plaintiff supplied quarterly affirmations that she was not aware of any fraud or improper activity, and she concedes that when specifically pressed at the December meeting, she confirmed that she was not aware of any violations of law. Instead, she stated she was only concerned because she felt she did not have sufficient resources to assure herself of the absence of violations.

The January 2005 incident cannot qualify as protected activity because it occurred before the company was "publicly traded," such that the Act did not apply and thus could not attach to her conduct. Furthermore, even if the Act does apply to employee activity undertaken before a Company is publicly traded, Plaintiff's actions in January 2005 still do not qualify as protected activity because (1) she acknowledges that she had no subjective belief that an *actual* violation of law had occurred; (2) she could not have held an objectively reasonable belief that activity she

2

reported was a violation of the law within the meaning of the Act; and (3) no inference of retaliatory motive may be inferred, and no causality shown, when the protected activity took place 23 months before the alleged retaliatory act.

Furthermore, Plaintiff admits that she informed the Company on December 12, 2006 that she intended to resign and asked for a severance proposal. Her independent act of disengaging from the Company prior to being "terminated" defeats any inference that the termination was in retaliation for either incident.

## II.    General Background and Procedural History

In 2003, Fieldstone Mortgage Company ("FMC") was in the business of originating mortgage loans and also did some securitization of those loans. (Transcript of Deposition of Michael Sonnenfeld[3] at 13) In 2004, Fieldstone Investment Company ("Fieldstone") was a non-publicly traded company whose stockholders included outside investors who had purchased shares via a private placement. (Ex. A, Sonnenfeld Tr. at 14) Fieldstone became the parent of FMC as its wholly owned subsidiary. It served as a holding company and supplied management services (see id.), while FMC was the operating arm of the enterprise and funded residential mortgage loans in various states across the country. (See Complaint at ¶ 14)

Fieldstone applied with the Securities and Exchange Commission to become a publicly traded company in 2004. (Defendant's Facts at 2)

Also in 2004, Fieldstone adopted a voluntary, internal Code of Business Conduct of the type used by publicly traded companies. It included a provision that prohibited employees from disclosing material, non-public information about the Company. (Defendant's Facts at 3)

Also in 2004, Fieldstone began creating and implementing internal control procedures

---

[3] Cited portions of the transcript of Michael Sonnenfeld's deposition are attached as Ex. A, and will hereafter be cited as "Ex. A, Sonnenfeld Tr. at ___".

and systems of the type required to be utilized by publicly traded companies under the Sarbanes-Oxley Act, including the creation of an Audit Committee comprised of independent directors. (Defendant's Facts at 4)

Fieldstone's application to become a publicly traded company was approved on or about February 2, 2005. (Defendant's Facts at 5)

At all times prior to approval of its application, Fieldstone was not a publicly traded company. (Defendant's Facts at 6;(Transcript of Deposition of Plaintiff Cynthia Harkness at 116-117[4]; see Complaint at ¶¶ 9, 30)

Plaintiff Cynthia Harkness is a lawyer. She served as General Counsel of Fieldstone from her hire in 2004 until termination of her employment with the company on January 15, 2007. (Defendant's Facts at 7) The decision to terminate her employment was made by Michael Sonnenfeld, Fieldstone's CEO.[5] (Ex. A, Sonnenfeld Tr. at 18)

On or about December 12, 2006, Harkness met with Fieldstone's Vice President for Human Resources, Andrew Goresh, and tendered her resignation subject to receiving a suitable severance package. She then took leave. On her return, she met again with Goresh who provided her a severance package and agreement, and informed her that her employment was terminated effective December 31, 2006. She and Goresh then worked out a transition period for her duties, agreeing to extend her final employment date to January 15, 2007. (See Defendant's Facts at 46, 48) Harkness rejected Fieldstone's severance offer of 18 months pay, and demanded a severance payment of $1.2 Million. (Id. at 48; Transcript of Deposition of Andrew Goresh at

---

[4] Cited portions of the transcript of Cynthia Harkness' deposition are attached as Ex. F, and will hereafter be cited as "Ex. F, Harkness Tr. at ___".

[5] Sonnenfeld and Fieldstone adamantly deny that Harkness was terminated in retaliation for the conduct she has characterized as protected activity, specifically including the reports made and actions taken by Harkness in January 2005 and December 2006. (E.g., Ex. A, Sonnenfeld Tr. at 47-48; 137) However, Defendant acknowledges that Plaintiff will not concede this to be an undisputed fact for purposes of this motion.

37 (amount of offer), 38-40 (Plaintiff's demand for $1.2 Million)[6] The Company declined her counterproposal. (See id.)

One of Harkness' transition duties was to complete a "disclosure questionnaire" for the fourth quarter of 2006 in her capacity as chief legal officer. She did so with the assistance of her counsel, asserting in her responses to the disclosure questions that her termination was in violation of Title VII and the Sarbanes-Oxley Act. (Ex. F, Harkness Tr. at 84, 78-79) On or about March 8, 2007, Harkness filed a complaint against Fieldstone with the Department of Labor asserting a claim for retaliation under the Sarbanes-Oxley Act. (Complaint at ¶ 11) The Department of Labor rejected the claim, and Harkness filed for review of her complaint by the Office of Administrative Law Judges. (Complaint at ¶ 12) She withdrew that claim after the statutory holding period expired, and filed this case. (Complaint at ¶ 13)

FMC encountered business difficulties in 2006 and filed for Chapter 11 protection in the United States Bankruptcy Court for the District of Maryland in or about July. It is Defendant's understanding that most employees were let go and business activity ceased by September, 2006. (See Ex. II, Goresh Tr. at 44) Fieldstone's ownership interest in FMC was extinguished through the bankruptcy proceeding. FMC was liquidated and neither company operates today.

## III. Argument

### A. Summary Judgment Standard

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Supreme Court has clarified

---

[6] Cited portions of the transcript of Andrew Goresh's deposition are attached as Ex. HH and will hereafter be cited as "Ex. HH, Goresh Tr. at ___".

this does not mean that any factual dispute will defeat the motion: "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material fact.*" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.,* 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). *See also Cleary v. Green, 2008 U.S. Dist. LEXIS 91834* (D. Md.) (same).

### B. The Sarbanes-Oxley Act And Whistleblower Protection

The Sarbanes-Oxley Act creates "whistleblower" protection for employees of publicly traded companies by prohibiting employers from retaliating against employees because they provided information about potentially unlawful conduct. Specifically, the Act provides:

WHISTLEBLOWER PROTECTION FOR EMPLOYEES OF PUBLICLY TRADED COMPANIES. No company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78l), or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934

6

(15 U.S.C. § 78o(d)), or any officer [or] employee ... of such company, may discharge ... an employee ... because of any lawful act done by the employee —
    (1) to provide information ... regarding any conduct which the employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the [SEC], or any provision of Federal law relating to fraud against shareholders, when the information ... is provided to ...
    ... a person with supervisory authority over the employee ....

18 U.S.C. § 1514A(a). *See also Welch v. Chao*, 536 F. 3d 269, 275 (4th Cir. 2008); *Livingston v. Wyeth, Inc.,* 520 F.3d 344, 351 (4th Cir. 2008); *Allen v. Admin. Review Bd.,* 514 F.3d 468, 475 (5th Cir. 2008).

    This whistleblower protection provision adopts the burden-shifting framework applicable to whistleblower claims brought under the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, 49 U.S.C. § 42121(b) (2000). *Welch*, 536 F. 3d at 275; *Livingston,* 520 F.3d at 351; *Allen*, 514 F.3d at 475. *See also* 18 U.S.C. § 1514A(b). Accordingly, an employee bears the initial burden of making a *prima facie* showing of retaliatory discrimination; the burden then shifts to the employer to rebut the employee's *prima facie* case by demonstrating by clear and convincing evidence that the employer would have taken the same personnel action in the absence of the protected activity. *Welch, supra*, citing 49 U.S.C. § 42121(b)(2)(B).

    The Department of Labor's regulations implementing § 1514A provide that in order to make her *prima facie* showing, an employee must allege [and ultimately prove by a preponderance of the evidence] that: (1) the employee engaged in protected activity; (2) the employer knew, actually or constructively, of the protected activity; (3) the employee suffered an unfavorable personnel action; and (4) the circumstances raise an inference that the protected activity was a contributing factor in the personnel action. 29 C.F.R. § 1980.104(b)(1) (2007). *See also Welch, supra*, citing 29 C.F.R. § 1980.104(b)(1) to the same effect.

    To satisfy the first element and establish that she engaged in protected activity, an

employee must show that she had both "a subjective belief and an objectively reasonable belief" that the conduct she complained of constituted a violation of relevant law. *Welch, supra*; *Livingston*, 520 F.3d at 352. Additionally, "an employee must show that [her] communications to [her] employer 'definitively and specifically relate[d]' to one of the laws listed in § 1514A." *Welch, supra* (citations omitted); *Allen*, 514 F.3d at 477 (same); *Platone v. FLYI, Inc.*, ARB Case No. 04-154, 2006 WL 3246910, at *8 (ARB Sept. 29, 2006) (same), aff'd, *Platone v. U.S. Dept. of Labor*, 548 F.3d 322 (4th Cir. 2008).

As set out in the following sections, Harkness cannot establish one or more of these elements as to both of the incidents she claims as protected activity. Because her December 2006 meeting with the Audit Committee occurred more proximately to the alleged unfavorable personnel action (i.e., the termination of Harkness' employment)[7], Defendant will address that incident first.

### C. Plaintiff's December 5, 2006 Meeting With The Audit Committee Was Not "Protected Activity"

First and foremost, Plaintiff concedes that the conduct she complained of during her meeting with the Audit Committee on December 5, 2006 *did not* constitute a violation of relevant law. (Defendant's Facts at 56–60) Further, she could not have made such a report nor held such a belief in subjective or objective good faith – at her deposition in this matter, Harkness confirmed that as of the date of the meeting, she had no knowledge of any actual violations of law by Fieldstone. (Ex. F, Harkness Tr. at 100)

---

[7] In her Complaint, Harkness seems to suggest that the Company's failure to agree to her counterproposal for severance pay of $1.2 Million was also an act of retaliation in violation of the Act. (See Complaint ¶ 41, 47) Of course, it is inherently inconsistent to claim that her termination was appropriate but a voluntary severance offer to an at-will employee was retaliation. To the extent that Harkness makes such a claim, she cannot offer any comparator to show that she received disparate treatment. The $1.2 Million package she alleges was offered to another senior employee terminated before her was provided to the employee based upon money due him under his employment contract. (Ex. HH, Goresh Tr. at 38) Harkness did not have a contract, and was employed at-will.

Indeed, after Harkness stated her complaints, one of the Committee members asked her specifically if she was aware of any illegal actions by the Company. (Ex. FE, Declaration of Cynthia Harkness at ¶ 6; Ex. F, Harkness Tr. at 99-100; Ex. D, Transcript of Jonathan Michael at 78, 80; Ex. GG, Declaration of Celia Martin at ¶ 3) Harkness stated that she was not. (Id.)

Instead, Harkness bases her claim that she engaged in protected activity on having complained to the Committee: (1) that the departments reporting to her were understaffed and her requests for more staff or outside resources were being ignored, which gave her concern that the Company could be in violation of lending practice laws and she would not know it; and (2) that she was being excluded from some senior level meetings and events at the Company, which gave her concern that she and her staff could not be certain that disclosures made in public filings were accurate or that the "tone at the top" of the Company exhibited a commitment to compliance. (Defendant's Facts at 57; Complaint at ¶¶ 38-39). On its face, complaining about understaffing and a lack of faith in the "tone at the top" of the Company is not a communication about a violation of the law. It is no crime to understaff a department, even a compliance department, and it is no crime not to include counsel at meetings, even meetings so consequential they might have to be reported to the market. Moreover, this generic complaint that she could not be sure of compliance because of the "tone at the top" does not meet the requirement that "an employee must show that [her] communications to [her] employer 'definitively and specifically relate[d]' to one of the laws listed in § 1514A." *See Welch*, 536 F.3d at 275 (citations omitted); *Allen*, 514 F.3d at 477 (same); *Platone*, 2006 WL 3246910, at *8 (same).

Regardless, Harkness' own internal reports, filed systematically by her for a period of two years both before and after her meeting with the Audit Committee, confirm she had no subjective belief that violations had occurred or were occurring, and if she did, her belief could

not have been objectively reasonable. Specifically, among Harkness' obligations and undertakings as general counsel of a public company were the following quarterly written reports:

1. To certify that she had disclosed **any fraud** involving management

2. To complete a questionnaire by stating whether she was aware of **any illegal acts** committed by the Company or management

3. To complete a questionnaire by stating whether she was aware of **any fraud or other improper activity** by a member of management

(Defendant's Facts at 49-54; Ex. F, Harkness Tr. at 45; see also certification forms (Ex. S-Y) and disclosure questionnaire excerpts (Ex. Z-DD) for the period from the first quarter of 2005 thought the third quarter of 2006 (relevant passages highlighted for ease of review))

Harkness took her obligation to make accurate reports seriously, performed her obligations in this regard diligently and stands by the accuracy of these reports today based upon the knowledge she had as of the date she submitted each report. (Ex. F, Harkness Tr. at 45-46) Harkness never reported fraud by the Company during her tenure as an employee, and these reports confirm that Harkness was not aware of any acts by the Company or its managers that she considered to be fraudulent, or violations of the law, or otherwise improper within the bounds of the disclosure obligations of a public company through the date of her termination. (Ex. S-DD; Ex. F, Harkness Tr. at 68-69) Even after termination, the only improper or illegal activity reported by Harkness in her final disclosure questionnaire, submitted with the assistance of her counsel in January 2007, was that she had been terminated in violation of the Sarbanes-Oxley Act and based upon her sex in violation of Title VII. (Defendant's Facts at 60-61)

These contemporaneous documents and recollections notwithstanding, at her deposition

in this matter Plaintiff asserted that she might also have told the Committee that her staffing concerns related to periodic contacts from states about state lending law compliance issues arising from older individual loans, predating when the Company even had a legal department, and her inability due to lack of resources to proactively look for similar issues with other closed transactions. (Compare Ex. F, Harkness Tr. at 98-99 (describing discussion of issue with auditors) and 100-101 (alleged dialogue regarding same with Committee and her request for additional resources to review historic record[8]) with Ex. FF, Harkness Declaration at ¶ 6 (where Harkness relates that her concern with understaffing was whether she had enough capacity to keep up with changes in state laws and to review current transactions to check for errors and detect misconduct by field staff) and Ex. HH (Harkness' talking points, which include no reference to violations of state law) To the extent Plaintiff intended this testimony to mean that she was reporting known violations of law by complaining about her staffing needs, this post-hoc addition to her version of the meeting should not be credited. She should be held to her original description of her December 5 complaint to the Committee, as provided to the Department of Labor when she initiated this proceeding in her contemporaneous Declaration to the DOL.

---

[8] Notably, and regardless of whether she actually made such a report about historic lending errors to the Committee, Plaintiff affirmed at her deposition that the description in the Company's SEC filings of its compliance process as to lending requirements was correct, and her concern was whether they were actually achieving compliance with the process described. (Ex. F, Harkness Tr. at 101) In terms of ongoing or current compliance by the Company with lending laws as of December 2006, it is worth noting that in 2006 Fieldstone had rolled out a new program for its loan originations known as Empower, whose lending documents had been extensively reviewed with full sign-off as to compliance by Harkness' legal and compliance departments. (Defendant's Facts at 45) In short, whatever Harkness' concerns may have been about historic errors that were "popping up" periodically, the fact remains that – as she related to OSHA at the time she filed her initial complaint under the Act – her only current or ongoing concern was her belief that she lacked the staff and resource to be sure the Company was keeping up with changes in the law and to audit transactions for errors. (See Ex. FF, Harkness Declaration at ¶ 6) It bears repeating that when Harkness filed her final disclosure questionnaire a month later, she did not report any of these concerns as rising to the level of reportable fraud, violation of law, or other improper activity by Fieldstone, and the only violation of law she did report being aware of was her own termination from employment. (Defendant's Facts at 61)

Regardless, the discussion of historic violations Plaintiff now seeks to leverage into a claim still does not meet her burden to demonstrate that she engaged in protected activity within the meaning of the Act. Reviewing courts, and in particular the Fourth Circuit, have consistently held that complaining about violations of law under some other statutory scheme is not protected activity; to be protected, the employee's complaint must refer explicitly to a company's violation under one of the four listed criminal statutes, the rules or regulations of the SEC, or otherwise implicating fraud against shareholders. *Welch*, 536 F. 3d at 276; *Livingston*, 520 F.3d at 351 & n 1; *see also Day v. Staples, Inc.*, 555 F.3d 42, 55 (1st Cir. 2009) (billing discrepancies do not rise to level of shareholder fraud, and are not protected); *Platone v. U.S. Dept. of Labor*, 548 F.3d 322, 327 (4th Cir. 2008) (same). Here, complaints about historic violations of state lending laws, such as usury, plainly did not "definitively and specifically" related to one of the statutes listed in the Act. Moreover, Harkness herself never characterized this conduct as fraud, and she confirmed that she did not consider the Company's SEC filings to be improper on account of her concerns as expressed to the Committee.

Accordingly, Plaintiff's admission that she reported no violations of law during her December 5 meeting with the Audit Committee must be taken at face value, and judgment entered in favor of Defendant on the claim that it retaliated against her for the December 5 report because she cannot make a *prima facie* showing of protected activity.

**D.     Plaintiff's January 2005 Reports To The Audit Chair Were Not "Protected Activity"**

**1. The Act does not apply because Fieldstone was not a publicly traded company**

Fieldstone's application to become a publicly traded company was approved on or about February 2, 2005. (Defendant's Facts, No. 5) On or about January 26, 2005, Harkness issued

her report about the events of January 2005 and her review of a potential violation of SEC Regulation FD to Fieldstone's Audit Chair, and in that report acknowledges that Fieldstone was not then subject to Regulation FD because its application to become a publicly traded company had not been approved. Ex. C at pp. 2-3, ¶ 10. Accordingly, none of the actions Harkness alleges to be protected activity occurred while the Company was subject to 18 U.S.C. § 1514A(a), the whistleblower protection provision of the Sarbanes-Oxley Act, she cannot be deemed a "whistleblower" based on these actions, and Defendant is entitled to judgment as a matter of law.

Defendant's research has revealed no reported decisions of courts or the Administrative Review Board addressing the applicability of the Act to employee actions undertaken before her employer became a publicly traded company.[9] However, Congressional intent not to have the provision apply may be discerned both from the title of the provision ("Whistleblower protection for employees of publicly traded companies") and, of equal or greater importance, from Congress' decision to make other provisions of the Sarbanes-Oxley Act applicable to companies before they become publicly traded. Specifically, under Sarbanes-Oxley, "Issuer" is defined as:

> an issuer (as defined in section 3 of the Securities Exchange Act of 1934 (15 U.S.C. 78c)), the securities of which are registered under section 12 of that Act (15 U.S.C. 78l), or that is required to file reports under section 15(d) (15 U.S.C. 78o(d)), *or that files or has filed a registration statement that has not yet become effective under the Securities Act of 1933* (15 U.S.C. 77a et seq.), and that it has not withdrawn.

15 U.S.C. § 7201(7) (emphasis supplied). In turn, other requirements of Sarbanes-Oxley are triggered if a company is an "Issuer." For example, only accounting firms registered with the

---

[9] The question has apparently been addressed at the agency level by only one Administrative Law Judge, who found – without analysis – that the Act does apply when the adverse action is taken after the employer become subject to the Act. *See Gallagher v. Granada Entertainment USA*, 2004-SOX-74 (ALJ April 1, 2005). The opinion does not addresses Congressional intent, as discussed above. Accordingly, Defendant believes the decision is incorrect.

Accounting Oversight Board may prepare reports for an Issuer (15 U.S.C. § 7212), accountants engaged by Issuers are subject to all of the auditor independence provisions (15 U.S.C. § 7233), and enhanced forfeiture provisions apply to certain executives of Issuers (15 U.S.C. § 7243). By contrast, the Whistleblower protection provision is not made applicable to employees of an "Issuer," as defined to include companies with shares in registration, and instead specifically, and thus intentionally, is made applicable only to employees of companies whose stock is already registered for public trading.

### 2. Plaintiff did not report a violation of relevant law, and had no subjective belief that she was reporting a violation

As set out above, to satisfy the first element of the Act and establish that she engaged in protected activity, Harkness must show that she had both "a subjective belief and an objectively reasonable belief" that the conduct she complained of constituted a violation of relevant law. *See Welch,* 536 F. 3d at 275; *Livingston,* 520 F.3d at 352; *accord Allen,* 514 F.3d at 480, n.9 (while employee "does not need to prove an actual violation of the law occurred, the employee does need to prove that [her] belief was objectively reasonable under the circumstances"). Thus, the employee must show both that she actually believed the conduct complained of constituted a violation of pertinent law and that "a reasonable person in [her] position would have believed that the conduct constituted a violation." *Livingston,* 520 F.3d at 352; *accord Allen,* 514 F.3d at 477, 479 (because employee was a CPA, the reasonableness of her belief must be evaluated from the perspective of an accounting expert). The undisputed fact that Plaintiff was unsure whether she was reporting a violation (Defendant's Facts at 23) is sufficient to defeat her claim because she did not hold the requisite subjective belief.

By her own admission, Harkness was reporting nothing more than a *possible* violation of law. She was not reporting an event she knew, or even believed, to be an *actual* violation. At

the time Plaintiff reported her concern about what potentially *might* be a violation to the Audit Chair (see Ex. F, Harkness Tr. at 126, 129), she knew, first, that Fieldstone was not publicly traded, second, that Fieldstone had already issued its press release and, third, that Sonnenfeld had informed the investor that the information was confidential. (Defendant's Facts at 8, 13, 21) Plaintiff cannot have considered this possible violation to have been actual or even probable, because she never researched nor sought advice as to what steps Fieldstone needed to take to cure an actual violation, nor how quickly such steps had to be taken. At best, she understood that she was reporting an issue that might call for further review. (Ex. F, Harkness Tr. at 129) Without even a subjective belief of an actual violation, Plaintiff does not satisfy that element of a claim under the Act. See 18 U.S.C. § 1514A(a). Of course, in short order she learned conclusively that there was no actual violation.

### 3. Plaintiff's belief that she was reporting a possible violation of Regulation FD does not qualify under the Act and was not objectively reasonable

Evaluated from the legal expert perspective of a lawyer who was the general counsel of a company in registration with the SEC to become publicly traded, Harkness could not have held an objectively reasonable belief that Regulation FD was violated as a result of Sonnenfeld's actions when she contacted the Audit Committee Chair on January 17, 2005. Defendants Facts at Nos. 13-22 and 26-28 set out in detail what Harkness knew and when she knew it, as well as her absolute failure to take a single step to educate herself as to whether Regulation FD was even applicable to Fieldstone in the first place, when she knew it might not be. The most critical of these facts for purposes of evaluating the objective reasonableness of Plaintiff's belief are discussed below. Based upon these undisputed facts, the court may, and should, conclude that Plaintiff could not have held an objectively reasonable belief that she was reporting a violation of Regulation FD when she spoke with the Chair of Fieldstone's Audit Committee about

Sonnenfeld's actions. *See Welch*, 536 F.3d at 278, n. 4; *Jordan v. Alternative Resources Corp.*, 458 F.3d 332, 240 (4th Cir. 2006); *Gould v. Davis*, 165 F.3d 265, 269 (4th Cir. 1998). *See also Livingston*, 520 F.3d 352 & n.2, 355, 356 (citing *Jordan* and deciding as a matter of law that plaintiff did not have an objectively reasonable belief that he was reporting a violation of relevant law).

At the outset, and as predicate to the following review, Defendant notes that in fact and in law, Sonnenfeld's actions were not and could not have been in violation of Regulation FD. By its express terms, the Regulation applies only to the same entities as does the Whistleblower protection provision of Sarbanes-Oxley, that is, companies with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78l), or that are required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. § 78o(d)). *See* Regulation FD, codified at 17 C.F.R. § 243. The liability phase testifying experts for Plaintiff and Defendant agree on this point, and Plaintiff's expert conceded at his deposition that any competent securities lawyer would have said as much to Plaintiff, had she bothered to consult one to secure this vital information at the outset.[10] Likewise, every lawyer who had any role in this matter in January 2005 was of the same opinion. As reported in Harkness' January 26 written report, after speaking with Harkness, Audit Chair Jonathan Michael consulted his own counsel who informed him that Regulation FD did not apply. (Ex. C at ¶ 10) Michael relayed this to Harkness and instructed her to confirm. Only then did Harkness direct her Associate Counsel Sally LaFond to review the law, which confirmed that Regulation FD did not apply. (Ex. C at ¶ 12)

---

[10] As to Plaintiff's expert, Ivan Knauer, see Ex. JJ, Excerpts of the Deposition of Ivan Knauer at 47 (Regulation FD did not apply), 71, 74-75 (if consulted, securities counsel would have reached same conclusion, and Harkness would have had no reason to report to the Audit Chair). As to Defendant's expert, Anthony W. Djinis, see Ex. KK, Expert Report of Anthony W. Djinis at 3.

Harkness' uninformed belief regarding Regulation FD was not reasonable for a lawyer in her position. In order for a general counsel such as Harkness to obtain a reasonably objective belief that Regulation FD had (or had not) been violated as a result of Sonnenfeld's actions, it was necessary for her first to resolve the threshold question of whether Regulation FD applied to Fieldstone. This exercise was particularly mandated here since, as a result of Plaintiff's interviews of Partlow and Argires, she was put on express notice that Regulation FD might not be applicable at all.

Moreover, Harkness had other information readily at hand which should have caused her to test her threshold "assumption" that Regulation FD might apply to Fieldstone. First, she had no basis for her assumption. (Ex. F, Harkness Tr. at 127, 140) Second, she knew that Fieldstone was not then filing "disclosure" reports (like 10Ks and 10Qs), because it as yet had no obligation to meet these affirmative disclosure obligations under section 15(d) of the Securities and Exchange Act (i.e., was not a public reporting company). (See Ex. JJ, Knauer Tr. at 42-44)

When a company has filed an application to become publicly traded, a prudent and competent general counsel would generally familiarize herself with the various SEC rules and regulations applicable to the company during the registration process as well as those SEC rules and regulations with which the company would have to comply after becoming publicly traded, such as Regulation FD. Here, in fact, Harkness understood that to be her role (see, e.g., Complaint ¶ 17) and had a generalized understanding of what Regulation FD requires, so it stands to reason that she should have made it her business to know when compliance became mandatory for Fieldstone. Thus, a prudent and competent general counsel should generally understand that Regulation FD does not apply to a company "in SEC registration" until its application to become a publicly traded company has been declared effective. Harkness never

took steps to acquire this knowledge.

If a general counsel is not certain of the applicability of a particular SEC rule or regulation, including Regulation FD, a general counsel typically has various resources available to readily determine such rule's applicability.[11] First, as a lawyer, the general counsel has been trained to review the SEC Rule in question as well as the proposing and adopting releases for the rule to gain an understanding of its applicability and requirements. In this case, Harkness admittedly did not conduct a review of Regulation FD or the SEC's proposing and adopting releases concerning Regulation FD, before contacting the Audit Committee Chair on January 17, 2005 about Sonnenfeld's actions.

The express terms of Regulation FD as well as the SEC's proposing and adopting releases (which were readily available on the SEC's website) make clear that only publicly traded companies are required to comply with Regulation FD. (Ex. KK, Djinis Report at 3) Harkness admittedly knew at the time that Fieldstone was not a publicly traded company, but upon receiving the report of Sonnenfeld's actions, she failed to familiarize herself with the basic elements of Regulation FD so as to determine its applicability to Fieldstone as of January 2005. At the time, Harkness was the chief legal officer of the Company, and understood her job duties to encompass bringing Fieldstone into full compliance with applicable securities regulations and filing procedures. (Complaint ¶ 17) Remarkably, given this context, she also undertook no research or consultation to determine what remedial obligations Fieldstone might have if Regulation FD had been violated, nor how much time Fieldstone had to meet those obligations.

Other means by which a general counsel could have found out the answer to the question

---

[11] At her deposition, Harkness readily acknowledged that that lawyers are trained to issue spot, that lawyers should distinguish false from real issues to best serve their clients, that knowledge is key to differentiating, and that knowing whether Regulation FD applied at all was a key to differentiating whether Sonnenfeld's actions were a real legal concern. (Ex. F, Harkness Tr. at 134-35)

about the applicability of Regulation FD were to instruct an attorney on her staff to research the issue or to consult with outside securities counsel. In this case, Harkness had on her staff an assistant general counsel, LaFond, who was capable of conducting research on securities issues. However, Plaintiff admittedly did not request LaFond to determine whether Regulation FD was applicable to Fieldstone and Sonnenfeld's actions, and LaFond did not advise Plaintiff that she had researched this issue, before Harkness reported Sonnenfeld's actions to the Audit Committee Chair on January 17, 2005. Moreover, Harkness did not consult with Hogan & Hartson, Fieldstone's outside securities counsel on this vital, threshold question.

Had Harkness conducted (or directed) a review of the relevant rule and SEC releases for either purpose – whether to confirm that the Regulation applied or to learn how to cure a violation – she would have readily discerned that a company that had merely filed an application to become publicly traded was not yet subject to Regulation FD and, therefore, Regulation FD could not have been violated by Fieldstone as a result of Sonnenfeld's actions. *See* Regulation FD, 17 C.F.R. § 243.100, 101(b); Adopting Release, 65 FR 51738 at II.B.6 (August 24, 2000) (available online at www.sec.gov/rules/final/33-7881.htm).

Because Plaintiff was unclear but failed to take any of these above-described steps to determine the threshold question of whether Regulation FD applied to Fieldstone, Plaintiff could not have held an objectively reasonable belief as to whether Regulation FD had been violated. *See Allen*, 514 F.3d at 479 (CPA's "suspicion" that Company's SEC filings violated law when she complained about false and misleading accounting records was not objectively reasonable when she could have conducted basic research within the scope of her professional training that would have confirmed whether or not there was an actual violation, but did not).

A second and independent reason why Harkness could not have held an objectively

reasonable belief, in her capacity as a lawyer serving as the general counsel of a company planning to go public, is that her theory of the violation does not comport with another basic element of Regulation FD. Regulation FD does not prohibit a senior officer of a publicly traded company from disclosing non-public material information to all shareholders of the company, but only those investors who are reasonably likely to buy or sell the company securities on the basis of the material non-public information. *See* Regulation FD, 17 C.F.R. § 243.100, 101. (See also Ex. KK, Djinis Report at 3, discussing same) In this case, Harkness was told by Partlow and Argires that Sonnenfeld informed the investor that he could not use the information for any purpose. Plaintiff did not interview Sonnenfeld or the investor and did not have any evidence that the investor was likely to trade on the information disclosed by Sonnenfeld, notwithstanding Sonnenfeld's admonition. Therefore, Plaintiff lacked the necessary information upon which to form a reasonably objective belief that this basic element of Regulation FD had been met when she contacted the Audit Committee Chair on January 17, 2005.[12]

### 4. Plaintiff's and Defendant's experts

The positions taken by the parties' experts do not create an issue of fact and, to the

---

[12] Furthermore, nothing Harkness learned thereafter could serve to elevate her belief to "objectively reasonable." After first reporting to the Audit Committee Chair on January 17, 2005, Plaintiff interviewed Sonnenfeld for the first time. Sonnenfeld advised Plaintiff that before he divulged to the investor information concerning the SEC's comment letter and Fieldstone's intent to submit restated financial statements, he told the investor that the investor could not trade based upon the information. Sonnenfeld further advised Plaintiff that it was his understanding that the investor had agreed not to purchase or sell any Fieldstone securities until after Fieldstone's restated financial statements had been issued. As noted previously, during her investigation Plaintiff did not interview the investor or obtain any information to the contrary.

Thereafter, on January 19, 2005, the Audit Committee Chair informed Plaintiff that he had spoken with securities counsel and had been advised that Sonnenfeld's conduct did not violate any securities laws and that Fieldstone was not subject to Regulation FD. Thereafter, for the first time, Plaintiff, with the assistance of LaFond, reviewed Regulation FD and concluded that securities counsel's determination that Regulation FD did not apply was probably correct. She was, in any event, sufficiently satisfied with this opinion that she took undertook no further legal or factual research. Thus, under these circumstances, any possible belief held by Plaintiff that Regulation FD had been violated as a result of Sonnenfeld's actions was even more unreasonable and certainly not reasonably objective.

contrary, confirm that Defendant is entitled to judgment as a matter of law. The "objective reasonableness" of Harkness' belief regarding the meaning and legal import of SEC Regulation FD is the "ultimate issue" in determining whether her report is Sarbanes-Oxley-protected activity. *See, e.g., Livingston.*, 520 F.3d at 352. Although "ultimate issue" testimony is no longer absolutely proscribed, "Rule 704(a) does not permit the expert witness to usurp the province of the judge." *Adalman v. Baker, Watts & Co.*, 807 F.2d 359, 368 (4th Cir. 1986). As noted by the Fourth Circuit in *U.S. v. Barile*, 286 F.3d 749 (4th Cir. 2002),

> To determine when a question posed to an expert witness calls for an improper legal conclusion, the district court should consider first whether the question tracks the language of the legal principle at issue or of the applicable statute, and second, whether any terms employed have specialized legal meaning.

286 F.3d at 760-61 (finding District Court within its discretion to exclude testimony about whether document contained "materially misleading statements" as legal conclusion because materiality has a specialized legal meaning). In *Livingston*, the Fourth Circuit addressed the pertinent part of Plaintiff's burden under Sarbanes-Oxley, 18 U.S.C. § 1514A(a)(1), finding,

> To "reasonably believe" that company conduct "constitutes a violation" of law, as those terms are used in § 1514A(a)(1), Livingston must show not only that he believed that the conduct constituted a violation, but also that a reasonable person in his position would have believed that the conduct constituted a violation. It would make no sense to allow Livingston to proceed if he himself did not hold the belief required by the statute, and the language of the statute itself requires that the belief be a "reasonable" one. 18 U.S.C. § 1514A(a)(1). Thus, § 1514A requires both a subjective belief and an objectively reasonable belief that the company's conduct constitutes a violation of the relevant law.

520 F.3d at 352. The "specialized terms" and seminal legal conclusions in Knauer's report closely track the *Livingston* Court's language and standard. As such, any question fairly based upon the expert report would have to address Knauer's legal conclusions – improper legal conclusions per the Fourth Circuit's guidance. Thus, at best, Knauer's report and his carefully

phrased opinions should be taken only for what they say about what an attorney in Harkness' position might know, and what she should do based upon her knowledge, or lack of knowledge.

Taken in fair context, all that Knauer opines is that when LaFond first reported to Harkness, it was reasonable for a general counsel who was ignorant of the law to believe that Sonnenfeld's actions *might* be a violation of Regulation FD, not that Sonnenfeld's conduct "constitute[d] a violation of the relevant law." *See id.* Indeed, the careful phrasing of Knauer's report confirms as much: "it is my opinion to a reasonable degree of certainty that it was objectively reasonable for Cynthia Harkness to believe that the actions of Michael Sonnenfeld on January 14, 2005, constituted a potential violation of a rule or regulation of the Securities and Exchange Commission, specifically SEC Regulation FD."

At the time Knauer prepared his report, Harkness had not been deposed. Thus, his report does not include, or comment on, background information as to Harkness aside from knowing that she was Fieldstone's general counsel and the contents of her January 26, 2005 report. His "snapshot" taken as of January 14 – the date that Harkness received the initial report from LaFond about what Sonnenfeld reportedly did the day before, necessarily assumes ignorance of the relevant law, and it leaves entirely out of the equation any steps she took, or failed to take, over the next three days prior to her phone call to Audit Chair Michael on January 17.[13]

---

[13] In particular, the following three passages from Knauer's deposition confirm the limited nature of his opinion:

> Q  Would you agree that for Cynthia Harkness'
> belief to be objectively reasonable she had to be
> ignorant of whether regulation FD applied to
> Fieldstone at that point in time?
>
> THE WITNESS:  Sorry.  Can I have it, please.
> (The reporter read the record at page 28,
> lines 20-21 and page 29, line 1 [sic], inclusive.)
>
> THE WITNESS:  I don't particularly like the

Thus, even if credited in full, Knauer's opinion does not address the objective reasonableness of Harkness' actual report to Michael. Of course, the actual report on January 17 was made after Harkness was put on notice by her interviews with Partlow and Argires that Regulation FD *did not apply*, after Harkness chose to research her own obligations under Sarbanes-Oxley but, inexplicably, not Fieldstone's obligations under the relevant law, and after she had ample opportunity to consult with Fieldstone's securities counsel, a consultation that

---

> word ignorant because it has pejorative
> implications but I think generally the answer to
> that is yes because as I understand it she was
> aware that there was an issue and wanted to
> educate herself more on the facts and the law.

Ex. JJ, Knauer Tr. 27:20 – 28:11.

>    ***
>
> A   The opinion that I have expressed to date is
> based on my understanding that she was not sure at the
> time she learned of those actions as to the nuances of
> whether Fieldstone was a, quote, issuer as defined by
> Reg FD.

Ex. JJ, Knauer Tr. 29:20 – 30:2.

>    ***
>
> Q   Okay.  So it follows that Ms. Harkness if she
> was not aware of when those obligations kicked in
> should have consulted with someone who did know;
> correct?
>  That's why you had the outside counsel
> available as a resource in other words?
>
> A   As I understand the facts that is essentially
> what happened.
>
> Q   So the answer is yes?
>
> A   The answer is that as I understand the facts
> Ms. Harkness became aware of a potential issue and ran
> it up the flag pole so to speak, at which point
> outside counsel was consulted, additional research was
> done and then ultimately this memorandum was written.

Ex. JJ, Knauer Tr. 43:20-44:11.

would have confirmed there was no "potential" violation of law, such that all she needed to report to Michael was an apparent violation of Fieldstone's Code of Business Conduct. As shown by the passages quoted above at footnote 13, during his deposition, Knauer effectively conceded as much. Accordingly, while it might be reasonable for a person in Harkness' position – a lawyer and thus by definition a legal expert – to believe there was a potential violation of the law at first blush, it was not reasonable for her believe that she was reporting a violation of the law at the time she called Michael. The *Allen* court held as much in the analogous circumstance of an accounting professional, and Harkness' own expert effectively agreed.

In contrast, Defendant's expert tackled head on the steps a prudent and competent general counsel would take, both before and after receiving the initial report. In Djinis' opinion, Harkness' admitted ignorance of whether or not Regulation FD applied to her company was wholly inconsistent with her own understanding of her obligations as general counsel of a company that had, and was undertaking, significant legal obligations under the securities laws. Thus, because of her professional obligations, her belief founded in knowing ignorance was not objectively reasonable. Likewise, in Djinis' opinion, Harkness' subsequent failure to take any steps to relieve her ignorance after receiving the initial report was also at odds with her professional obligations, and as of January 17, 2005 when she called the Audit Chair her belief was not objectively reasonable.

In the end, the fine line that Plaintiff and her expert seek to walk cannot hold. If her subjective belief was that a legal violation might have occurred, but she was unsure, then she has not met the basic requirement of the Act by reporting what she reasonably believed to be an *actual* violation of law. If instead Plaintiff's subjective belief was firm but wrong *and ignorant*, then, whether or not this belief was objectively reasonable for a lawyer and general counsel on

January 14, it was not by January 17 because: she was unsure; the information was readily available; and she failed to take a single step to inform her judgment.

### 5. Plaintiff's January 2005 reports are too remote in time to permit an inference of causation, and Plaintiff has no other evidence of causation

Sonnenfeld terminated Harkness' employment on December 29, 2006, 23 months after her January 17, 2005 call to the Audit Chair. These events are too remote to support Plaintiff's claim that her report caused her termination. As the Supreme Court held in affirming a grant of summary judgment as to a directly analogous claim by an employee that she was fired in retaliation for filing a charge of sex discrimination:

> The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be "very close," O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (CA10 2001). See e.g., Richmond v. Oneok, Inc., 120 F.3d 205, 209 (CA10 1997) (3-month period insufficient); Hughes v. Derwinski, 967 F.2d 1168, 1174-1175 (CA7 1992) (4-month period insufficient). Action taken (as here) 20 months later suggests, by itself, no causality at all.

*Clark County School District v. Breeden*, 532 U.S. 268, 273-74, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001). Thus, even if the events of January 2005 could qualify as protected activity, Defendant would still be entitled to summary judgment on this claim because Plaintiff cannot meet the fourth element of her prima facie case by showing that the protected activity was a contributing factor in the termination of her employment.

Defendant anticipates that Plaintiff will argue that Sonnenfeld was merely biding his time for revenge, and urge the court to find a prima facie case, despite the passage of nearly two years, from circumstantial evidence that she and Sonnenfeld did not get along, he took other adverse actions against her during those two years, and Fieldstone's Human Resources staff consulted with outside counsel in connection with some of these issues as they arose, including consultation about whether Harkness might claim retaliation under the Act. Individually or

collectively, none of these circumstances adequately supports Plaintiff's burden. These incidents, too, are remote in time, Harkness herself did not consider them to be retaliation under the Act, and there is nothing sinister, or even remarkable, about a company taking stock of claims an aggrieved employee might raise when unrelated personnel issues arise.

Relevant and undisputed events from the two years between the January 2005 reports and the termination make this plain, and include the following as set forth with record support in Defendant's Facts, Nos. 31 to 45.

On at least three occasions, February 22, 2005, April 6, 2005 and May 20, 2005, Sonnenfeld and Harkness met in the presence of a senior human resources officer to discuss disagreements and complaints concerning her conduct, his management of her and their working relationship. (Defendant's Facts at 33)

The respective issues and concerns reviewed during these ongoing meetings included: Harkness' concerns that Sonnenfeld had made sexist remarks about her and was discriminating against her or treating her disparately based on her sex, including with respect to her compensation, that there were mutual difficulties with effective communication, and that she was disappointed in her performance review; and Sonnenfeld's concerns that Harkness had gone around him to the Board's Compensation Committee to complain about her pay, that she should raise issues personal to her with him rather than with the Board, that she needed to be more of a team player, that he did not like subordinates who did not let him know when something was bothering them, that there were mutual difficulties with effective communication, and that she had made a poor selection on a choice of outside legal counsel. (Defendant's Facts at 34)

On March 9, 2005, Fieldstone's two most senior human resource officers, Jean Slone and Carol Ballentine, consulted with outside employment counsel, Tom Dowd, about risks attendant

to a proposal to change the reporting relationship of the Human Resources Department so that the Senior Vice President for HR (Slone) would report to Sonnenfeld instead of Harkness.[14] They consulted with outside counsel because they wanted advice about the potential that this decision could give rise to a facially colorable allegation of retaliation because Harkness had complained about a statement made by Sonnenfeld during her January performance review that she considered sexist, and because of Harkness reporting Sonnenfeld to the Audit Chair for his conversation with the investor. This request for advice did not include advice concerning termination. (Defendant's Facts at 35)

As of the April 6, 2005 meeting between Harkness and Sonnenfeld, Ballentine did not understand Harkness to be under threat of termination. (Defendant's Facts at 36)

Outside employment counsel Dowd was next consulted about Harkness by Slone and Ballentine on April 26, 2005. At the time, they recapped with him the prior conversation and related more recent events, including that Harkness had complained to the Board about her compensation and that she had informed the Board that in her opinion, Sonnenfeld had a conflict of interest in insisting that the company hire a long-time acquaintance as outside counsel to defend a lawsuit. The trigger for this call was Sonnenfeld's irritation with the report to the Board by Harkness about his having bypassed her to hire an outside counsel. During this meeting, they solicited from Dowd his advice concerning a range of options as to Harkness' employment,

---

[14] During Sonnenfeld's deposition by Plaintiff's counsel, he was asked when he first considered terminating Harkness' employment, and if he and Fieldstone's Human Resources managers had consulted with outside employment counsel at the time. He recalled that he first raised the possibility in the second or third quarter of 2005, and that employment counsel (Thomas Dowd of the firm Littler Mendelson) had been consulted at the time. In view of this testimony and the suggestion made during the OSHA proceeding by another witness, Carol Ballentine, that the Dowd consultation about termination had occurred more proximate to January, Plaintiff's counsel asked that Fieldstone consider producing billing records with respect to the consultation. Defendant agreed, and waived privilege. Dowd's billing records and Carol Ballentine's notes of her April 26 consultation with Dowd have been produced, and Ballentine testified without restriction as to all of her communications with Dowd concerning Plaintiff and any knowledge she had as to advice given to Sonnenfeld by Dowd.

including that she might be terminated if the situation did not improve. (Defendant's Facts at 37)

On the two days following this conference, Dowd spoke with Sonnenfeld, Ballentine and Slone about the same topics, and then met with them. (Defendant's Facts at 38)

In or about May 2005, Dowd was again consulted by Slone and Ballentine for input about talking points for a possible meeting between a member of the Compensation Committee of the Board and Harkness about her taking directly to the Board issues that were instead issues for management (i.e., Sonnenfeld), such as her compensation. (Defendant's Facts at 39)

Dowd was consulted again in July concerning another employment conflict that Human Resources was reviewing as to Harkness. Dowd continued to provide employment law services to Fieldstone but was not contacted again about Harkness until after she was terminated from employment in 2007 and had filed her claim of retaliation with the Department of Labor. (Defendant's Facts at 40)

In January 2006, the reporting structure for Human Resources was changed so that the manager of human resources reported directly to Sonnenfeld and not to Harkness. Harkness did not claim this action to be discrimination or illegal retaliation at the time, despite an affirmative obligation to do so if she held this belief (i.e., based upon her understanding that such conduct by the Company would be an illegal act, and her obligation as general counsel to report any knowledge of illegal acts on her quarterly disclosure questionnaire). (Defendant's Facts at 41)

In March 2006, Harkness' own reporting structure was changed so that she was no longer a direct report to Sonnenfeld and instead reported to the company's new Chief Financial Officer, Nayan Kisnadwala. Harkness did not claim this to be discrimination or illegal retaliation at the time despite an affirmative obligation to do so if she held this belief. (Defendant's Facts at 42)

In connection with Harkness' mid-year performance review with Kisnadwala in July

2006, he suggested to her that because of her poor relationship with Sonnenfeld, she should look for another job. (Defendant's Facts at 43)

On several occasions in 2005 and 2006, outside director and then Chairman of the Board Thomas Eckert advised Sonnenfeld that he should terminate Harkness and replace her with more competent counsel. Eckert made these recommendations based upon his own observations and dealing with Harkness, which led him to conclude that she lacked the maturity of judgment and discretion for the position of general counsel, and because she did not handle issues adequately as they arose. (Defendant's Facts at 44)

On at least two occasions in the last quarter of 2006, Sonnenfeld made clear his extreme disappointment with Harkness' job performance. In the first incident, Harkness failed to deliver what Sonnenfeld considered a definitive legal opinion about whether modest plaques proposed to recognize brokers would violate HUD regulations prohibiting lenders from giving things of value to loan brokers, instead saying whether to give the plaques was a "business decision." In the second incident, Harkness' Compliance Department did not complete its final review of model loan documents in time for the scheduled December 1 rollout of a high-profile, nationwide project known as Empower, and Sonnenfeld did not believe there was any good excuse for her failure to deliver on what he considered a mission critical project. Under pressure, she told Sonnenfeld to proceed with the rollout even though her team would not timely complete its final review, as all other departments had. The review was finished the next day and no changes were recommended to the documents. (Defendant's Facts at 45)

This history is exactly the type of water under the bridge inherent in many employment relationships which end badly and, to the extent relevant at all, supports the conclusion that 23 months necessarily removes any causal link. *Cf. Breeden, supra.* Among other things, this

record demonstrates that the topic of termination as one *potential* outcome if things did not improve between Harkness and Sonnenfeld arose in late April 2005, immediately after she accused him to the Board of having a conflict of interest. This independent and proximate trigger aside, it is notable that by this time three months had already passed since Harkness' alleged protected activity, a span of time cited with approval by the *Breeden* Court as insufficient in temporal proximity to support a causal link. *See id.*

### 6. Carol Ballentine's Declaration in the OSHA proceeding

During the OSHA administrative proceeding, Ballentine provided a Declaration in support of Harkness. (See Ex. LL, Declaration of Carol Ballentine) In relevant part, the Declaration states that when Sonnenfeld learned that Harkness had reported him for possibly violating Regulation FD, he became angry and told Ballentine and Jean Slone (who was Ballentine's superior and Fieldstone's director of Human Resources) that he wanted to fire Harkness. (Ex. LL, Ballentine Declaration at ¶4) The Declaration goes on to state that Fieldstone obtained advice from outside counsel about this situation, and that counsel's advice was provided to Sonnenfeld. (Id.) Ballentine's deposition testimony and the documentary record (which Ballentine acknowledged to be accurate) contradict the Declaration on these points. Defendant nevertheless anticipates that Plaintiff will seek to rely upon the Declaration to support causation. Because the Declaration overstates what Ballentine knows from personal knowledge, and because it is contradicted on material points by undisputed facts, Ballentine's deposition testimony and contemporaneous documents, the court may disregard it entirely. In any event, it cannot create a material dispute of fact sufficient to avoid summary judgment, as follows.

Ballentine was herself terminated from employment with Fieldstone, in April 2006.

(Transcript of Deposition of Carol Ballentine at 5-7[15]) She has been unemployed since (Ex. H, Ballentine Tr.2 at 16), feels she was treated unfairly, and believes Sonnenfeld was responsible for her termination. (Ex. H, Ballentine Tr. at 5-7, 15) After being informed of her termination, she filed a report with the Fieldstone's internal ethics office complaining that the Company discriminated against women, but she never reported Sonnenfeld for the alleged threat to retaliate against Harkness for her report to the Audit Chair. (Ex. H, Ballentine Tr. at 10-11, 12)

Ballentine had no independent recollection of the timing of the relevant events. Iin this regard, Defendant also notes that the Declaration is silent as to dates, stating only that she heard from the "angry" Sonnenfeld "when he heard what [Harkness] had done". However, at her deposition Ballentine testified that she and Slone contacted Dowd within a day or two of the event. (Ex. H, Ballentine Tr. at 27) She confirmed the accuracy of: (1) Human Resources records, including those which record the details of the meeting between Harkness and Sonnenfeld on February 22, 2005 (Ex. I) and her own discussion with Dowd about Harkness on April 26, 2005 (Ex. O); and (2) Dowd's billing records relating to Harkness (Ex. N), which reflect that he was first consulted on March 9, 2005.[16] (Ex. H, Ballentine Tr. at 40-41, 56-57, 50) With respect to the invoices for legal services, Ballentine also testified that she had reviewed Dowd's invoices on behalf of Fieldstone at the time they were submitted, and that she had reviewed them again in preparation for her deposition. (Ex. H, Ballentine Tr. at 15)

At her deposition Ballentine recanted her Declaration in several significant respects. First, she has no recollection of the details of any of her own conversations with Sonnenfeld

---

[15] Cited portions of the transcript of Carol Ballentine's deposition are attached as Ex. H, and will hereafter be cited as "Ex. H, Ballentine Tr. at ___" or "Ex. H, Ballentine Tr.2 at ___."

[16] Ballentine graduated from law school, but has worked in human resources rather than as a practicing lawyer. (Ex. H, Ballentine Tr.2 at 15) With regard to her interactions with outside counsel, during her deposition, Ballentine admitted the importance of "frontloading" discussions with all relevant information and to not knowingly omitting any material details. (Ex. H, Ballentine Tr. at 21-22)

about Harkness. (Ex. H, Ballentine Tr. at 52-53) Second, she was not personally a party to the alleged "angry" threat to terminate Harkness for her report. Instead (she now claims), she heard it secondhand from Slone, who came directly to her office from meeting with Sonnenfeld. (Ex. H, Ballentine Tr. at 24, 29-30) Third, the implication that Dowd gave advice to talk a reluctant Sonnenfeld out of firing Harkness in the aftermath of this "angry" threat is also misplaced. Rather, Ballentine has no recollection of the general or specific conversation between Dowd and Sonnenfeld, what advice he gave, or even when the conversation took place. (Ex. H, Ballentine Tr. at 54, 75-76) In short, what purports to be a first person narrative is nothing of the sort.

Based upon these discrepancies alone, but in particular coupled with Ballentine's patent grounds for bias against Sonnenfeld and Fieldstone, the court may disregard her testimony entirely, not as a credibility determination as such, but because it is so internally inconsistent on matters of consequence that some part of it must be false. If any material part of the testimony is false, the court may properly disregard it all. *See The Santissima Trinidad*, 20 U.S. 283, 399 (1822) ("Falsus in uno, falsus in omnibus").

To the extent that Ballentine's testimony is credited at all, the internal inconsistencies must be taken into account, reformed, and used only to the extent what remains is, or can be interpreted as, consistent with the balance of the undisputed record, in particular the following. First, it is undisputed that Ballentine and Slone first contacted Down on March 9, 2009, based on records Ballentine concedes are accurate. Second, the event or incident between Harkness and Sonnenfeld most proximate to that consultation occurred on February 22, 2005, when Harkness made it known that she believed Sonnenfeld was discriminating against her on the basis of her sex. Third, Dowd's records reflect that this initial consultation was not about termination, but rather about a different "adverse action" – Sonnenfeld's plan to remove Human Resources from

Harkness' control and have its manager (Slone) report directly to him. Fourth, while Ballentine no longer recalls the specifics of the call with Dowd when they discussed the possibility of termination, she does recall that during the call he informed Slone that he wanted to do some research regarding Sarbanes-Oxley, that he got back to them soon after, and Dowd's conversation with Sonnenfeld occurred after that. (Ex. H, Ballentine Tr. 46-48) In turn, Dowd's billing records reflect that after the March 9 call, he did no further work in connection with Harkness until April 26, 2005. On April 26, he spoke with Ballentine and Slone, immediately had an associate do research, and spoke with Ballentine, Slone and Sonnenfeld the next day. Fifth, Ballentine's own notes of the April 26, 2005 call with Dowd reflect that the impetus for the call was Sonnenfeld's anger at Harkness recently accusing him to the Board of having a conflict in selecting outside counsel for a matter, the potential that termination or some other adverse action could follow, and a review or recap of the earlier call to Dowd. Notably, the recap in Ballentine's April 26 notes of matters discussed during the March 9 call includes reference to changing Slone's reporting relationship, but not to termination.

In sum, taken in fair context, Ballentine provides no support for Harkness. If anything, her testimony and the documents she verified confirm that the events of January 2005 did not play any role in the eventual decision to terminate Harkness' employment 23 months later and, in particular, did not prompt an angry decision to fire her in the immediate aftermath of the report.

Because the undisputed record provides no fair inference to support retaliation 23 months after the fact, Plaintiff cannot establish the fourth element of her cause of action, that the protected activity was a contributing factor in her termination from employment, and Defendant is entitled to summary judgment.

33

## IV. CONCLUSION

For the reasons stated herein, summary judgment should be granted in favor of Defendant

C-Bass Diamond, LLC on all claims.

August 28, 2009

Respectfully submitted,

/s/ Joseph E. Schuler
Joseph E. Schuler (Fed. Bar #04360)
Matthew F. Nieman (Fed. Bar #17558)
JACKSON LEWIS LLP
10701 Parkridge Boulevard, Suite 300
Reston, VA 20191
schulerj@jacksonlewis.com
niemanm@jacksonlewis.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 28h day of August, 2009, the foregoing *Defendant's Memorandum in Support of Motion for Summary Judgment* was served via the courts electronic filing system upon:

> Joseph B. Espo, Esq.
> BROWN, GOLDSTEIN & LEVY, LLP
> 120 E. Baltimore Street, Suite 1700
> Baltimore, MD 21202-6701
>
> *Attorneys for Plaintiff*
>
> /s/ Joseph E. Schuler
> Joseph E. Schuler