# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
(Northern Division)

CYNTHIA L. HARKNESS,             :

        Plaintiff,           :

        v.              :    Civil Action No. 1:08-CV-00231-CCB

FIELDSTONE INVESTMENT     :
CORPORATION,

                     :

        Defendant.

* * * * ooo0ooo * * * *

## PLAINTIFF'S OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Joseph B. Espo, Fed. Bar No. 07490
Mehgan Sidhu, Fed. Bar No. 28173
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore Street, Ste. 1700
Baltimore, Maryland 21202
(410) 962-1030
jbe@browngold.com
ms@browngold.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  STATEMENT OF UNDISPUTED MATERIAL FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      A.      STANDARD FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      B.      THE SARBANES-OXLEY ACT'S WHISTLEBLOWER PROVISION . . . . . . 11

      C.      MS. HARKNESS RAISES A TRIABLE ISSUE OF MATERIAL FACT THAT
             HER REPORTS TO FIELDSTONE'S AUDIT COMMITTEE IN JANUARY
             2005 AND DECEMBER 2006 ARE PROTECTED ACTIVITY . . . . . . . . . . . 12

            1.      Sarbanes Oxley applies to the January 2005 activity because Fieldstone
                  was a public company when Plaintiff was fired. . . . . . . . . . . . . . . . . . . . . 13

            2.      Ms. Harkness had the requisite belief that she was reporting potentially
                  illegal conduct in January 2005. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

                  (a)      The Evidence Demonstrates that Ms. Harkness Subjectively
                          Believed that Mr. Sonnenfeld's Disclosure Implicated
                          Regulation FD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

                  (b)      The Evidence Demonstrates that Ms. Harkness's Belief that
                          Regulation FD was Implicated and Warranted Reporting to the
                          Audit Committee was Objectively Reasonable. . . . . . . . . . . . . . 18

            3.      The Evidence Demonstrates that Ms. Harkness's December 2006 Report
                  to the Audit Committee Constituted Protected Activity. . . . . . . . . . . . . . 21

      C.      MS. HARKNESS RAISES A TRIABLE ISSUE OF MATERIAL FACT THAT
              HER REPORTS TO THE AUDIT COMMITTEE CAUSED FIELDSTONE'S
             ADVERSE TREATMENT OF HER AND TERMINATION. . . . . . . . . . . . . . 22

            1.      The Act Only Requires that the Protected Activity be a Contributing
                  Factor of The Adverse Action. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

2. The Evidence Demonstrates that Ms. Harkness's Reports to the Audit Committee Contributed to Fieldstone's Adverse Treatment and Decision to Terminate Ms. Harkness. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

3. The Mere Passage of Time does not Defeat Plaintiff's Claim. . . . . . . . 25

4. The Credibility of Carole Ballentine's Testimony Is a Question for the Trier of Fact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

APPENDIX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Apx. A-1-A-B

# TABLE OF AUTHORITIES

## Cases

*Allen v. Admin. Review Bd.,*
514 F.3d 468 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 15

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Clark County Sch. Dist. v. Breeden,*
532 U.S. 268 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Cruzan v. Director, Missouri Dep't of Health,*
497 U.S. 261 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Farrell v. Planters Lifesavers, Co.,*
206 F. 3d 271 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Gallagher v. Granada USA,*
2004-S0X-74 (ALJ April 1, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-14

*Gray v. Spillman,*
925 F.2d 90 (4th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Greenhouse v. MCG Capital Corp.,*
392 F.3d 650 (4th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Jordan v. Alternative Resources Corp.,*
458 F.3d. 332 (4th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Kachmar v. Sunguard Data Systems,*
109 F. 3d 173 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Lerbs v. Bucca di Beppo., Inc.,*
2004-SOX-8 (ALJ June 15, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Lettieri v. Equant Inc.,*
478 F.3d 640 (4th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Livingston v. Wyeth, Inc.,*
  520 F.3d 344 (4ᵗʰ Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 14

*Lore v. City of Syracuse,*
  583 F. Supp. 2d 345 (N.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*The Santissima Trinidad,*
  20 U.S. 283 (1822) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Schneider v. United States,*
  57 F.2d 454 (3ʳᵈ Cir. 1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Shecil v. United States,*
  226 F. 184 (7ᵗʰ Cir. 1915) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Van Asdale v. Int'l Game Technology,
  __ F.3d ___, 2009 WL 2461906 (9ᵗʰ Cir. Aug. 13, 2009) . . . . . . . . . . . . . . . . . . . . 15-17, 22-23

*Welch v. Chao,*
  536 F. 3d 269 (4th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 14, 16-17, 21, 25

### Statutes and Regulations

17 C.F.R. § 243 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 14

29 C.F.R. § 1980.104(b)(1) (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 23

18 U.S.C. § 1514A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 11

49 U.S.C. § 42121(b) (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

S. Rep. No. 107-146, at 5 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**
(Northern Division)

| | | |
|---|---|---|
| CYNTHIA L. HARKNESS, | : | |
| Plaintiff, | : | |
| v. | : | Civil Action No. 1:08-CV-00231-CCB |
| C-BASS DIAMOND, LLC, | : | |
| Defendant. | : | |

\* \* \* \* ooo0ooo \* \* \* \*

## PLAINTIFF'S OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Cynthia L. Harkness hereby files this opposition to Defendant's Motion for Summary Judgment. Because Defendant is not entitled to judgment as a matter of law and there are disputed material facts about whether Defendant fired Ms. Harkness in illegal retaliation for activity protected by the employee protection provisions of the Sarbanes-Oxley Act the Motion should be denied.

## I. INTRODUCTION

Plaintiff, Cynthia Harkness, is an attorney who worked for Fieldstone Mortgage Company and its publicly-traded parent company Fieldstone Investment Corp. from 2004 until she was fired in early 2007.[1] As set out in greater detail below, Ms. Harkness filed suit because her termination was motivated by two instances of conduct that constitute protected activity under the whistleblower protection provisions of the Sarbanes-Oxley Act of 2002, 18 U.S.C.

---

[1] As Defendant did in its Motion and as the parties have done during depositions throughout this case Plaintiff will refer to the defendant as Fieldstone, despite its sale and corporate name change to C-Bass Diamond, LLC after the events that gave rise to this litigation.

§ 1514A, which was passed in the wake of the Enron collapse to promote identification of wrongdoing within publicly-traded companies. As set out in greater detail below, Defendant is not entitled to judgment as a matter of law and disputes of material fact preclude the entry of summary judgment.

## II.  STATEMENT OF UNDISPUTED MATERIAL FACTS

Cynthia Harkness ("Harkness") joined Fieldstone as its Senior Vice President, General Counsel, and Corporate Secretary in March 2004.[2]  Before her hiring, Ms. Harkness had an exceptional background as in-house counsel and executive at several high-profile national and international corporations.[3]  Following her hiring, Ms. Harkness devoted three years of her life to making Fieldstone a success.

Ms. Harkness was hired by Fieldstone at the express invitation of its President and CEO, Michael J. Sonnenfeld.[4]  He expected Ms. Harkness to build and manage a legal department as Fieldstone moved from a private to a publicly-traded company.[5]  His expectations were more than met.  In her first year, Ms. Harkness single-handedly built a successful legal department that brought Fieldstone into full compliance with applicable securities regulations and filing procedures – enabling Fieldstone to go public in February 2005.[6]

---

[2] Ex. 1, Harkness Dep. at 16-17; Ex. 10, Harkness Aff. at ¶ 4. Plaintiff accepts as accurate the description of the background of Fieldstone as it existed in 2004 set out in Defendant's Statement of Material Facts Not in Dispute In Support of Motion for Summary Judgment (hereafter referred to as "Defendant's Statement of Facts") ¶ 1.

[3] Harkness Dep. at15:21-19:10; Ex. 10, Harkness Aff. at ¶ 3.

[4] Ex. 2, Sonnenfeld Dep. at 90:b-91:22; Ex. 10, Harkness Aff. at ¶ 4.

[5] Ex. 10, Harkness Aff. at ¶ 4.

[6] Ex. 3, Performance Review at 2, 4; Ex. 10, Harkness Aff. at ¶ 5.

In view of her outstanding performance as General Counsel, in the spring of 2004 Mr. Sonnenfeld added to her portfolio by also appointing Ms. Harkness to head the Quality Control and Human Resources Departments.[7]  Ms. Harkness rose to those tasks, as well.  She restructured Fieldstone's Quality Control department, increasing its efficiency, and turned around what had been a defective Human Resources Department, all within the first few months of employment at Fieldstone.[8]

Because of her outstanding performance, Mr. Sonnenfeld gave Ms. Harkness a glowing annual review in early January 2005 and an overall performance rating of "4+" out of 5.[9]  Mr. Sonnenfeld also awarded Ms. Harkness a substantial salary increase and bonuses.[10]

Shortly thereafter, on January 14, 2005, at a time when Fieldstone's stock was "in registration," Fieldstone's assistant general counsel, Sally LaFond, informed Ms. Harkness that an auditor and a Fieldstone executive had just reported to her that Mr. Sonnenfeld informed an outside investor that Fieldstone was about to restate its earnings – information that had not been made public at the time of the disclosure.[11]  Ms. Harkness recognized that Mr. Sonnenfeld's

---

[7] Harkness Aff. at ¶ 6, Ex. 2, Performance Review at 2-3.

[8] Harkness Aff. at ¶ 6.

[9] Ex. 3, Performance Review; Ex. 10, Harkness Aff. at ¶ 7.

[10] Ex. 10, Harkness Aff. at ¶ 7.

[11] Ex. 1, Harkness Tr. at 123:12-132:14; 137:2-140:2; Ex. 4, January 26, 2005 Memorandum at 1-2; Ex. 10, Harkness Aff. at ¶¶ 8-9.

reported conduct – disclosing non-public information to an outside investor – potentially

implicated serious federal securities law violations, including Regulation FD, 17 C.F.R. § 243.[12]

On January 17, 2005 Ms. Harkness and Ms. LaFond interviewed Harry Argires and

Robert Partlow, the outside auditor and executive, respectively, who had reported

Mr. Sonnenfeld's disclosure.[13] Mr. Argires and Mr. Partlow explained that during a meeting

with Mr. Sonnenfeld, Mr. Sonnenfeld described a conversation he had with an outside investor

and said that he told the investor Fieldstone would be restating its earnings.[14] Concerned that

Mr. Sonnenfeld gave information in potential violation of securities regulations, Mr. Argires and

Mr. Partlow immediately reported the conversation to Ms. LaFond.[15]

After researching her legal obligations, including requirements under the Sarbanes-Oxley

Act, Ms. Harkness concluded she was obligated to notify Fieldstone's Audit Committee of what

she had learned.[16] Accordingly, following the interviews on January 17, 2005 Ms. Harkness

called Jonathan Michael, chair of Fieldstone's audit committee and an ontrade director, and

reported the facts she had learned.[17] After speaking with his securities counsel, Mr. Michael

---

[12] Ex. 1, Harkness Dep. at 123:11-132:14; 137:2-140:2; Ex. 4, January 26, 2005 Memorandum at 1-2; Ex. 10, Harkness Aff. at ¶¶ 9-11.

[13] Ex. 2, Harkness Tr. at 123:11-132:14; 137:2-140:2; Ex. 4, January 26, 2005 Memorandum at 1-2; Ex. 10, Harkness Aff. at ¶ 10-11.

[14] Ex. 1, Harkness Dep. at 135:2-137:2; Ex. 4, January 26, 2005 Memorandum at 1-2; Ex. 10, Harkness Aff. at ¶ 10-11.

[15] Ex. 1, Harkness Dep. at 137:2-138:21; Ex. 4, January 26, 2005 Memorandum at 2; Ex. 10, Harkness Aff. at ¶ 10-11.

[16] Ex. 1, Harkness Dep. at 123:11-132:14; 137:2-140:2; Ex. 4, January 26, 2005 Memorandum at 1-2; Ex. 10, Harkness Aff. at ¶ 12.

[17] Ex. 4, January 26, 2005 Memorandum at 1-2; Harkness Aff. at ¶ 12-13.

advised Ms. Harkness to continue her investigation by interviewing Mr. Sonnenfeld.[18]  At the Audit Committee Chairman's direction, Ms. Harkness and Ms. LaFond interviewed Mr. Sonnenfeld.[19]  Mr. Sonnenfeld confirmed that he had disclosed non-public information to an outside investor regarding Fieldstone's earnings restatement and said he had done so because he wanted to get a sense of the likely market reaction to the restatement.[20]

Ms. Harkness promptly reported Mr. Sonnenfeld's comments to Mr. Michael, who responded that he would contact her after he determined the next course of action.[21]  On January 19, 2005 Mr. Michael told Ms. Harkness that he had talked to his securities counsel and did not believe that Mr. Sonnenfeld violated any securities laws.[22]  At Mr. Michael's request, on January 26, 2005 Ms. Harkness provided him with a memorandum of her investigation and the legal implications of Mr. Sonnenfeld's disclosure.[23]  A week later, on February 2, 2005 Fieldstone's stock became publicly traded.[24]

In early 2005, after Mr. Sonnenfeld learned that Ms. Harkness had reported his disclosure to Mr. Michael, the Audit Committee Chairman, he summoned a meeting with Fieldstone's

---

[18] Ex. 1, Harkness Dep. at 140:21-141:4; Ex. 4, January 26, 2005 Memorandum at 1-2; Ex. 10, Harkness Aff. at ¶13.

[19] Ex. 1, Harkness Dep. at 140:21-141:4; Ex. 4, January 26, 2005 Memorandum at 1-2; Ex. 10, Harkness Aff. at ¶¶13-14.

[20] Ex. 4, January 26, 2005 Memorandum at 2; Ex. 10, Harkness Aff. at ¶ 14.

[21] Ex. 1, Harkness Dep. at 141:5-16; Ex. 4, January 26, 2005 Memorandum at 2; Ex. 10, Harkness Aff. at ¶¶14-15.

[22] Ex. 4, January 26, 2005 Memorandum at 2-3; Ex. 10, Harkness Aff. at ¶ 15.

[23] Ex. 4, January 26, 2005 Memorandum; Ex. 10, Harkness Aff. at ¶ 15.

[24] Ex. 1, Harkness Dep. at 116:25-117:2; Ex. 10, Harkness Aff. at ¶ 16.

Human Resources director, Jeanie Slone, and told her that he wanted to fire Ms. Harkness because her action in reporting his conduct to the Audit Committee caused him to lose confidence in her.[25]  Ms. Slone warned Mr. Sonnenfeld that firing Ms. Harkness could violate the Act and recommended that outside counsel review whether Ms. Harkness could be fired without violating Sarbanes-Oxley.[26]  After that advice was received Ms. Harkness was not terminated.[27]

Although Mr. Sonnenfeld did not immediately fire Ms. Harkness, he did launch a two-year campaign against her that culminated in her firing. For the remainder of 2005, Mr. Sonnenfeld criticized Ms. Harkness and berated her when she advised him of Fieldstone's legal risks in various areas.[28]  Mr. Sonnenfeld also blamed Ms. Harkness for conduct that he knew was not attributable to her.[29]

Though Ms. Harkness continued to perform her job duties in a stellar fashion, Mr. Sonnenfeld gave Ms. Harkness a markedly cold annual review in January 2006.[30]  In that annual review – the first since he had learned of her disclosure – Mr. Sonnenfeld dropped Ms. Harkness's performance rating to 3 out of 5, chastised her for questioning a decision he made regarding the replacement of Fieldstone's outside litigation counsel, and commented that

---

[25] Ex. 6, Ballentine Dep. at 24:8-25:18; 27:2-29:21.

[26] Ex. 6, Ballentine Dep. at 44:14-46:15.

[27] Ex. 7, Ballentine Dec. at ¶ 4; Ex. 6; Ballentine Dep. at 97:22-98:18.

[28] Ex. 6, Ballentine Dec. at 100:1-101:11; Ex. 10, Harkness Aff. at ¶ 17.

[29] Ex. 10, Harkness Aff. at ¶17.

[30] Ex. 8, 2006 Performance Appraisal; Ex. 10, Harkness Aff. at ¶ 18.

Ms. Harkness "must focus equally on achieving desired business objectives as on avoiding legal risk."[31]

In January 2006, Mr. Sonnenfeld removed Ms. Harkness as head of the Quality Control and Human Resources Departments.[32]  He also isolated Ms. Harkness in the company so that she could no longer effectively perform her role as General Counsel of Fieldstone.  He stripped Ms. Harkness of her executive role in the company and told Ms. Harkness that she would no longer report to him, but to the Chief Financial Officer, a position that was unfilled at that time.[33] The position was later filled by Nayan Kisnadwala in February 2006.

Mr. Sonnenfeld also prohibited Ms. Harkness from attending weekly senior management meetings.[34]  When Ms. Harkness asked how she could be expected to advise Fieldstone as its General Counsel if she did not participate in meetings, Mr. Sonnenfeld had no response, noting however that "it was a good question."[35]

As 2006 progressed, Mr. Sonnenfeld amplified his criticism and isolation of Ms. Harkness and her team.  Mr. Sonnenfeld refused to inform Ms. Harkness or her legal team about significant Fieldstone transactions that had legal implications for the company, including a possible transaction to acquire another company, despite the legal department's responsibility for

---

[31] Ex. 8, 2006 Performance Appraisal; Ex. 10, Harkness Aff. at ¶ 18.

[32] Ex. 1, Harkness Dep. at 82:24-83:6; Ex. 10, Harkness Aff. at ¶ 19.

[33] Ex. 1, Harkness Dep. at 82:24-83-6; Ex. 10, Harkness Aff. at ¶19.

[34] Ex. 10, Harkness Aff. at ¶20.

[35] Ex. 10, Harkness Aff. at ¶ 20.

making the required public SEC filings.[36]  When, at the insistence of Mr. Kisnadwala,

Mr. Sonnenfeld eventually included Ms. Harkness in the transaction team, he refused to allow

Ms. Harkness to accompany the team on its due diligence trip.[37]

In mid-2006, when Ms. Harkness learned of Mr. Sonnenfeld's intention to meet

individually with investors without including a Fieldstone attorney or other Fieldstone officer,

she warned Mr. Sonnenfeld that doing so could expose Fieldstone to liability for claims of

violations of securities laws regarding insider trading.[38]  Mr. Sonnenfeld lashed out at

Ms. Harkness and made clear his view that the solution to this issue was for the General Counsel

not to know about it.[39]

On another occasion, Mr. Sonnenfeld openly criticized Ms. Harkness's refusal to sign off

on loan documents without first having reviewed them, but praised another Fieldstone employee

for signing off on the documents without review.[40]

Ms. Harkness continued to perform her role as General Counsel effectively, despite

Mr. Sonnenfeld's attacks on her.  She received a positive mid-year review from Mr. Kisnadwala

---

[36] Ex. 10, Harkness Aff. at ¶ 21.

[37] Ex. 10, Harkness Aff. at ¶ 21.

[38] Ex. 10, Harkness Aff. at ¶ 22.

[39] Ex. 10, Harkness Aff. at ¶ 22.

[40] Ex. 10, Harkness Aff. at ¶ 23.

and received a performance award from Mr. Kisnadwala in the fall of 2006.[41]  Ms. Harkness

received 100% of her 2006 bonus based on accomplishing individual goals for that year.[42]

      In late-November 2006, Fieldstone's external auditors from Deloitte & Touche, LLP

asked Ms. Harkness whether she felt that the "tone from the "top" of the company" exhibited a

commitment to legal compliance and ethics.[43]  Ms. Harkness responded that because she had

been routinely excluded from senior management meetings and discussions about subjects that

could have significant legal and compliance implications, among other things, she could not

definitively say 'yes'.[44]

      At the external auditor's suggestion, on December 5, 2006 Ms. Harkness conveyed her

response to Fieldstone's Audit Committee.[45]  She also told the Committee that the Legal and

Compliance Departments were unable to ensure that Fieldstone complied with all applicable

regulatory requirements because those departments were significantly understaffed.[46]

      Shortly after the meeting, Ms. Harkness took a previously scheduled vacation.  When she

returned, on December 29, 2006, Fieldstone informed Ms. Harkness, at Mr. Sonnenfeld's

---

[41] Ex. 1, Harkness Dep. at 109:2-110:8; Ex. 10, Harkness Aff. at ¶ 24; Ex. 11, 2006 Mid-Year Performance Review.

[42] Ex. 10, Harkness Aff. at ¶ 24; Ex. 12, Declaration of Neil Kilgallon ¶ 2-5.

[43] Ex. 1, Harkness Dep. at 96:12-100:14; Ex. 10, Harkness Aff. at ¶25.

[44] Ex. 1, Harkness Dep. at 96:12-100:14; Ex. 10, Harkness Aff. at ¶25.

[45] Ex. 1, Harkness Dep. at 96:12-100:14; Ex. 10, Harkness Aff. at ¶ 26.

[46] Ex. 1, Harkness Dep. at 96:12-100:14; Ex. 10, Harkness Aff. at ¶ 26.

direction, that she would be discharged.[47]  The firing demonstrated that Mr. Sonnenfeld had not accepted Ms. Slone's and Ms. Ballentine's advice not to fire Ms. Harkness; instead, he had merely delayed his revenge. At the time of Ms. Harkness's termination, neither Ms. Ballentine nor Ms. Slone were employed by Fieldstone.  The new director of the Human Resources Department had no knowledge of any of the events which preceded Ms. Harkness's termination.[48]

## III.  ARGUMENT

As set forth below, Defendant is mistaken as to the law with respect to Ms. Harkness's report to the Audit Committee chairman in 2005 and December 2006 and disputes of material fact preclude summary judgment with respect to whether Ms. Harkness's protected activity was a contributing factor to her firing.

### A.      STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate only "if the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A material fact is one that may affect the outcome of the suit. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding a motion for summary judgment, a court must construe the facts in a light most favorable to the non-moving party.  *Id.* at 255.

---

[47] Ex. 1, Harkness Dep. at 69:5-9; 105:3-14; Ex. 2, Sonnenfeld Dep. at 18; Ex. 10, Harkness Aff. at ¶ 27.

[48] Defendant's passing contention that Ms. Harkness resigned is incorrect.  *See* Harkness Aff. at ¶ 27.

## B. THE SARBANES-OXLEY ACT'S WHISTLEBLOWER PROVISION

Ms. Harkness's single claim is that she was retaliated against in violation of the employee-protection provisions of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A ("the Act"). The Act "creates 'whistleblower' protection for employees of publicly-traded companies by prohibiting employers from retaliating against employees because they provided information about potentially unlawful conduct." *Welch* v. *Chao,* 536 F.3d 269, 275 (4th Cir. 2008). Specifically, the Act provides, in relevant part:

> No [publicly-traded company], or any officer [or] employee . . . of such a company, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee . . . because of any lawful act done by the employee -
>
> > (1) to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section . . . 1348 [securities fraud], any rule or regulation of the [SEC], or any provision of Federal law relating to fraud against shareholders, when the information . . . is provided to . . .
> >
> > . . . a person with supervisory authority over the employee . . .

18 U.S.C. § 1514A(a); *see also Welch,* 536 F.3d at 275; *Livingston v. Wyeth, Inc.,* 520 F.3d 344, 351 (4th Cir. 2008); *Allen v. Admin. Review Bd.,* 514 F.3d 468, 475 (5th Cir. 2008).

The whistleblower protection provision of the Act "adopts the burden-shifting framework applicable to whistleblower claims brought under the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, 49 U.S.C. § 42121(b) (2000)." *Welch,* 536 F. 3d at 275; *see also Livingston,* 520 F.3d at 351; *Allen,* 514 F.3d at 475; 18 U.S.C. § 1514A(b). "Accordingly, an employee bears the initial burden of making a prima facie showing of retaliatory discrimination; the burden then shifts to the employer to rebut the employee's prima facie case

by demonstrating by clear and convincing evidence that the employer would have taken the same personnel action in the absence of protected activity." *Welch,* 536 F.3d at 275 (*citing* 49 U.S.C. 42121(b)(2)(B)).

The Department of Labor (DOL) regulations implementing the Act provide that in order to make a prima facie showing, an employee's complaint must allege that: (1) the employee engaged in protected activity; (2) the employer knew, actually or constructively, of the protected activity; (3) the employee suffered an unfavorable personnel action; and (4) the circumstances raise an inference that the protected activity was a contributing factor in the personnel action. 29 C.F.R. § 1980.104(b)(1) (2007); *see also*, *Welch,* 536 F. 3d at 275.[49]

## C. MS. HARKNESS RAISES A TRIABLE ISSUE OF MATERIAL FACT THAT HER REPORTS TO FIELDSTONE'S AUDIT COMMITTEE IN JANUARY 2005 AND DECEMBER 2006 ARE PROTECTED ACTIVITY

As set forth below Plaintiff's January 2005 report to the Fieldstone Audit Committee chair about Mr. Sonnenfeld's potentially illegal conduct and her December 2006 both constituted protected activity under the Act. As explained below, the fact that the initial report was made before Fieldstone was publicly traded is legally insignificant and the admissible evidence supports the conclusion that Ms. Harkness's reports constituted protected activity. Accordingly, the question of whether Ms. Harkness engaged in protected activity is for the trier of fact to decide.

---

[49] Plaintiff does not understand Defendant to claim that it was unaware of Ms. Harkness's protected activity or that she did not suffer an adverse consequence. Therefore, she will not discuss those elements of her claim.

1. **Sarbanes Oxley applies to the January 2005 activity because Fieldstone was a public company when Plaintiff was fired.**

Ms. Harkness's initial report to the Audit Committee occurred in January 2005, when Fieldstone was in registration but not yet publicly traded. Fieldstone's retaliation against Ms. Harkness, including her isolation from the company and termination, took place after Fieldstone had gone public in February 2005. Contrary to Defendant's claims, because the adverse actions against Ms. Harkness took place when Fieldstone was a publicly-traded entity, Ms. Harkness's January 2005 report to the Audit Committee is protected activity under the Act.

Both the language of the Act and the administrative cases make clear that the time of the adverse action controls the Act's application. At least one ALJ has examined the issue and concluded "that it is the date upon which an employer is alleged to have engaged in retaliation which determines whether the Act applies, not the date upon which the alleged protected activity occurred." *Lerbs v. Buca di Beppo., Inc.* 2004-SOX-8, at 11 (ALJ June 15, 2004). There, the ALJ relied upon the language of the statute, finding that the Act "itself supports such a conclusion inasmuch as [the Act] is clearly intended to punish the conduct of employers, *i.e*., '[n]o company . . . may discharge, demote, suspend, threaten, harass, or in any other manner discriminate . . . .'" *Id.* (quoting 18 U.S.C. § 1514A(a)) *; see also Gallagher v. Granada Entertainment USA*, 2004-S0X-74, at 10 (ALJ April 1, 2005) (an employer that became publicly traded after the protected activity took place, but before the adverse action, is subject to the Act).

Because both the language of the Act and supporting cases make clear that application of the Act is controlled by the timing of the retaliatory action, there is no need for further inquiry into Congress' intent. Moreover, because it is undisputed that Fieldstone's retaliatory conduct against Ms. Harkness, including her ill-treatment, isolation from the company, and her

13

termination, all took place after February 2, 2005, the date that Fieldstone became publicly traded, Ms. Harkness's claim falls squarely under the purview of the Act.

### 2. Ms. Harkness had the requisite belief that she was reporting potentially illegal conduct in January 2005.

To establish that an employee engaged in protected activity under the Act, an employee "must show that [she] had both a subjective belief and an objectively reasonable belief" that the conduct she complained of constituted a violation of relevant law. *Welch,* 536 F. 3d at 275 (*citing Livingston,* 520 F.3d at 352). Additionally, an employee must show that her communications "definitively and specifically relate[d]" to one of the listed categories of fraud or securities violations under the Act. *Welch,* 536 F. 3d at 275 (citation omitted). Ms. Harkness's communications in January 2005 to the Audit Committee chairman, Jonathan Michael, "definitively and specifically related" to one of the listed categories under the Act - specifically, Regulation FD, 17 C.F.R. § 243. Therefore, the only remaining issues are whether there is sufficient record evidence from which a reasonable fact-finder could find that Ms. Harkness held the requisite subjective and objectively reasonable belief that Ms. Sonnefeld may have violated a securities law.

At the outset, whether an actual violation took place is irrelevant to the inquiry. To encourage disclosure, Congress chose statutory language which ensures that "an employee's reasonable but mistaken belief that an employer engaged in conduct that constitutes a violation of one of the six enumerated categories is protected." *Allen*, 514 F.3d at 477. Thus all that matters is whether the employee had a subjective and objectively reasonable belief – not that a violation in fact occurred.

Defendant's argument that Ms. Harkness did not subjectively believe that she was reporting a violation because she reported what she described as a "potential violation" rests on an overly-technical reading of the Sarbanes-Oxley Act that would defeat its purpose and that has been rejected by at least one Court of Appeals. *See Van Asdale v. Int'l Game Tech.,* __ F.3d ___, 2009 WL 2461906 at *6 (9th Cir. Aug. 13, 2009).

In *Van Asdale*, the Ninth Circuit Court of Appeals reversed a district court's grant of summary judgment to a defendant when an employee reported potentially illegal conduct even though the reporting employee acknowledged that she "hadn't reached a conclusion as to whether fraud had occurred" when she made her report and stated that a further investigation might be warranted. *Id.* at *12. As Defendant urges in this case, the district court in *Van Asdale* concluded that the Plaintiff's testimony precluded the employee from claiming protection under the Act because she did not yet know whether an actual violation had, in fact, occurred, but rather believed that the matter was significant enough to warrant further investigation. *Id.*[50]

---

[50] The testimony the District Court in *Van Asdale* relied upon is as follows:

Q. Prior to retaining [legal counsel], did you have any personal belief that a fraud had been perpetrated on the shareholders of IGT, [the employer]?

A. I had a belief that something had happened in the due diligence with Anchor and IGT and that an investigation needed to be conducted to see if a fraud had occurred.

Q. So you didn't have a specific belief that a fraud had occurred or not?

A. I had a belief that an investigation needed to occur.

Q. So you hadn't reached a conclusion one way or another as to fraud?

A. No, because we were not allowed to do an investigation.

Q. Okay. But you had a strong belief that an investigation needed to be done.

In reversing the grant of summary judgment the Ninth Circuit noted that although the employee "hadn't reached a conclusion" as to whether fraud had occurred, the context of her statement was her discussion of the need for an investigation, and was therefore sufficient to trigger the Act's whistleblower protection. *Id*. The *Van Asdale* Court held that "in passing the Sarbanes-Oxley Act, Congress noted the existence of a 'culture, supported by law, that discourage[s] employees from reporting fraudulent behavior not only to the proper authorities, but even internally." *Id.* (citing S. Rep. No. 107-146, at 5 (2002)). Thus, the Court concluded, "[r]equiring an employee to essentially prove the existence of fraud before suggesting the need for an investigation would hardly be consistent with Congress's goal of encouraging disclosure." *Van Asdale*, __ F.3d at ___, 2009 WL 2461906 at *12.

The *Van Asdale* holding is consistent with that of other courts, including the Fourth Circuit, which has expressly agreed that the Act "does *not* in fact require that an employee complain of an *actual* violation." *Welch,* 536 F.3d at 277 (emphasis in original). As the Fourth Circuit explained, the Act "protects an employee's communications based on a reasonable, but mistaken, belief that conduct constitutes a securities violation." *Id.* In this case there is ample evidence to support a finding that Ms. Harkness meets both the subjective and objective prongs of her burden.

---

A. Yes.

*Van Asdale*, __ F.3d at ___, 2009 WL 2461906 at *12.

**The Evidence Demonstrates that Ms. Harkness Subjectively
Believed that Mr. Sonnenfeld's Disclosure Implicated
Regulation FD.**

As in the *Van Asdale* case, Ms. Harkness believed that a securities law may have been

violated, that the matter was significant enough to warrant further investigation and, moreover,

that her obligations as legal counsel required her to report the matter.  There is ample evidence to

support that Ms. Harkness's belief was both subjectively and objectively reasonable.

Ms. Harkness testified that on January 14, Fieldstone's assistant general counsel,

Sally LaFond, who handled Fieldstone's securities matters, reported to Ms. Harkness that the

senior partner for Fieldstone's accounting firm, Harry Argires, and Fieldstone's CFO, Rob

Partlow, had informed her that Mr. Sonnenfeld appeared to have disclosed material non-public

financial information to an outside investor.[51]

Upon receiving the information from Ms. LaFond, Ms. Harkness understood that the

disclosure of material, non-public information could trigger Regulation FD, a securities law

violation.[52]  Although Fieldstone was not yet public, it had stock in registration and was about to

go public any day.[53]  The company was operating internally as though all securities regulations

applied.[54]

Ms. Harkness interviewed Mr. Argires and Mr. Partlow, who confirmed the disclosure

and expressed "shock" that Mr. Sonnenfeld had given information that could be in violation

---

[51] Ex. 1, Harkness Dep. at 123:11-124:19; Ex. 10, Harkness Aff. at ¶ 9.

[52] Ex. 1, Harkness Dep. at 133:10-18; 137:2-138:15; 148:5-146:15; Ex. 10, Harkness Aff. at ¶¶ 9-11.

[53] Ex. 10, Harkness Aff. at ¶ 11.

[54] Ex. 1, Harkness Dep. at 133:10-18; *See also* Ex. 10, Harkness Aff. at ¶¶ 10-11.

Regulation of FD.[55]  Recognizing the potential severity of the information she had received, Ms. Harkness was immediately concerned that, as general counsel, her receipt of this information triggered "up-the-ladder reporting" obligations under Sarbanes-Oxley.[56]  It is with that understanding that Ms. Harkness and Ms. LaFond contacted Jonathan Michael, the Chairman of Fieldstone's Audit Committee, to "advise him of the facts and solicit [his] input as to how [they] should proceed."[57]

At Mr. Michael's behest, Ms. Harkness and Ms. LaFond interviewed Mr. Sonnenfeld and ultimately drafted a memorandum to Mr. Michael of the facts and relevant law surrounding the matter.[58]

That Ms. Harkness subjectively believed that Fieldstone was in potential violation of Regulation FD is clear and supported by her testimony, as stated above.

> **(b)**     **The Evidence Demonstrates that Ms. Harkness's Belief that Regulation FD was Implicated and Warranted Reporting to the Audit Committee was Objectively Reasonable.**

There also is ample evidence in the record to support a finding that Ms. Harkness's belief that there may have been a securities law violation was objectively reasonable.  Plaintiff's expert Ivan Knauer, an expert in securities law, concluded in both in his deposition and his report that "it was objectively reasonable for Cynthia Harkness to believe that the actions of Michael Sonnenfeld on January 14, 2005, constituted a potential violation of . . . Regulation FD" and,

---

[55] Ex. 10, Harkness Aff. at ¶ 10.

[56] Ex. 1, Harkness Dep. at 124:12; 125:7; Ex. 4, January 26, 2005 Memorandum; Ex. 10, Harkness Aff. at ¶¶ 10-12.

[57] Ex. 4, January 26, 2005 Memorandum; Ex. 10, Harkness Aff. at ¶¶ 10-12.

[58] Ex. 4, January 26, 2005 Memorandum; Ex. 10, Harkness Aff. at ¶¶ 13-15.

moreover, that it was "appropriate for Ms. Harkness to contact the Chairman of the Audit Committee to seek guidance and to conduct a further investigation into the facts and circumstances regarding Mr. Sonnenfeld's actions." Expert Report of Ivan Knauer at 2-3.[59]

Defendant's attempts to dismiss Ms. Knauer's opinions is simply an attempt to relitigate Defendant's Motion to Strike Plaintiff's designation of Mr. Knauer as an expert.[60] Even if nothing else does, Mr. Knauer's opinion creates a dispute of material fact that precludes summary judgment on the objective reasonableness of Ms. Harkness's belief she was reporting a securities law violation in January 2005. Mr. Knauer testified at deposition that Mr. Sonnenfeld's conduct in selectively disclosing non-public information to a shareholder presents at least the possibility of a *prime facie* violation of Regulation FD.[61] Mr. Knauer further opined at deposition that it would require some effort for one not already intimately knowledgeable about securities law to understand that Regulation FD did not apply to Mr. Sonnefeld's conduct.[62] As Mr. Knauer testified, his opinion about whether Ms. Harkness's belief about the January 2005 incident was (or could be) a violation of Regulation FD was premised, in part, on Ms. Harkness not being familiar with the nuances of whether Fieldstone was an "issuer" as that term is defined in Sarbanes-Oxley.[63] As Mr. Knauer pointed out, the term "issuer" is a defined

---

[59] Mr. Knauer adopted his report at his deposition. Ex. 13, Knauer Dep. at 10:11 - 11:3.

[60] Defendant's claim that Mr. Knauer's opinion is somehow deficient because he gave it before Ms. Harkness was deposed is flawed. Mr. Knauer testified at deposition that he read Ms. Harkness's deposition before his own and that nothing he read caused him to change his opinions. Ex. 13, Knauer Dep. at 13:9-14:7.

[61] Ex. 13, Knauer Dep. at 20:13 - 21:5.

[62] Ex. 13, Knauer Dep. at 26:14 - 27:19

[63] Ex. 13, Knauer Dep. at 29:16 - 30:2.

term that is not always defined in the same way by various federal securities laws.[64]  Further, as

Mr. Knauer testified, because companies "come in all shapes and sizes" a chief legal officer of a

private company that has been private and is going public (as Fieldstone was) may not yet fully

understand all of the intricacies of what is required of public companies.[65]  Further, Mr. Knauer

testified ". . . it is not inconsistent in my opinion with being reasonable and diligent to

understand one's limitations and to take the time to investigate and learn under the appropriate

circumstances."[66]

The Fourth Circuit already has rejected Defendant's proposition that Mr. Knauer's

testimony must be barred and this Court has expressly denied Defendant's previous Motion to

Strike Mr. Knauer's report after the benefit of full briefing on the issue after the report was

issued. Because this issue has been briefed and decided in this case, Plaintiff will not repeat all

of her previous arguments.  She will note, however, that the Fourth Circuit has held that

objective reasonableness is not always a pure matter of law.  *Welch*, 536 F.3d at 278 n. 4.  The

*Welch* court stated that:

> . . . Welch argues that the [Administrative Review Board] erroneously
> held that objective reasonableness is *always* a question of law. We
> agree that the ARB would have erred if it had so held, because
> objective reasonableness is a mixed question of law and fact.  But the
> ARB did not hold that objective reasonableness is *always* a question
> of law. Rather, the ARB decided the question of objective
> reasonableness as a matter of law *in this case*, as we did in *Jordan v.
> Alternative Resources Corp.*, 458 F.3d. 332, 340-41 (4th Cir. 2006). As
> in *Jordan*, the ARB applied the familiar rule that issues may be

---

[64] Ex. 13, Knauer Dep. at 30:15 - 30:22.

[65] Ex. 13, Knauer Dep. at 33:3 - 33:11.

[66] Ex. 13, Knauer Dep. at 33:7 - 33:10.

> decided as a matter of law if the facts cannot support a verdict for the
> non-moving party. . .

*Id.* (emphasis in original). When facts are in dispute, or when inferences from those facts are in dispute, the question of reasonableness is either a question of fact or a mixed question of law and fact, either of which is appropriately a jury question. *Cf. Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 657 (4th Cir. 2004) (determination of materiality in a securities case is a mixed question of law and fact subject to decision as a matter of law only when no reasonable jury could find factual misstatement or omission material).

In this case, after reviewing Mr. Knauer's report and following briefing by the parties, this court denied Defendant's Motion to Strike Plaintiff's liability phase expert. Defendant advances no change in the law or other reason to revisit that question. Therefore, there is a triable issue of fact as to whether Mr. Harkness's belief that Mr. Sonnenfeld may have violated Regulation FD was objectively reasonable in January 2005.

### 3. The Evidence Demonstrates that Ms. Harkness's December 2006 Report to the Audit Committee Constituted Protected Activity.

Applying the reasoning of *Van Asdale* above, the facts support a finding that Ms. Harkness's December 2006 report to the Audit Committee is protected under the Act. At that time Ms. Harkness reported that she was unable to definitively conclude that Fieldstone was operating in compliance with relevant laws because her office was understaffed and she was being excluded from important meetings. [67] There is no dispute of fact that Ms. Harkness was, in fact, excluded from virtually all significant activity at that time. As the audit committee chair

---

[67] Ex. 10, Harkness Aff. at ¶¶ 25-26.

testified, "I think maybe we had already been approached by C-Bass at that point [of the December 2006 Audit Committee Meeting], and we all knew that [Ms. Harkness] was not in the loop because there were only a few people in the loop."[68]  Mr. Michael subsequently stated that  "[t]he fact that the general counsel was not in that process on the face was a problem."[69]

### C. MS. HARKNESS RAISES A TRIABLE ISSUE OF MATERIAL FACT THAT HER REPORTS TO THE AUDIT COMMITTEE CAUSED FIELDSTONE'S ADVERSE TREATMENT OF HER AND TERMINATION.

Measured against the proper legal standard it is clear that Ms. Harkness has generated a dispute of material fact as to whether her protected activity led to her firing. Therefore, Defendant's Motion should be denied.

### 1. The Act Only Requires that the Protected Activity be a Contributing Factor of The Adverse Action.

The whistleblower protections of Sarbanes-Oxley are triggered when circumstances "were sufficient to raise the inference that the protected activity was a *contributing* factor in the unfavorable action."  *Van Asdale,* __ F.3d __, 2009 WL 2461906 at *12 (*citing* 29 C.F.R. § 1980.104(b)(1)(iv)) (emphasis added).  The record evidence is ample for a fact finder to conclude that Ms. Harkness's reports to the Audit Committee Chair in January 2005 and to the full audit committee in December 2006 were a contributing factor to Fieldstone's exclusion and isolation of Ms. Harkness, removal of her responsibilities, and ultimately to Ms. Harkness's firing in January 2007.

---

[68] Ex. 5, Michael Dep. at 72:23 - 73:11.

[69] Ex. 5, Michael Dep. at 73:12 - 73:19.

##### 2. The Evidence Demonstrates that Ms. Harkness's Reports to the Audit Committee Contributed to Fieldstone's Adverse Treatment and Decision to Terminate Ms. Harkness.

Carol Ballentine, the Human Resources manager at the time of the first occurrence of protected activity, testified that after learning that Ms. Harkness had reported his disclosure to Mr. Michael, Mr. Sonnenfeld initially wanted to fire Ms. Harkness.[70]  Because Ms. Ballentine was concerned that terminating Ms. Harkness for making a report about a potential securities law violation would violate the whistleblower provision of the Act, she and Jeannie Slone, the Human Resources director, hired outside counsel, Tom Dowd, to investigate the matter.[71]  As Ms. Ballentine stated during her deposition, "the primary purpose in calling Mr. Dowd was in connection with Michael [Sonnenfeld's] stated desire to terminate Cynthia in connection with her making a report to the audit committee."[72]  After receiving the legal advice, Fieldstone ultimately decided not to terminate Ms. Harkness at that time.   Instead, however, Ms. Ballentine noted that the relationship between Mr. Sonnenfeld and Ms. Harkness deteriorated.[73]

Ms. Harkness stated that around the same period of time following her report to the Audit Committee, Mr. Sonnenfeld's behavior toward her drastically changed.  Though she had previously received a glowing annual review, her review from Mr. Sonnenfeld the following year was markedly cold.[74]  Further, Mr. Sonnenfeld excluded Ms. Harkness from attending

---

[70] Ex. 6, Ballentine Dep. at 24:12 - 25:5; 28:1-20.

[71] Ex. 6, Ballentine Dep. at 44:18 - 45:14.

[72] Ex. 6, Ballentine Dep. at 45:11-12.

[73] Ex. 6, Ballentine Dep. at 100:1 - 101:11.

[74] Ex. 10, Harkness Aff. at ¶18; *See also*  Ex. 8, 2006 Performance Appraisal.

senior management meetings, changed the reporting structure so that she would no longer report to him, isolated Ms. Harkness within the company and belittled her when she advised Mr. Sonnenfeld of Fieldstone's potential legal risks.[75] Ultimately, Ms. Harkness felt she could no longer effectively perform her job as general counsel because Mr. Sonnenfeld had excluded from information about Fieldstone's activities and denied her the resources she required to ensure that Fieldstone was compliant with applicable laws and regulations.[76] When she spoke out about these concerns to external auditors in December 2006 and, at their suggestion, to the Audit Committee, Mr. Sonnenfeld terminated Ms. Harkness.[77]

Given Ms. Ballentine's testimony that Mr. Sonnenfeld was determined to fire Ms. Harkness for reporting him to the Audit Committee chair in January 2005, his progressive exclusion and isolation of Ms. Harkness from the company, and her ultimate termination, it is not unreasonable for a trier of fact to conclude that Ms. Harkness's report to Mr. Michael in 2005 was a contributing factor to Mr. Sonnenfeld's subsequent adverse treatment of her and termination from the company. Because there is thus a genuine issue of material fact, summary judgment is inappropriate.

It is particularly appropriate to require a trial in this case because Defendant must rebut Plaintiff's *prima facie* case with clear and convincing evidence, not merely with a preponderance of the evidence. *See Welch,* 536 F. 3d at 275 *(citing* 49 U.S.C. 42121(b)(2)(B)). The Supreme Court has defined clear and convincing evidence as evidence which "produces in the mind of the

---

[75] Ex. 10, Harkness Aff. at ¶¶ 19-23.

[76] Ex. 10, Harkness Aff. at ¶¶ 25-26.

[77] Ex. 10, Harkness Aff. at ¶¶ 26.

trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the fact-finder] to come to a clear conviction, without hesitancy." *Cruzan v. Director, Mo. Dep't of Health*, 497 U.S. 261, 285 Fn. 11 (1990) (citation omitted). Defendant clearly has not met that burden.

### 3. The Mere Passage of Time does not Defeat Plaintiff's Claim.

Because Plaintiff has direct evidence that she was fired as a result of her January 2005 report to the audit committee the fact that 23 months separate the initial protected activity and the termination does not defeat her claim. As courts have recognized, "[t]emporal proximity is only one of several methods for demonstrating the requisite causal link between an adverse employment action and a charge of unlawful retaliation." *Lore v. City of Syracuse*, 583 F. Supp. 2d 345, 368 (N.D.N.Y. 2008). In this case, as set forth in Plaintiff's statement of facts, there is direct evidence that Fieldstone's CEO Michael Sonnenfeld stated he wanted to fire Ms. Harkness because of the January 2005 report. Thus, unlike the plaintiff in *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268 (2001), Plaintiff does not rely on temporal proximity to establish her retaliation claim.

In *Lettieri v. Equant Inc.*, 478 F.3d 640 (4th Cir. 2007), the Fourth Circuit recognized that the *Breeden* holding is limited to those cases in which temporal proximity between some protected activity and an adverse employment action is the only evidence of discrimination. "In cases 'where temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus.'" *Lettieri*, *supra*, 478 F.3d at 650 (quoting *Farrell v. Planters Lifesavers, Co.*, 206 F. 3d 271, 281 (3d Cir. 2000)). The *Lettieri* plaintiff overcame the lack of temporal proximity between her

complaint of gender discrimination in December 2001 and her termination in July 2002 with evidence that in the intervening months her job responsibilities and authority were stripped away from her.  *Lettieri,* 478 F.3d at 650-51.

The *Farrell* court, upon which the Fourth Circuit relied in *Lettieri*, held that in retaliation cases a plaintiff may rely upon "a broad array of evidence" to demonstrate a causal link between protected activity and a retaliatory employment action. *Farrell,* 206 F.3d at 284; *see also Kachmar v. SunGuard Data Sys.*, 109 F.3d 173, 177 (3d Cir. 1997)(circumstantial evidence of a pattern of antagonism following protected activity can give rise to an inference of retaliation). The evidence in this case, as set out in Plaintiff's facts, is that following her report to the audit committee chairman Ms. Harkness: had her responsibilities cut; was isolated within the company; was given unjustified harsh reviews; was given a new reporting line; and suffered from public humiliating and belittling behavior from Mr. Sonnfenfeld.  That evidence is more than sufficient to overcome any lack of temporal proximity between Ms. Harkness's original protected activity and her termination.  Of course, the time between the second report to the audit committee and the termination was sufficiently close to give an inference of retaliation from that second incident.

For those reasons, Defendant is not entitled to summary judgment.

### 4.     The Credibility of Carole Ballentine's Testimony Is a Question for the Trier of Fact.

Defendant's effort to launch a pre-emptive attack on Carol Ballentine's Declaration based on her subsequent deposition testimony on the grounds that the earlier statement is inaccurate or the product of bias should be rejected as just the type of credibility determination that may not be made on a motion for summary judgment. Defendant's argument overstates both

the alleged discrepancies between Ms. Ballentine's Affidavit and her subsequent deposition and overstates the holding of the more than 100 year-old case upon which it relies.

In her Declaration filed in the OSHA proceeding initially brought by Ms. Harkness, (attached as Ex. LL to Defendant's Motion) Ms. Ballentine stated that when Michael Sonnenfeld learned of Ms. Harkness's March 2005 report to the audit committee he told "me and Jean Slone" that he wanted to fire Ms. Harkness. Def. Ex. LL at ¶ 4. Later in that same paragraph, Ms. Ballentine wrote that: "Slone and I talked with Sonnenfeld about my concerns (that firing Ms. Harkness would violate the Sarbanes-Oxley law), but he still wanted to fire Harkness." *Id*. Ms. Ballentine went on to say that Fieldstone obtained outside counsel to get advice on the matter and that she "participated in several meetings with Sonnenfeld and Slone to discuss his (Sonnefeld's) desire to fire Harkness. . ." *Id*. Ms. Ballentine concluded that eventually she and Ms. Slone were able to convince Mr. Sonnefeld not to fire Harkness. *Id*.

At her deposition, Ms. Ballentine testified (in pertinent part): that she and Ms. Slone spoke with attorney Tom Dowd on March 9, 2005 about whether firing Ms. Harkness because of Mr. Sonnenfeld's unhappiness about her report to the audit committee chair could create liability for Fieldstone under Sarbanes-Oxley;[78] that within a few days of the first telephone call there was a second call with Mr. Dowd in which he expressed concern about whether Ms. Harkness was a whistleblower and that her termination could be seen as retaliation;[79] and that she has a specific memory of having conversations with Mr. Sonnenfeld and Ms. Slone about whether it was appropriate to fire Ms. Harkness and that the conversation was "around terminating her in

---

[78] Ex. 6, Ballentine Dep. at 44-45.

[79] Ex. 6, Ballentine Dep. at 49.

connection with the report to the audit committee."[80] At her deposition Ms. Ballentine did not remember the precise date of her conversations with Mr. Sonnefeld and Ms. Slone, but recalled that they took place between March 2005 and Memorial Day 2005.[81] Ms. Ballentine was quite clear at her deposition that the principal purpose of her telephone call with Mr. Down on March 9 was to discuss terminating Ms. Harkness because of her call to the audit committee.[82]

These facts make clear that there is simply no fatal inconsistency between Ms. Ballentine's deposition testimony and her previous Declaration. Whether or not she was in the initial meeting with Mr. Sonnefeld and Ms. Slone in which the termination of Cynthia Harkness was discussed (a seeming discrepancy between the deposition and Declaration), there is no inconsistency about her having been involved first-hand in discussions with Ms. Slone and outside counsel Tom Dowd about firing Ms. Harkness. The fact that the billing records from Littler do not specifically reflect discussions about firing Ms. Harkness but instead refer to more general issues provides room for argument to a fact-finder about which is more reliable evidence and what inferences should be drawn, but does not create a factual inconsistency.

The rest of Defendant's attack on Ms. Ballentine's Declaration suggests that her own termination by Fieldstone creates bias that makes ignoring her testimony appropriate. This contention completely ignores the fundamental summary judgment principals that all evidence is construed in the light most favorable to the non-moving party and that the court will not make credibility determinations..

---

[80] Ex. 6, Ballentine Dep. at 53-54.

[81] *Id*., Ballentine Dep. at 54.

[82] *Id.*, Ballentine Dep. at 45.

Defendant's argument that Ms. Ballentine's declaration should be ignored also overstates the holding and subsequent interpretation of the sole case it relies upon, *The Santissima Trinidad*, 20 U.S. 283, 339 (1822). The *Santissima* court, ruling on an appeal following a full trial, approved of the maxim *falsus in uno falsus in omnibus* when confronted with testimony, stating, "[W]here the party speaks to a fact in respect to which he cannot be presumed liable to mistake, as in relation to the country of his birth, or his being in a vessel on a particular voyage, or living in a particular place, if the fact turn out otherwise, it is extremely difficult to exempt him from the charge of deliberate falsehood." *Id.* On the other hand, when a witness's testimonial discrepancies may "be accounted for in a manner consistent with the utmost good faith and probability, there is much reason for indulging the belief that the discrepancies arise from the infirmity of the human mind, rather than from deliberate error." *Id.* at 338-39. In this case, Defendant seeks to have the earlier statement excluded, despite it being closer in time to when the events took place and presumably when the events were fresher in the witness's mind, rather than the more remote testimony taken years later. Additionally, the matters about which Ms. Ballentine is testifying are matters that the passage of time might affect.

Whatever merit the maxim adopted in the *Santissima* may have, even if appropriate it is a discretionary one relating to evaluating the weight of evidence not a positive rule of law about the admissibility of evidence.[83] *Schneider v. United States*, 57 F.2d 454, 457 (3rd Cir. 1932). As the Third Circuit noted, "The maxim, '*Falsus in uno, falsus in omnibus*,' as pointed out by Wigmore . . . has to do solely with the weight, not the admissibility of the evidence." *Schneider*,

---

[83] Even if the *Santissima Trinidad* had laid down a rule of evidentiary law it is highly unlikely it would have survived the adoption of the Federal Rules of Evidence.

57 F.2d. at 457 (citing *Shecil v. United States*, 226 F. 184, 187 (7th Cir. 1915)).  Because it is a discretionary rule going to the weight of the evidence, it is not one that is appropriate for application when deciding summary judgment, at which time all evidence in to be taken in the light most favorable to the non-moving party and all reasonable inferences are given to the non-moving party.  At a trial, a fact-finder may decide what weight to give Ms. Ballentine's testimony and how to weigh it against other evidence.  As the Fourth Circuit has held "It is not our job to weigh the evidence, to count how many affidavits favor the plaintiff and how many oppose him, or to disregard stories that seem hard to believe." *Gray v. Spillman*, 925 F.2d 90, 95 (4th Cir. 1991).

## CONCLUSION

For the foregoing reasons, Defendant's Motion should be denied.

Respectfully submitted,

____/s/_____
Joseph B. Espo, Fed. Bar No. 07490
Mehgan Sidhu, Fed. Bar No. 28173
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore Street, Ste. 1700
Baltimore, Maryland 21202
(410) 962-1030
jbe@browngold.com
ms@browngold.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on September 21, 2009, a copy of the forgoing Plaintiff's Opposition to Defendant's Motion for Summary Judgment, proposed Order, and Exhibits were served on all parties via the Court's Electronic Filing System.

                                                /s/
                                             Joseph B. Espo