# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Northern Division

---

CYNTHIA L. HARKNESS,

       *Plaintiff,*

*v.*                                   Civil Action No.: 1:08-CV-00231-CCB

C-BASS DIAMOND, LLC

       *Defendant.*

---

# REPLY MEMORANDUM IN SUPPORT OF
# DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Joseph E. Schuler (Fed. Bar #04360)
Matthew F. Nieman (Fed. Bar #17558)
JACKSON LEWIS LLP
10701 Parkridge Boulevard, Suite 300
Reston, VA  20191
(703) 483-8300
*Attorneys for Defendant*

# TABLE OF CONTENTS

I.   Plaintiff's Response to Defendant's Statement of Material Facts Not In Dispute ...... 2

II.  Plaintiff's Counter Statement of Material Facts ............................................................. 5

III. Argument ........................................................................................................................ 9

     A. Plaintiff Presents No Triable Issue Of Fact As To Her December 2006 Report .......... 9

     B. The Act Does Not Apply To Plaintiff's January 2005 Activity ................................. 11

     C. Plaintiff Did Not Have A Reasonable Belief That She Was Reporting A Covered
        Violation Of Law In January 2005 ........................................................................... 12

     D. Plaintiff's Expert Cannot Create A Factual Dispute Where None Exists ................... 16

     E. Plaintiff Cannot Show Causation .............................................................................. 18

        1. Ballentine's statement is not direct evidence and it is not admissible ................. 19
        2. Plaintiff's January 2005 activity is too remote in time to permit an inference of
           causation, and Plaintiff has no other evidence sufficient to permit an inference
           of causation ........................................................................................................ 21

IV.  CONCLUSION ............................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Admin. Review Bd.*, 514 F.3d 468 (5th Cir. 2008) ............................................. 13, 15, 18

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................... 25

*Barwick v. Celotex Corp.*, 736 F.2d 946 (4th Cir. 1984) ................................................ 24

*Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) .............................. 12

*Day v. Staples, Inc.*, 555 F.3d 42 (1st Cir. 2009) ............................................................ 16

*Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653 (4th Cir. 1998) ..... 24, 25

*Farrell v. Planters Lifesavers Co.*, 206 F.3d 271 (3rd Cir. 1999) ................................. 22

*Fraser v. Fiduciary Trust Company International*, 2009 WL 2601389 (S.D.N.Y.) .............. 24, 25

*Hall v. U.S. Dep't of Labor*, 476 F.3d 847 (10th Cir. 2007) ......................................... 19, 20

*Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173 (3rd Cir. 1997) ..................... 22

*Lerbs v. Buca di Beppo, Inc.*, 2004-SOX-8 (ALJ June 15, 2004) ................................. 11

*Lettieri v. Equant Incorporated*, 478 F.3d 640 (4th Cir. 2007) .................................... 22

*Livingston v. Wyeth, Inc.*, 520 F.3d 344 (4th Cir. 2008) ............................................... 10, 13

*Rao v. Daimler Chrysler Corp.*, 2007 WL 1424220 (E.D. Mich. 2007) ...................... 12

*Russello v. United States*, 464 U.S. 16 (1983) ................................................................ 12

*Seago v. North Carolina Theatres, Inc.*, 42 F.R.D. 627 (E.D. N.C. 1996), aff'd, 338 F.2d 987 (4th Cir. 1967) ........................................................................................... 24

*The Santissima Trinidad*, 20 U.S. 283 (1822) ............................................................... 21

*Van Asdale v. International Game Technology,* 2009 WL 2461906 (9th Cir. 2009) .. 9, 10, 13, 14, 15

*Vaughn v. Epworth Villa*, 537 F.3d 1147 (10th Cir. 2008) ........................................... 19, 20

*Welch v. Chao*, 536 F. 3d 269 (4th Cir. 2008) ............................................................... 9, 10, 11, 13, 16

**Rules**

Fed. R. Civ. P. 56 ................................................................................................................ 2, 23

Federal Rule of Evidence 803(6) ........................................................................................ 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
**Northern Division**

| | | |
|---|---|---|
| **CYNTHIA L. HARKNESS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil Action No.: 1:08-CV-00231-CCB** |
| | ) | |
| **C-BASS DIAMOND, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPLY MEMORANDUM IN SUPPORT
## OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant C-Bass Diamond LLC[1] hereby submits its Reply Memorandum in support of its Motion for Summary Judgment and in response to the Opposition thereto filed by Plaintiff Cynthia L. Harkness ("Harkness" or "Plaintiff"). Based upon the material, uncontested record before the court, neither incident relied upon by Plaintiff constitutes protected activity under the employee protection provisions of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A(a)(1) ("the Act"). Moreover, Plaintiff cannot establish a causal link between the alleged protected activity and her termination from employment. Accordingly, for the reasons set out below and in Defendant's Motion, based upon undisputed material facts, Defendant is entitled to judgment as a matter of law as to each of the instances of alleged protected activity relied upon by Plaintiff.

Defendant will first address Plaintiff's Response to Defendant's Statement of Material Facts Not In Dispute And Counter-Statement Of Material Facts [Doc. 54], then turn to argument in response to Plaintiff's Opposition [Doc. 55] and in support of its motion. [Doc. 49]

---

[1] Continuing the practice adopted by both parties in their opening briefs, Defendant will hereafter refer to itself in this memorandum as "Fieldstone" or "Defendant."

# I. Plaintiff's Response to Defendant's Statement of Material Facts Not In Dispute

Plaintiff does not offer any response to most of the facts recited by Defendant in its Statement of Material Facts Not In Dispute, and as such they should be accepted as true for purposes of this motion because they are supported by the accompanying citation to the record. *Cf.* Rule 56 (e) . The facts not contested by Plaintiff are Defendant's Facts Nos. 1-9; 13-18; 20; 24-32; 36-40; 44-54; and 56-61. The concerns raised by Plaintiff with the remainder of Defendant's Facts are misplaced or of no moment, as follows.

10. The statement of fact characterizing Plaintiff's knowledge of securities law as "passing" is a fair reading of the cited testimony. Regardless, Plaintiff agrees that she was not an expert and had only "a general understanding of the framework of securities laws."

11. The statement of fact that Plaintiff did not know on January 17, 2005 whether Regulation FD applied is fully supported by the cited testimony, including her testimony that it was "unclear" to her whether it applied.

12. The statement of fact in paragraph No. 12 is supported by the record cites, and Plaintiff does not contend the statement is untrue, nor offer any record citation in opposition. Moreover, other record citations lend further support. See Ex. F[2], Harkness Tr. at 126:8 – 128:5; 134:1 – 8; 134:12 – 17.

19. The statement of fact in paragraph No. 19 is supported. In addition to the citation offered by Plaintiff in her own response, she also testified that LaFond's research took place after the fact. Ex. F, Harkness Tr. at 140:10 – 16.

21. Plaintiff is mistaken and has not re-read her own document. As cited by Defendant, her January 26, 2005 memorandum to the Audit Chair expressly states that Partlow and Argires

---

[2] Unless noted otherwise, lettered Exhibits refer to exhibits in Defendant's compendium of exhibits filed with its Motion, and numbered Exhibits refer to exhibits appended to Plaintiff's Opposition.

each told her that Sonnenfeld informed the investor that the information was non-public and he could not trade on it. Ex. C, January 26, 2005 Memorandum, at ¶ 5 (d) and (g). See also Ex. C at ¶ 8 (c) (reporting that Sonnenfeld confirmed this when interviewed).

22. The testimony cited by Plaintiff does not support her partial challenge to the undisputed facts recited in paragraph No. 22. Rather, at the testimony cited by Plaintiff, she stated that she "thinks" – present tense, meaning as her deposition was being taken – that Argires, Partlow and LaFond all "thought" – past tense, meaning as of January 2005 – that Regulation FD applied. Her self-serving, conclusory deposition testimony is belied by her January 26, 2005 memorandum, where she contemporaneously reported that Argires and Partlow each stated to her that Sonnenfeld's statements to the investor might be a violation of Regulation FD *if Fieldstone was public* (which they all knew it was not). Ex. C at ¶ 5 (f) (emphasis added). Regardless, her challenge to this fact paragraph does not go to the facts actually recited and documented by the record cites, namely, that Argires and Partlow put Plaintiff on notice that Regulation FD did not apply to Fieldstone until it went public, and she failed to take any step to confirm or deny this critical distinction, including consulting with the Company's outside securities counsel or directing LaFond to do the basic research. Whether Plaintiff now "thinks" that LaFond then believed Regulation FD applied is speculative, conclusory and immaterial.

23. Defendant disagrees that the record citation does not support the paragraph. Regardless, Plaintiff concedes that the fact is undisputed.

33. The notes created and maintained by the human resources department are competent for purposes of Defendant's summary judgment motion because they were identified by Ballentine (as Plaintiff concedes), and would be admissible at trial as business records pursuant to Federal Rule of Evidence 803(6). Ballentine testified that such records of meetings attended

3

by senior HR staff, including this particular record, were made at the time by a person with knowledge, in the course of a regularly conducted activity, as a regular practice. By her position and knowledge (the number two HR officer, who created or reviewed these records) she was qualified to give this information and Plaintiff has suggested nothing to indicate that her testimony on this point is untrustworthy. See Supplemental Excerpts from Transcript of Deposition of Carol Ballentine (appended hereto as Exhibit. 1) at 40:18 – 41:14; 43:17 – 44:3; 56:11 – 57:9.

34. See response in support of paragraph No. 33, above.

35. Defendant's statement is intended to attribute to Dowd only his knowledge of what he was told, including what others said they believed or had done, not any knowledge of what other actually believed or had done.

41. Plaintiff's concession that she had an affirmative obligation to report the restructuring if she believed it to be retaliation is implicit from the testimony cited by Defendant in support of this Fact and Fact No. 42, and is therefore a reasonable, indeed necessary, inference. She expressly concedes that she had an affirmative obligation to report violation of law, that retaliation in violation of SOX (or Title VII) is a reportable violation, and that she made no report. It is also worth noting that Plaintiff affirmed that she took her reporting obligations seriously and that her reports were accurate and complete. See Defendant's Fact No. 53.

42. Plaintiff's statement concerning this Fact is non-responsive and irrelevant.

43. At her deposition, as reflected in the testimony cited by Defendant, Plaintiff disputed the exact words used by Kisnadwala in his declaration but not their essence. The essence, according to her, was that he informed her something had to change or she had to go.

55. Plaintiff's quibble concerning Fact No. 55 is non-responsive and immaterial. No

party has relied upon or produced notes of a committee session, and she acknowledges that there are no official notes.

## II.    Plaintiff's Counter Statement of Material Facts

At the outset, Defendant notes that a number of Plaintiff's Facts contain argument, including her characterization as to how a given fact should be perceived. Most are immaterial, but in any event such characterization and argument are improper, and Defendant objects to their inclusion and asks that these "facts" be disregarded. Specific paragraphs as to which this general objection applies will be noted below, along with Defendant's other responses.

2. Whether Plaintiff's background is "exceptional" is argument. The uncontested record supports that she worked for Fieldstone from March 2004 until January 2007, nothing more.

3. Plaintiff's performance review speaks for itself and any embellishment is argument of counsel. In particular, the record citations do not support that Plaintiff did anything "single-handedly" or that Sonnenfeld's expectations of her in her first part-year were "more than met." Plaintiff's self-serving characterizations in her affidavit of her performance or how Sonnenfeld perceived her are not admissible evidence because they are conclusory, speculative or both.

4. Harkness was first employed in the Spring of 2004, so Plaintiff's assertion that Sonnenfeld added to her job assignments at that time "in view of her outstanding performance" is plainly not just argument, but impossible. Again, her performance review speaks for itself and her own self-serving characterizations in her affidavit of her performance or how Sonnenfeld perceived her are inadmissible as conclusory, speculative or both.

5. Plaintiff's performance review speaks for itself, and the self-serving characterizations in her affidavit of her performance or how Sonnenfeld perceived her are inadmissible as conclusory, speculative or both. Moreover, to the extent that her characterization of the timing

of her review as "early" is intended to imply that the review took place before her alleged protected activity of reporting to the Audit Chair and interviewing Sonnenfeld at his direction on January 17, 2005, the implication is incorrect based on the undisputed record. The review itself indicates on its face that it was prepared for a review meeting scheduled for January 26, 2005 – nine days after the alleged protected activity. See Exhibit 3 to Plaintiff's Opposition at p. 1 (Bates number Harkness 000544). The written review was personally prepared by Sonnenfeld within days of the date scheduled for the meeting (i.e., January 26, 2005) and encompassed Plaintiff's performance up to the date of review. See Supplemental Excerpts from Transcript of Deposition of Michael Sonnenfeld (appended hereto as Exhibit. 2) at 98:19 – 100:1; Declaration of Michael J. Sonnenfeld (Sonnenfeld Dec.) at ¶¶ 2-4 (appended hereto as Exhibit 3).[3] Accordingly, Sonnenfeld prepared and delivered to Plaintiff a review she now characterizes as "glowing" *even after he was aware of her alleged protected activity. Id.* at ¶ 5.

7. Plaintiff's paragraph 7 overstates or misstates the record in two material respects. First, the initial "report" of Sonnenfeld's conversation with the investor was made *by Sonnenfeld* to another senior officer of the Company (Partlow) and its outside auditor (Argires), and included details making it plain that he had communicated to the investor in confidence, with an agreement not to trade. Plaintiff's Ex. 4, Defendant's Ex. C (January 26, 2005 Memorandum) at 2. Second, Plaintiff attributes to Partlow and Argires "concern" that Sonnenfeld had given the information in potential violation of Regulation FD. Plaintiff has not submitted evidence of Partlow's and Argire's motive. The January 26, 2005 memorandum itself – prepared

---

[3] Like Harkness, Sonnenfeld does not recall the exact date they met for her review. However, based on his custom and practice the review meeting would have been on or after the "scheduled date" listed in the document introduced by Plaintiff as Exhibit 3 to her Opposition. Defendant's Ex. 3, Sonnenfeld Dec. at ¶ 2-4. In any event the more relevant date is the date that Harkness' self-proclaimed "glowing" review was prepared, and it was prepared after Sonnenfeld was aware that she was investigating him for his conversation with the investor. *Id*. at ¶ 4. As this review documents, her investigation did not affect his perception of her as an employee. *Id*. at ¶ 5.

contemporaneously by Harkness, does not support such a "concern," and instead supports the opposite conclusion. The expression of "concern" attributed to them by Harkness in her report is that they believed Sonnenfeld's interaction with the investor might have implicated a violation Regulation FD *"if Fieldstone were public."* *Id.* at p. 2, ¶ 5 (f) (emphasis added). Of course, everyone at the Company involved in the earnings restatement was aware Fieldstone was not public, because the purpose for the restatement was to permit that process to move forward. At the same time, to the extent it is fair to infer a basis or motive for the decision by Partlow and Argires to voice concern, one need look no further than the Company's internal Code of Business Conduct. As confirmed by the January 26, 2005 memorandum, Sonnenfeld's interaction with the investor was in derogation of the Code even though it was not in violation of Regulation FD (and would not have been even if the Company had already been public). *Id.* at pp. 2-3, ¶¶ 10 & 11. See Ex. F, Harkness Tr. at 135 (confirming that compliance with the Company's Code of Business Conduct was an issue under review).

8. Plaintiff overstates or misstates her record as to the facts in paragraph 8 in three respects. First, to be clear, Plaintiff concedes – and the record she cites documents – that the only research she undertook before speaking to the Audit Chair was to review her personal "up the ladder" reporting obligations. Any implication that she did other research is misplaced, and in particular she failed to research the seminal question of whether Regulation FD applied – which her own expert concedes would have materially altered the conclusion that up-the-ladder reporting requirements were even triggered.[4] Second, the January 26, 2005 memorandum reports that the Audit Chair spoke with the Chairman of the Board (who had spoken with *his* counsel), not that the Chair spoke with securities counsel before directing Plaintiff to interview

---

[4] See Ex. JJ, Excerpts of the Deposition of Ivan Knauer at 47 (Regulation FD did not apply), 71, 74-75 (if consulted, securities counsel would have reached same conclusion, and Harkness would have had no reason to report to the Audit Chair)

Sonnenfeld. Plaintiff's Ex. 4, Defendant's Ex. C at p. 2, ¶ 7. This distinction is noteworthy to the extent Plaintiff intends to suggest that the Chair was relying on input from any counsel other than her as to whether an investigation was warranted. As the January 26, 2005 memorandum reflects, once he did relate the facts to his securities counsel, the clear answer was that Regulation FD was not implicated. *Id.* at p. 2, ¶ 10. Third, as also reflected in the memorandum, when interviewed by Harkness, Sonnenfeld confirmed to her not only the reason he had spoken with the investor but that he had spoken in confidence on the understanding that the investor would not trade on the information while it was non-public. *Id.* at p. 2, ¶ 8.

10. Defendant's grounds as to why the allegations attributed to Carol Ballentine reflected in this paragraph cannot be taken as material facts are set out in detail its opening brief at section III.D.6, and further analyzed below in response to Plaintiff's Opposition brief. Defendant relies on these arguments and facts and will not further address the question here.

11-18. In these paragraphs, Plaintiff recites a number of workplace incidents that document issues arising from her performance in the workplace and Sonnenfeld's reaction to her performance. For purposes of this motion, Defendant does not dispute the underlying, unvarnished facts related, insofar as they go.[5] Plaintiff's Facts in these paragraphs also contain argument, including characterization as to how a given fact or document should be perceived by the reviewer. Most are immaterial, but in any event such characterization and argument are inadmissible as evidence, and Defendant objects to their inclusion and asks that these "facts" be disregarded. Documents and events speak for themselves.

---

[5] In addition to disputing the improper gloss and argument put on the facts in Plaintiff's presentation, Defendant also notes that these facts are not material except to confirm that Plaintiff's tenure with Fieldstone was unquestionably a mixed-bag. The unvarnished facts detailing this relationship, as set out in Plaintiff's version or in Defendant's version (see Defendant's Facts 31-48), document that, rightly or wrongly, Sonnenfeld had significant issues with how Plaintiff performed aspects of her job, and it came as no surprise to her when she was terminated.

21. The first two sentences of this paragraph mirror Defendant's Facts at paragraph 48. The final sentence of paragraph 21 (repeated twice) is curious at best, because Defendant does not make a "passing contention that Plaintiff resigned." At Defendant's Fact No. 46, Defendant recites the same facts that Plaintiff testified at her deposition and now repeats at ¶ 27 of her Affidavit in support of her Opposition: in mid-December 2006, she informed Goresh that she was prepared to resign if offered an acceptable package; she then went on vacation; when she returned, Goresh informed her she was terminated and presented her with a termination package. The remainder of the paragraph combines argument by counsel with facts for which Plaintiff offers no record support. As such, they may not be considered for purposes of this motion.

III.  **Argument**

A.  **Plaintiff Presents No Triable Issue Of Fact As To Her December 2006 Report**

Importantly, it is undisputed that: (1) Plaintiff was not aware of any violations of law by Fieldstone when she made her December 5, 2006 report to the Audit Committee; and (2) when Plaintiff was asked point blank during her December 2006 report to the Audit Committee whether she was aware of any illegal acts, she replied that she was not. Defendant's Facts 57 & 58. On this basis alone, Defendant is entitled to summary judgment as to Plaintiff's claim that she was retaliated against for her statements at this meeting. Plaintiff did not engage in protected activity because her report did not definitively and specifically relate to one of the laws or securities regulations listed in the Act, or otherwise implicate fraud against the shareholders. *See, e.g., Welch v. Chao*, 536 F. 3d 269, 275 (4th Cir. 2008).

Plaintiff attempts to salvage her position by asking the court to apply "the reasoning of *Van Asdale [v. International Game Technology, 2009 WL 2461906 (9th Cir. 2009)]*." Opposition at 21. However, in the single short paragraph devoted to this claim, Plaintiff never

connects the dots to explain why the highly fact-specific analysis applied to the claims one of the plaintiffs in that case applies to the facts of her case, consonant with the precedent of this Circuit. It does not.

To the extent that Plaintiff contends that *Van Asdale* means that any request to investigate or take action to address a potential violation of law is protected activity, that is plainly not the law of this Circuit, nor any other Circuit which has addressed this issue, nor the Arbitration Review Board, to whom courts should look for guidance in interpreting the Act and regulations.[6] This analysis is contained in Defendant's opening brief at section III.B. & C, pp. 6 - 12, and will not be repeated here, except to note as follows. First, in *Livingston v. Wyeth, Inc.,* 520 F.3d 344 (4th Cir. 2008) the court considered and rejected essentially this same argument. The dissent in *Livingston* believed that the plaintiff had met the essential elements of his claim by showing that he had provided information that he reasonably believed constituted a violation of one of the enumerated categories by repeatedly reporting his *concern* that FDA regulations were certain to be violated, that violations were being covered up, and that, as a result, shareholders were being impacted adversely. *Id.* at 362. The majority did not accept this premise, and instead held that "the employee must have an objectively reasonable belief that a violation *is actually occurring* [or has occurred] based on circumstances that the employee observes and reasonably believes." *Id.* at 352 (citation omitted; emphasis supplied). The court went on to list a number of reasons why the plaintiff's asserted concern was not sufficient to show a reasonable belief that he was reporting conduct in violation of the law, including that speculation will not do. *Id.* at 353-55. Here, Harkness was explicit that she was unable to say, one way or the other, whether the Company was in compliance with certain of its legal obligations. Her concern was not based on her belief that a law had been violated but instead that she did not have the degree of assurance

---

[6] As to the latter point, *see, e.g., Welch*, 536 F.3d at 276.

that she preferred, and a belief that she did not have the resources to secure that assurance.

Second, taking into account Plaintiff's Complaint and her Opposition, she still has not identified the law or regulation that she contends was the subject of her report on December 5, 2006. Pointing to the "tone at the top" of the Company and to a lack of resources for her compliance department is not enough. Failure to specify the law in question even after he went to court was held fatal to the plaintiff's claim in *Welch*, 536 F. 3d at 278-79, n.5 (4th Cir. 2008) ), and should be in this case, too.

### B.    The Act Does Not Apply To Plaintiff's January 2005 Activity

Plaintiff cites an administrative law judge decision, *Lerbs v. Buca di Beppo, Inc.*, 2004-SOX-8 (ALJ June 15, 2004), to support her contention that the Act applies to her January 2005 activity, even though Fieldstone was not then covered by the Act, because Fieldstone later became a publicly traded company. The decision is not on point and, in any event, not persuasive.[7] In *Lerbs* the question was whether the Act applied retroactively, that is, whether it protected activity undertaken by an employee of a publicly traded company before the effective date of the Act, when the company retaliated after the effective date. These facts are inapposite to this case, and put a different context on the ALJ's reliance on the language of the statute to conclude that he need look no further than the date on which the adverse action took place.

The analysis is different when the question is whether the Act should apply "retroactively" to ensnare a company that was not publicly traded when the alleged protected activity took place. Such employees have not "blown the whistle" at a publicly traded company, so the plain language of the Act is ambiguous at best. There is no evident congressional intent to impose the burdens of the Act on such companies; exactly the opposite. As discussed in

---

[7] The single on-point ALJ decision – referenced by Defendant in its opening brief at note 9 – does not provide analysis, and merely cites to *Lerbs*.

Defendant's opening brief, the fact that Congress expressly made other Sarbanes-Oxley requirements applicable to companies before they become publicly traded is good reason to conclude otherwise and find that the Act does not apply here. Indeed, to borrow from Plaintiff's brief opposing Defendant's motion to strike her jury demand, we may readily look to Supreme Court precedent for the proposition that where Congress uses different words in a related context, Congress intended purposely to have a different inclusion or exclusion. See Plaintiff's Brief [Doc. 55] at 4, citing *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006) ("We normally presume that, where words differ as they differ here, 'Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983))). *Cf. Rao v. Daimler Chrysler Corp.*, 2007 WL 1424220 * 4 (E.D. Mich. 2007) ("to hold that non-public subsidiaries are subject to the whistleblower protection provisions simply because their parent company is required by other SOX provisions to report the subsidiary's financial information or to adopt an umbrella compliance policy would widen the scope of the whistleblower protection provisions beyond what Congress appears to have intended").

Accordingly, Plaintiff's claim based on activity in January 2005 is not covered by the Act and there is no need to analyze whether or not she engaged in protected activity.

C. **Plaintiff Did Not Have A Reasonable Belief That She Was Reporting A Covered Violation Of Law In January 2005**

Plaintiff concedes that she was reporting nothing more than a *possible* violation of law in January 2005. She was not reporting an event she knew, or even believed, to be an *actual* violation. Furthermore, she does not dispute that when she reported her concern about what potentially *might* be a violation to the Audit Chair (see Ex. F, Harkness Tr. at 126, 129), she knew, first, that Fieldstone was not publicly traded, second, that Fieldstone had already issued its

12

press release and, third, that Sonnenfeld had informed the investor that the information was confidential. Defendant's Facts at 8, 13, 21. Plaintiff cannot have considered this possible violation to have been actual (even allowing that such belief might be erroneous), or even probable, because she never researched nor sought advice as to what steps Fieldstone needed to take to cure an actual violation, nor how quickly such steps had to be taken. *Id.* at 19. At best, she understood that she was reporting an issue that might call for further review. Neither does Plaintiff contest that existing precedent of this and other Circuits, as cited in Defendant's opening brief,[8] establishes that, to be protected, she had to report conduct which she understood to be an actual, ongoing (or imminent) violation of law.

Plaintiff seeks to avoid summary judgment as to her January 2005 activity by again analogizing her claim to that of one of the *Van Asdale* plaintiffs. As discussed above, *Van Asdale* is not the law of this Circuit. The decision is contrary to the holding in *Livingston*) to the extent that it can be read, as Plaintiff urges, to support the broad proposition that any report by an employee of her concern that particular conduct might possibly be in violation of law is protected activity.

Moreover, Defendant does not understand *Van Asdale* to stretch the law far as Plaintiff argues, and certainly not far enough to encompass Plaintiff's conduct in this case. Read carefully in the context of its facts, *Van Asdale* stands for the unremarkable proposition that an

---

[8] Defendant's argument on this point is at section III.B and III.D.2 of its opening brief. To summarize the most pertinent part, the cases hold that the plaintiff must show that she had "a subjective belief and an objectively reasonable belief" that the conduct she complained of constituted a violation of relevant law. *See Welch,* 536 F. 3d at 275; *Livingston,* 520 F.3d at 352; *accord Allen v. Admin. Review Bd.,* 514 F.3d 468, 480, n.9 (5th Cir. 2008) (while employee "does not need to prove an actual violation of the law occurred, the employee does need to prove that [her] belief was objectively reasonable under the circumstances"). Thus, the employee must show both that she actually believed the conduct complained of constituted a violation of pertinent law and that "a reasonable person in [her] position would have believed that the conduct constituted a violation." *Livingston,* 520 F.3d at 352; *accord Allen,* 514 F.3d at 477, 479 (because employee was a CPA, the reasonableness of her belief must be evaluated from the perspective of an accounting expert).

13

employee reporting suspected securities fraud can never be sure of the perpetrators motive and intent, and should not be penalized for saying so when deposed. Lena Van Asdale was a patent attorney who knew that the so-called wheel patents were material to the merger, she knew that they might be invalid, and she had reason to believe that individuals who stood to profit and should have known of the questions as to validity had not disclosed this information. In short, as made plain by the testimony recited by the *Van Asdale* court and repeated in Plaintiff's Opposition, Lena Van Asdale was reporting suspect conduct that, if confirmed, was stock fraud.

The distinction here is significant. Plaintiff concedes that when she called the Audit Chair she only suspected (incorrectly, of course), but did not know, that Regulation FD applied to a set of known facts that had been related to her by others. Unlike Van Asdale, her choice was not between ignoring a concern of fraud she perceived and reporting it for factual investigation. Instead, Harkness had an entirely different option, which was to fulfill her role as chief legal officer to determine in the first instance whether her instinct that there was an issue had any basis in law before contacting the Audit Chair to voice a "concern" that there might have been a violation of Regulation FD and request his instructions. She did not need to request an investigation into whether the law applied – it was her job to know and her duty to inquire if unsure. Moreover, the record shows she was unsure, both by her own admission during her deposition and based on the facts reported in her January 26, 2005 memorandum. That is, before Plaintiff made her call to the Audit Chair, the Company's CFO and its senior independent auditor had already stated to her that the conduct she was reporting did not violate Regulation FD, given that the Company was not yet publicly traded. By contrast, no one had suggested to Van Asdale that her concerns did not rise to the level of shareholder fraud, if the facts she suspected were borne out on investigation, and the Ninth Circuit concluded that they obviously did.

14

Simply put, Harkness put the cart before the horse, and that makes a difference. The better analog for her alleged protected activity is that of the CPA in *Allen v. Admin. Review Bd.*, 514 F.3d 468 (5th Cir. 2008). There, the plaintiff claimed she had engaged in protected activity when she reported her belief – based on assumption – that the Company's financial statements included accounting information she considered materially false, when in fact the false information was not included in the reported statements. The Fifth Circuit held that her belief was not objectively reasonable, taking into account the specialized knowledge attendant to her profession, because she had the ready ability to test her assumption by basic research. *Id.* at 477, 479. Here, just as in *Allen*, it is undisputed that: (1) Plaintiff failed to take any step to test her assumption that Regulation FD applied to Fieldstone before reporting her concern to the Audit Chair; (2) Plaintiff had resources readily available that she neglected to use; and (3) had she used any of the resources, she would have known her concern was unfounded (as in fact occurred within two days when the Audit Chair himself (a non-lawyer) asked the seminal question Plaintiff failed to ask and easily got the correct answer.

In sum, the undisputed facts show that Plaintiff did not hold a reasonable belief that she was reporting a violation of law. As discussed in greater detail in Defendant's opening brief, at best the facts reflect that Plaintiff held a subjective belief that there was a potential violation of law if Regulation FD applied. Subjective belief aside, Plaintiff cannot have held an objectively reasonable belief that she was reporting an actual violation of law at the time she called the Audit Chair on September 17. First, because she concedes that she did not report an event that she believed to be an actual violation if true, then she did not engage in activity protected under the Act – even with the gloss applied by the Ninth Circuit in *Van Asdale*. Moreover, whether her belief was objectively reasonable must take into account her profession as well as her role within

the Company as its chief legal officer. In this context, her admission that she was knowingly ignorant of whether Regulation FD did or did not apply, but failed to take a single step to relieve her ignorance, renders her belief objectively unreasonable. The *Allen* court so held in an analogous context, and its decision has been cited with approval by the Fourth Circuit as to the standard for an objectively reasonable belief. *Welch* at n.4. *See also Day v. Staples, Inc.*, 555 F.3d 42, 54 and n.8 (1st Cir. 2009) (same). This court should make the same finding on the plain, undisputed facts of this case.

### D.     Plaintiff's Expert Cannot Create A Factual Dispute Where None Exists

At the outset, Defendant respectfully advises the court that it is not seeking to relitigate its motion to strike the proposed testimony of Plaintiff's expert, Ivan Knauer. Plaintiff's assertion to the contrary in her Opposition is mistaken.

Defendant's opening brief is instead intended to, and does, deconstruct Knauer's anticipated opinion that Plaintiff could have held an objectively reasonable belief that Sonnenfeld's actions constituted a potential violation of Regulation FD. As set out in detail in Section III.D.4 of Defendant's opening brief, once deconstructed it is evident that Knauer's opinion is carefully bounded and those bounds render it unhelpful to this case, or, expressed differently, that his opinion cannot serve to create an issue of fact where none exists.

Nothing Plaintiff argues can dislodge this basic premise. First, and perhaps foremost, she agrees that the word "potential" is key to Knauer's opinion. Second, his opinion depends on Plaintiff's ignorance of the law. Simply put, no informed attorney could have reasonably believed Sonnenfeld's actions violated Regulation FD because it did not apply. Necessarily, Knauer's opinion further depends on the premise that it is acceptable for a general counsel to be

ignorant of when and how an important securities law applies to her company.[9] Finally, he conditioned this premise on the further assumption that a general counsel who was ignorant would take immediate steps to relieve her ignorance.[10] Of course, Plaintiff did not.

Thus, in the end, Knauer's opinion must be taken for what it is worth, but nothing more. Taken with its limits and boundaries in full view, it aligns with the discussion in the forgoing section as to whether Plaintiff believed she was reporting a violation of law within the meaning of the Act, or only a "potential" violation. When a plaintiff can use the skills of her profession to readily confirm whether a potential securities violation is an actual violation, such as by picking up the phone to call outside counsel, but fails to do so, then on the undisputed facts she cannot meet her burden to show that her belief was objectively reasonable as a matter of law. *Allen*, 514

---

[9] As set forth in Section III.D.4 of Defendant's opening brief, Defendant's expert disagrees that such ignorance is acceptable where, as here, Plaintiff understood her job to include being responsible for compliance with the securities laws applicable to Fieldstone.

[10] In this regard, the passage of Knauer's testimony cited by Plaintiff at page 20 of her Opposition does not go far enough. In full the testimony is as follows:

> Witness: A chief legal officer of a company that has been private and is proceeding into the process of going public may not yet fully understand all of the intricacies of the requirements of being a public company. And it is not inconsistent in my opinion with being reasonable and diligent to understand one's limitations and to take the time to investigate and learn under appropriate circumstances. That's what I mean by it depends.
>
> Q   So do you agree that a reasonably diligent and responsible chief legal officer of a company that is applying to become an issuer would at some point inform herself of the core legal obligations that such a company is subjecting itself to?
>
> A   Either that or have resources at her disposal to consult with on issues as they arise.

Plaintiff's Ex. 13, Knauer Dep. at 33:3-33:18. Further to the same point, Knauer also testified as follows:

> Q   Okay. So it follows that Ms. Harkness if she was not aware of when those obligations kicked in should have consulted with someone who did know; correct? That's why you had the outside counsel available as a resource in other words?
>
> A   As I understand the facts that is essentially what happened.

Ex. JJ, Knauer Tr. 43:20-44:5.

F.3d at 479 (CPA's "suspicion" that Company's SEC filings violated law when she complained about false and misleading accounting records was not objectively reasonable when she could have conducted basic research within the scope of her professional training that would have confirmed whether or not there was an actual violation, but did not).

Therefore, Knauer's opinion that Plaintiff acted reasonably in reporting a "potential" violation of Regulation FD to the Audit Chair before using any of her tools to confirm whether there was an actual violation is immaterial to the question of whether she held a reasonable belief that she was reporting a violation of law. Knauer's opinion is of no moment and does not create an issue of material fact.

### E.    **Plaintiff Cannot Show Causation**

Plaintiff asserts at section III.C of her Opposition that she has raised an issue of contested fact as to her obligation to make a prima facie showing of causation based on: (1) the double hearsay testimony of Carol Ballentine that, in early 2005, Jean Slone told her that Michael Sonnenfeld had just stated to her that he wanted to fire Plaintiff immediately because her action in reporting him to the Audit Committee had caused him to lose confidence in her;[11] and (2) the inference that her termination in December 2006 must be linked to her protected activity in January 2005 because Sonnenfeld showed a pattern of antagonism to her over the intervening two years. Plaintiff further asserts that because Ballentine's testimony provides direct evidence of discriminatory animus, she has met her prima facie case and needs nothing more to survive this motion.

---

[11] Defendant recognizes that this double hearsay is subject to an exception to the hearsay rule based on the identity of the alleged speakers and, as such, the court need not automatically exclude it for purposes of this motion. However, as discussed below and in Defendant's opening brief, Ballentine's testimony, including this statement, is wholly unreliable for a number of reasons, including that it is fundamentally internally contradictory, and the court may not fairly draw from it any inference of causation under the circumstances because her testimony could not support a verdict at trial.

## 1.    Ballentine's statement is not direct evidence and it is not admissible

For reasons discussed in detail in Defendant's opening brief at section III.B.6 and recapped below, Ballentine's testimony and declaration are not admissible and thus cannot be evidence of retaliatory animus, whether direct or indirect. However, even if admissible, the statement allegedly made by Sonnenfeld is not direct evidence. "Direct evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption." *Vaughn v. Epworth Villa*, 537 F.3d 1147, 1154-55 (10th Cir. 2008) quoting *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 854 (10th Cir. 2007) (internal quotation omitted). "A statement that can plausibly be interpreted two different ways—one discriminatory and the other benign—does not directly reflect illegal animus, and, thus, does not constitute direct evidence." *Hall*, 476 F.3d at 855 (quotation and cites omitted). *See also Vaughn*, 537 F. 3d at 1155 (statement by manager that employee had been terminated for providing medical records to the EEOC was not direct evidence because it was capable of the non-discriminatory interpretation that her termination was for disclosing records, not to whom they were disclosed).

Here, the alleged protected activity took place on January 17, 2005 when Harkness spoke with the Audit Chair about Sonnenfeld's actions and interviewed Sonnenfeld at his direction. Thereafter, Harkness wrote her January 26, 2005 memorandum to the Audit Chair confirming that Sonnenfeld had not violated Regulation FD but may have breached the Company's internal Code of Business Conduct. Harkness later presented this report to a meeting of the Audit Committee, on February 23, 2005. See Ex. G (meeting minutes). Of course, the latter two actions are not alleged as protected activity, and they cannot be, because by then it was clear to everyone, including Harkness, that she was not reporting a violation of law, specifically including Regulation FD. This sequence is significant for two reasons. First, Ballentine attributes to Sonnenfeld the statement that he wanted to terminate Harkness for her report *to the*

19

*Audit Committee.*[12] Second, while Ballentine's declaration was vague as to when this comment was reported to her, she pegged it to another event, adding that she and Jean Slone spoke to outside counsel afterward. At her deposition, Ballentine recalled that they spoke with counsel immediately, and the individual they consulted was Tom Dowd. She also verified the accuracy of Dowd's billing records of the consultation, which she had reviewed contemporaneously and again in preparation for her deposition. In turn, those records confirm that the first consultation between Dowd and Ballentine about Harkness took place on March 9, 2005. Defendant's Fact 35. In other words, the most proximate event to Sonnenfeld's alleged statement complaining about a report by Plaintiff to the Audit Committee was a recent meeting of the Committee at which Harkness presented her report chastising Sonnenfeld for breaching multiple provisions of the Code of Business Conduct when he spoke to the investor.[13] [14]

Because the statement attributed by Ballentine to Sonnenfeld is capable of an interpretation that does not reflect illegal discriminatory animus to retaliate against her for protected activity, it cannot be direct evidence. *See Vaughn, supra; Hall, supra.*

Regardless, the statement is no evidence at all because Ballentine's testimony should be excluded in its entirety as inherently untrustworthy. In this regard, Plaintiff mistakes Defendant's argument by characterizing it as merely a challenge to Ballentine's veracity. Ballentine did not change her story. Rather, she told a story that is self-contradictory at each

---

[12] As opposed to the Audit Chair – one being protected activity and the other not.

[13] This report prompted the Committee to order remedial training. By contrast, there was no direct consequence to Sonnenfeld from being wrongly accused of violating Regulation FD.

[14] In her own brief, Plaintiff characterizes Ballentine's testimony as meaning that Sonnenfeld was reacting to Harkness' "March 2005 report to the audit committee." Opposition at 27. Again, if this testimony is taken at face value, then it cannot support her claim that Sonnenfeld wanted to retaliate for her protected activity in January.

critical juncture.[15] Under the principle enunciated by the Supreme Court in *The Santissima Trinidad*, 20 U.S. 283, 399 (1822), a court *may not* rely on such inherently contradictory testimony. "Courts of justice, under such circumstances, are bound, upon principles of law, and morality and justice, to apply the maxim falsus in uno, falsus in omnibus." *Id.* While it is true that this rule was enunciated in connection with a trial, pursuant to Rule 56 this court should assess whether Ballentine's testimony would be admissible at trial. Since this testimony could not be relied upon based upon the evidentiary principle enunciated by the Supreme Court in *The Santissima Trinidad*, it would serve no purpose and would not be admissible. Accordingly, it cannot serve to support an inference of causation for purposes of this motion any more than if it were treated as double hearsay unredeemed by Rules of Evidence 801 and 805.

**2.     Plaintiff's January 2005 activity is too remote in time to permit an inference of causation, and Plaintiff has no other evidence sufficient to permit an inference of causation**

Plaintiff does not dispute that 23 months is too long a period to permit an inference of causation, and concedes that she "does not rely on temporal proximity to establish her retaliation claim." Opposition at 25. Instead, she points to cases holding that courts may look to the intervening period for other evidence of retaliatory animus. While this general proposition is correct, Defendant is aware of no case which has stretched the link so far and so thinly as Plaintiff asks this court to do. Rather, cases document that there are outer boundaries,

---

[15] These internal contradictions were catalogued in detail with record citations at Section III.D.6, pp. 30-33, of Defendant's opening brief and will not be restated here in full. They include insisting that she spoke with Dowd about the possible termination of Plaintiff during their first telephone conversation (on March 9), after which he did research and reported back to her and then spoke with Sonnenfeld, while at the same time acknowledging the accuracy of Dowd's billing records and her own contemporaneous notes of a second conversation with Dowd (on April 26), both of which confirm (a) that termination was not discussed in the March conversation; (b) that Dowd took no further action and was not consulted again until April 26; (c) that Dowd did research after the April call; and (d) that Dowd then met with Sonnenfeld. Plaintiff suggests that these contradictions should be ignored in favor of Ballentine's declaration, because it was prepared closer in time to the events. In fact, her April 26, 2005 notes were prepared contemporaneously and are thus a better source than the Declaration, which was prepared more than two years after the events related without the benefit of reference to her notes.

particularly when, as here, the passage of time is lengthy, and interim incidents of adverse action are sporadic and not directly linked to the plaintiff's discharged. In this regard, Defendant believes that a concise comparison of the facts of the cases she principally relies upon, this case, and more analogous cases, is instructive.

*Lettieri v. Equant Incorporated*, 478 F.3d 640, 650-51 (4th Cir. 2007), involved a gap of just seven months between the protected activity and termination, where the supervisor took immediate adverse actions designed to set the employee up for termination (stripping job responsibilities, reducing authority and eliminating client contact). *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 285 (3rd Cir. 1999) involved a gap of just three weeks, coupled with other evidence of hostility. *Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173, 178 (3rd Cir. 1997) involved a six-month gap, supported by direct evidence of discriminatory intent.

In the instant case, the record begins with a gap of 23 months during which (not surprisingly) Harkness and Sonnenfeld did not see eye-to eye in all matters. For example, the record reflects a meeting on February 22, 2005 between Harkness and Sonnenfeld where a number of grievances were on the table,[16] and continues through mid-December 2006 when she unilaterally told her supervisor that she was prepared to resign if offered a package she deemed suitable.[17] Given the length of this gap, the real question is whether any other *evidence* provides Plaintiff the necessary link to draw a reasonable inference that these squabbles and

---

[16] Among others, these issues included her salary and her recently completed performance review. See Ex. I. The former clearly predates the first instance of alleged protected activity and the latter Plaintiff now characterizes as "glowing."

[17] Moreover, Plaintiff has herself confirmed multiple reasons why she would have been terminated, from resigning subject to a demand for severance, to failing to meet Sonnenfeld's expectations on completing review of mission-critical Empower documents (when other divisions met their obligations), to in effect accusing him of meeting privately with investors so he could break the law. These are only of few of many examples. Taken individually or collectively, they beg the question: what Chief Executive Officer would want to continue working with such a general counsel? The answer is the answer given to Sonnenfeld by the Tom Eckert, the outside director who was the Chair of Fieldstone's Board: replace her with someone who had better judgment and more competence. See Ex. R (Eckert Declaration).

disagreements arose from a plan by Sonnenfeld to fire her two years after her protected activity. There is no evidence, only the self-serving, conclusory allegations in Plaintiff's affidavit.

In particular, Plaintiff asserts that Sonnenfeld began to inflict what amount to petty slights on her soon after her report to the Audit Committee,[18] such as exclusion from meetings and belittling her, none of which amount to "adverse actions." She also alleges that her 2004 year-end review was "glowing" while the next review was "markedly cold;" that he changed her reporting structure; and that he removed a department from her supervision. The latter two actions took place a year or more after the alleged protected activity, and thus are not sufficiently proximate to permit an inference of retaliatory animus. The 2005 review is also a year removed from the alleged protected activity, but it is instructive for a different reason than Plaintiff intends. On its face, the review Plaintiff characterizes as "glowing" was prepared and delivered to her on or about January 26, 2005, nine days *after* her alleged protected activity on January 17, 2005. See response to Plaintiff's Fact No. 5 *supra* at p.5-6. In short, this review represents the first opportunity Sonnenfeld had to retaliate, and he did not retaliate.[19]

In fair context this case is more analogous to other cases where courts have found that friction in the workplace, and even adverse personnel actions, did not warrant denial of summary

---

[18] Again, Defendant notes that the report to the Audit Committee in late February was not protected activity. To the extent that allegedly hostile behavior could be traced to on or after that date, the behavior would already be more than a month removed from the alleged protected activity on January 17, and not sufficiently proximate to permit an inference of causation.

[19] Similarly, to the extent that the court takes Ballentine's testimony into account for any purpose, the testimony about firing Harkness should be seen as no more than a stray remark. Sonnenfeld did not fire Harkness after he made the remark. She was fired 21 months later. Similarly, the first adverse action of any kind does not occur until January 2006, 11 months later. Notably, Ballentine's notes of her April 26, 2005 review with Dowd document that Sonnenfeld was then angry with Harkness, and termination was being considered as an option, based on other conduct he found unacceptable, including complaining directly to the Board about her compensation and accusing him of having a conflict of interest in selecting an acquaintance to perform services as outside counsel. See generally Defendant's opening brief at pp. 32-33 for a review of Ballentine's evidence and testimony taken as a whole, which conforms that the Plaintiff's report in January 2005 was a non-event, and the issues between Harkness and Sonnenfeld, including those described in her affidavit, arose from unrelated sources of conflict and disagreement.

judgment because the passage of time was extended or the events were not sufficiently adverse. As to the former, in *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 655, 657 (4th Cir. 1998), the Fourth Circuit sustained an award of summary judgment where three years had elapsed between the protected activity and termination, even when the facts of the case reflect that the plaintiff was subjected during that time to a number if disciplinary actions over that three-year period that ultimately resulted in her termination, holding that to do otherwise would hamstring employers by securing guaranteed employment to any employee who exercised a protected right. As to the latter, in *Fraser v. Fiduciary Trust Company International*, 2009 WL 2601389 *6 and n.7 (S.D.N.Y.), a recent decision involving a whistleblower claim under the Act, the court granted summary judgment to the employer holding that ten months was too long to demonstrate a causal connection, even when the employer took other actions that the employee characterized as "adverse" but the court found not to amount to material changes in his working conditions (the acts were moving his desk, relieving him of client newsletter duties, and not inviting him to meetings).[20]

In the end, Plaintiff must do more to sustain her position than point to stray facts and remote inferences to sustain her burden of causation. "A mere scintilla of evidence is not enough to create a fact issue." *Barwick v. Celotex Corp.*, 736 F.2d 946, 958-59 (4th Cir. 1984) (quoting *Seago v. North Carolina Theatres, Inc.*, 42 F.R.D. 627, 640 (E.D.N.C. 1996), *aff'd*, 338 F.2d 987 (4th Cir. 1967)). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

---

[20] The Fraser court also found that a second instance of protected activity which occurred *one month* prior to termination failed due to reliance on temporal proximity for causation, because temporal proximity does not compel a finding of causation, particularly where the record reflects a legitimate intervening basis for the termination. *Id.* at *6.

249-50 (1986) (citations omitted). Here, following the lead of cases like *Dowe* and *Fraser*, *supra*, summary judgment based on lack of causation is particularly apt, given the 23 month interval between Plaintiff's alleged protected activity and her termination, and the numerous intervening events, not the least of which are the major dispute between Sonnenfeld and Harkness over her failure to timely support the Empower rollout in Fall 2006, Chairman Eckert urging Sonnenfeld to get a new general counsel, and Harkness informing the Company that she was prepared to resign. See Defendant's Facts at 43-46.

## IV.   CONCLUSION

For the reasons stated herein and in its motion and initial brief, summary judgment should be granted in favor of Defendant C-Bass Diamond, LLC on all claims.

Dated:  October 5, 2009

Respectfully submitted,

/s/ Joseph E. Schuler
Joseph E. Schuler (Fed. Bar #04360)
Matthew F. Nieman (Fed. Bar #17558)
JACKSON LEWIS LLP
10701 Parkridge Boulevard, Suite 300
Reston, VA  20191
schulerj@jacksonlewis.com
niemanm@jacksonlewis.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of October, 2009, the foregoing *Defendant's Reply Memorandum in Support of Motion for Summary Judgment* was served via the courts electronic filing system upon:

> Joseph B. Espo, Esq.
> BROWN, GOLDSTEIN & LEVY, LLP
> 120 E. Baltimore Street, Suite 1700
> Baltimore, MD 21202-6701
>
> *Attorneys for Plaintiff*
>
> /s/ Joseph E. Schuler
> Joseph E. Schuler