## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | : | |
|---|---|---|
| CYNTHIA L. HARKNESS | : | |
| | : | |
| | : | |
| v. | : | |
| | : | Civil Action No. CCB-08-231 |
| C-BASS DIAMOND, LLC | : | |
| | : | |

...o0o...

## MEMORANDUM

Now pending before the court is a motion for summary judgment, filed by defendant C-Bass Diamond, LLC ("C-Bass")[1]. Plaintiff Cynthia L. Harkness brings this lawsuit under the Sarbanes-Oxley Act of 2002 ("the Act"), 18 U.S.C. § 1514A, alleging that C-Bass retaliated against her for engaging in protected activities under the Act. The issues in this case have been fully briefed and the court heard oral argument on March 11, 2010. For the reasons stated below, C-Bass's motion for summary judgment will be granted.

## BACKGROUND

Ms. Harkness began working for Fieldstone as its General Counsel on March 1, 2004, at the invitation of Fieldstone's President and Corporate Executive Officer, Michael J. Sonnenfeld. Mr. Sonnenfeld hired Ms. Harkness to manage Fieldstone's legal department as the company moved from a private to a publicly-traded company. Ms. Harkness, in turn, hired Sally LaFond to serve as Assistant General Counsel. Ms. LaFond had previously worked for the law firm that served as Fieldstone's outside counsel for matters relating to its application with the SEC. Within a few

---

[1] This lawsuit was originally brought against Fieldstone Investment Corporation ("Fieldstone"), which has since merged into C-Bass, the surviving entity. When describing events that occurred prior to the merger, I will refer to Fieldstone rather than C-Bass.

months of Ms. Harkness's arrival at Fieldstone, Mr. Sonnenfeld asked her to lead the Quality

Control and Human Resources departments, in addition to the legal department she already ran.

Pleased with Ms. Harkness's work, Mr. Sonnenfeld gave her a positive review in early January

2005 and ranked her performance a "4+" out of 5.[2] (*See* Def.'s Reply, Sonnenfeld Decl. Ex. 1) In

addition, Mr. Sonnenfeld awarded Ms. Harkness a salary increase and bonus.

Fieldstone applied with the Securities and Exchange Commission ("SEC") to become a

publicly-traded company in April 2004. In anticipation of its application being approved, Fieldstone

voluntarily adopted an internal Code of Business Conduct that closely followed the rules and

regulations to which publicly-traded companies are subject. Among other provisions, the Code

called for the creation of an Audit Committee comprised of independent directors and prohibited

employees from disclosing material, non-public information about the company. The SEC approved

Fieldstone's application to become a publicly-traded company on February 2, 2005.

On January 14, 2005, prior to approval of Fieldstone's SEC application, Ms. LaFond

informed Ms. Harkness of information that Robert Partlow, an outside auditor, and Harry Argires, a

Fieldstone executive, had just relayed to her. According to Mr. Partlow and Mr. Argires, Mr.

Sonnenfeld had informed an outside investor that Fieldstone was about to restate its earnings. At

that point, this information was not yet public, although Ms. Harkness was initially uncertain as to

whether Mr. Sonnenfeld had made the disclosure before or after Fieldstone issued a press release on

January 14, 2005 publicly announcing the news. Ms. LaFond and Ms. Harkness researched their

reporting obligations under the Sarbanes-Oxley Act and decided to interview Mr. Partlow and Mr.

Argires to learn more. Mr. Partlow and Mr. Argires told Ms. Harkness that Mr. Sonnenfeld had

---

[2] Although the performance review is dated January 26, 2005, the exact date on which Mr. Sonnenfeld drafted the
review is unknown. Both parties agreed at oral argument that Mr. Sonnenfeld likely drafted the review prior to January
26, but after Ms. Harkness's January 17, 2005 interview with Mr. Sonnenfeld described below.

recounted to them the conversation he had with the outside investor on January 13, 2005. They explained to Ms. Harkness that in response to the investor asking Mr. Sonnenfeld what was happening in the company, Mr. Sonnenfeld responded, "I could either tell you nothing or give you non-public information, which you couldn't do anything with." (Def.'s Mot. for Summ. J. Ex. C at ¶ 5(d).) Mr. Sonnenfeld then divulged the non-public information about the company restating its earnings to the investor. Mr. Partlow and Mr. Argires told Ms. Harkness they were shocked by this disclosure and, as Ms. Harkness later described in a memorandum, they indicated that "if Fieldstone were public, this would/might be a violation of Regulation FD." (*Id.* at ¶ 5(f).) Finally, they relayed to Ms. Harkness Mr. Sonnenfeld's belief that the disclosure of non-public information to an investor was permissible as long as the investor was told he could not trade based upon the information.

Following her interviews with Mr. Partlow and Mr. Argires, Ms. Harkness called Jonathan Michael, the Chair of Fieldstone's Audit Committee, on January 17 to advise him of what she had learned and to seek guidance on how to proceed.[3] Ms. Harkness explained to Mr. Michael that she thought Mr. Sonnenfeld's disclosure might constitute a violation of Regulation FD, 17 C.F.R. §§ 243.100-243.103.[4] Prior to calling Mr. Michael, Ms. Harkness did not investigate whether Regulation FD applied to Fieldstone, even though she knew that the SEC had not yet approved Fieldstone's application to become a publicly-traded company. Neither did Ms. Harkness ask members of her legal staff or Fieldstone's outside counsel to conduct research on this threshold question. Ms. Harkness stated in her deposition that Ms. LaFond may have believed that Regulation FD applied to Fieldstone, yet she did not ask Ms. LaFond to conduct any research on the issue prior

---

[3] Mr. Michael is not an attorney.
[4] Regulation FD prohibits "an issuer, or any person acting on its behalf," from disclosing "material nonpublic information regarding that issuer or its securities" to certain types of investors and brokers, unless the issuer discloses the information publicly simultaneously, when the disclosure was intentional, or promptly, when the disclosure was unintentional. 17 C.F.R. § 243.100(a)-(b).

to the January 17 phone call. In addition, there is no evidence that Ms. Harkness relied upon any representation by Ms. LaFond that Regulation FD applied.  In response to Ms. Harkness's report, Mr. Michael directed her to interview Mr. Sonnenfeld and asked her to provide him with her legal opinion.

Ms. Harkness and Ms. LaFond interviewed Mr. Sonnenfeld later that afternoon. He confirmed what Ms. Harkness had learned from Mr. Partlow and Mr. Argires and explained that he had disclosed the information in order to get a sense of the likely market reaction to the earnings restatement. Furthermore, he claimed to have told the investor that he could not trade based on the information. Ms. Harkness reported the results of this interview to Mr. Michael.

On January 19, Mr. Michael informed Ms. Harkness that he had spoken with outside securities counsel, who believed that Regulation FD had not been violated because Fieldstone was not yet a publicly-traded company and because Mr. Sonnenfeld had told the investor the information was confidential and that he could not traded based upon it. Mr. Michael asked Ms. Harkness to prepare a report concerning her investigation and explaining whether Fieldstone's Code of Business Conduct or Regulation FD had been violated. Ms. Harkness asked Ms. LaFond to review Regulation FD in preparation for this report. In her January 26, 2005 report to Mr. Michael, Ms. Harkness wrote that,

> [Ms. LaFond] reviewed Regulation FD and believes that, *if Fieldstone's shares were publicly registered, and therefore Fieldstone were subject to Regulation FD*… [Mr. Sonnenfeld's] disclosure of material, non-public information likely would be deemed an 'intentional' disclosure under Regulation F, and the Company would have had an obligation to simultaneously publicly disclose this information.

(Pl.'s Opp. Ex. 4 at ¶ 12 (emphasis added).) On February 23, 2005, Ms. Harkness's report was presented to the Audit Committee.

Following these events, the relationship between Mr. Sonnenfeld and Ms. Harkness deteriorated. Ms. Harkness claims that Mr. Sonnenfeld began to criticize her legal advice and treat her in a generally hostile manner. In March 2005, employees within Fieldstone's Human Resources department contacted an attorney specializing in employment law, Thomas Dowd, to discuss the strained relationship between Ms. Harkness and Mr. Sonnenfeld. In contrast to the very positive review Ms. Harkness received in January 2005, Mr. Sonnenfeld wrote Ms. Harkness a significantly poorer annual review in 2006. In January 2006, Mr. Sonnenfeld removed Ms. Harkness's responsibilities as head of the Quality Control and Human Resources departments. Furthermore, he informed Ms. Harkness that instead of reporting to him, she would now report to the Chief Financial Officer, a position that was vacant at the time, but was filled by Nayan Kisnadwala in February 2006. Mr. Kisnadwala's assessment of Ms. Harkness's performance in mid-2006 was markedly better than Mr. Sonnenfeld's previous review and she received her full bonus in the fall of 2006.

According to Ms. Harkness, Mr. Sonnenfeld prohibited her from attending senior management meetings, refused to inform Ms. Harkness, or her legal team, of significant transactions with legal implications for the company, and barred Ms. Harkness from accompanying the transaction team on a due diligence trip. When Ms. Harkness discovered in mid-2006 that Mr. Sonnenfeld planned to meet with investors alone, she warned him that such meetings could expose Fieldstone to liability for violations of securities laws regarding insider trading. In response, Mr. Sonnenfeld rebuked Ms. Harkness and informed her that the solution was for the General Counsel simply to remain uninformed about these meetings. Mr. Sonnenfeld also criticized Ms. Harkness for refusing to sign off on loan documents that her legal department had not yet reviewed.

In November 2006, Fieldstone's external auditors asked Ms. Harkness whether the tone from upper management exhibited a commitment to legal compliance and ethics. In response, Ms. Harkness stated that she could not definitively answer that such a tone existed because of her routine exclusion from important meetings and events and continued isolation within the company. The external auditors suggested that Ms. Harkness raise her concerns before Fieldstone's Audit Committee and she did so on December 5, 2006. She reported to the Committee that due to her isolation within the company and understaffed legal department, she could not ensure Fieldstone's legal compliance with applicable securities laws. Ms. Harkness did not specify, however, any securities law Fieldstone may have violated by intentionally keeping her uninformed of major events within the company.

On December 12, 2006, Ms. Harkness met with Fieldstone executives to discuss the possibility of her resignation and to negotiate an acceptable severance package in that event. She then took a planned vacation. Upon her return on December 29, 2006, the Vice President of Human Resources presented her with a termination letter and proposed severance package. Ms. Harkness objected to both and her departure date was pushed back to January 15, 2007. Ms. Harkness continued to believe that her severance package was insufficient. Just before leaving Fieldstone, Ms. Harkness completed a disclosure questionnaire for the fourth quarter of 2006 in her capacity as General Counsel. In her responses, Ms. Harkness indicated that she believed Fieldstone to have violated Title VII and the Sarbanes-Oxley Act by terminating her based on sex discrimination or retaliation, but did not identify any other violations.

On March 8, 2007, Ms. Harkness filed a complaint against Fieldstone with the Department of Labor, Occupational Safety and Health Administration, alleging retaliation under the Sarbanes-Oxley Act. After waiting 180 days for the Secretary to issue a final decision, Ms. Harkness brought

this lawsuit in federal court pursuant to 18 U.S.C. § 1514A(b)(1)(B). C-Bass has moved for

summary judgment, arguing that Ms. Harkness has failed to state a prima facie case of retaliation

under the Act because she did not engage in protected activity and cannot prove causation.

## ANALYSIS

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "should

be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show

that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(c). The Supreme Court has clarified that this does not mean that

any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere

existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment; the requirement is that there be no *genuine* issue of

*material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in

original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon

the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing

that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d

514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must

"view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable

inferences in her favor without weighing the evidence or assessing the witnesses' credibility,"

*Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the court also

must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims

and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotations omitted)

(quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

The Sarbanes-Oxley Act provides protection against retaliation to "whistleblowing" employees of publicly-traded companies who report potentially unlawful conduct. *See Welch v. Chao*, 536 F.3d 269, 275 (4th Cir. 2008). The Act provides that:

> No [publicly-traded company], or any officer [or] employee…of such company, may discharge…an employee…because of any lawful act done by the employee—(1) to provide information…regarding any conduct which the employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information…is provided to…(C) a person with supervisory authority over the employee….

18 U.S.C. § 1514A(a)(1)(C).

To state a prima facie claim for retaliation under the Sarbanes-Oxley Act, the employee's complaint must allege that "(1) the employee engaged in protected activity; (2) the employer knew, actually or constructively, of the protected activity; (3) the employee suffered an unfavorable personnel action; and (4) the circumstances raise an inference that the protected activity was a contributing factor in the personnel action." *Welch*, 536 F.3d at 275 (citing 29 C.F.R. § 1980.104(b)(1)). The Act's whistleblower protection provision adopts a burden-shifting framework whereby the employee bears the initial burden of making a prima facie showing of retaliation. *Id.* The burden then shifts to the employer to demonstrate by clear and convincing evidence that it would have taken the same personnel action in the absence of the protected activity. *Id.*

Ms. Harkness alleges that her reports to Fieldstone's Audit Chair and Committee in January 2005 and in December 2006 constitute protected activity. She further claims that Fieldstone knew about these reports and that they were a contributing factor in her termination in January 2007. C-

8

Bass does not contest that Fieldstone knew about Ms. Harkness's reports or that her termination

constituted an unfavorable personnel action; instead, C-Bass argues that Ms. Harkness's reports do

not constitute protected activity and that even if they do, they were not a contributing factor in her

eventual termination.

C-Bass first asserts that the January 2005 incident in which Ms. Harkness reported to the

Audit Chair what she believed might be a violation of Regulation FD was not protected activity

under the Act. To prove that she engaged in protected activity, Ms. Harkness must demonstrate that

she possessed both a subjective and an objectively reasonable belief that the conduct about which

she complained constituted a violation of the relevant law. *See id.* at 278 n.4. Ms. Harkness must

show, therefore, that she actually believed the conduct to be a violation of the pertinent law and that

a reasonable person in her position would have believed the same. *See Livingston v. Wyeth, Inc.*,

520 F.3d 344, 352 (4th Cir. 2008). The conduct need not constitute an actual violation, however, in

order for the report to qualify as protected activity under the Act. *See Welch*, 536 F.3d at 277.

Although the objective reasonableness of Ms. Harkness's belief is a mixed question of law

and fact, a court may decide the question as a matter of law "if the facts cannot support a verdict for

the non-moving party." *Welch*, 536 F.3d at 278 n.4; *see also Jordan v. Alternative Resources Corp.*,

458 F.3d 332, 339 (4th Cir. 2006) (noting that because "determining whether an employee

reasonably believes a practice is unlawful is an objective one, the issue may be resolved as a matter

of law"). In this case, no material facts relating to how Ms. Harkness formed her belief are in

dispute. The parties agree that upon learning about Mr. Sonnenfeld's exchange with the investor,

Ms. Harkness took the time to research her reporting obligations under the Sarbanes-Oxley Act, but

did not research the threshold question of whether Regulation FD applied. Neither did Ms. Harkness

ask outside securities counsel for their opinion on the applicability of Regulation FD or direct any

members of her legal staff to look into the question. Furthermore, according to Ms. Harkness's January 26, 2005 letter to Mr. Michael, the accuracy of which neither party contests, Mr. Partlow and Mr. Argires indicated to Ms. Harkness during their interview on January 14, 2005 the possibility that Regulation FD might apply only if Fieldstone were a public company. (*See* Pl.'s Opp. Ex. 4 at ¶ 5(f) ("Rob [Partlow] and Harry [Argires]…indicated that, *if Fieldstone were public,* this would/might be a violation of Regulation FD") (emphasis added).) Nevertheless, Ms. Harkness did not ask her staff to research the issue until Mr. Michael informed her that, according to his conversation with outside securities counsel, Regulation FD did not apply.

Ivan Knauer, an expert in securities law, provided a report and deposition testimony on Ms. Harkness's behalf, opining that it was objectively reasonable for Ms. Harkness to believe that Regulation FD had been violated.[5] Mr. Knauer's opinion is based primarily on his contention that the definition of "issuer" in Regulation FD is not completely clear and that "[a] chief legal officer of a company that has been private and is proceeding into the process of going public may not yet fully understand all of the intricacies of the requirements of being a public company." (Pl.'s Opp. Ex.13, Knauer Dep. at 33.) Mr. Knauer's opinion that it is reasonable for an attorney in Ms. Harkness's situation not to fully understand whether Regulation FD applies, however, does not negate the undisputed fact that Ms. Harkness had the resources available to her to help clarify this threshold question, but failed to utilize them. (*See id*. (noting that "it is not inconsistent in my opinion with being reasonable and diligent to understand one's limitations and to take the time to investigate and learn under appropriate circumstances").)

---

[5] Mr. Knauer also agreed, however, that Regulation FD did not apply to Fieldstone when Ms. Harkness reported Mr. Sonnenfeld's conduct to Mr. Michael. (*See* Def.'s Mot. for Summ. J. Ex. JJ at 28.)

Given that Ms. Harkness is a lawyer with over 20 years of legal experience, much of it spent as in-house counsel for large domestic and international corporations, she should be familiar with performing legal research to ascertain the applicability of various laws. In this sense, this case is similar to *Allen v. Admin. Review Bd.*, in which the Fifth Circuit held that a licensed certified public accountant's belief that her company had violated an SEC rule or regulation was unreasonable. *See* 514 F.3d 468 (5th Cir. 2008); *see also Welch*, 536 F.3d at 277 (citing *Allen* approvingly). The court concluded that given "the limited nature of [the plaintiff's] inquiry" into the alleged accounting problem and "her extensive accounting background," the administrative law judge's finding that the plaintiff did not reasonably believe that an SEC rule had been violated was supported by substantial evidence. *Allen*, 514 F.3d at 478-79. Although the administrative law judge in *Allen* resolved the question of objective reasonableness after conducting an evidentiary hearing, rather than on the employer's motion for summary judgment, the judge did so after determining that a genuine issue of material fact precluded summary judgment. *Id.* at 478. In this case, however, no genuine issue of material fact exists as to the limited nature of Ms. Harkness's inquiry into whether Regulation FD applied.

The Federal Circuit also has stressed the importance of a complainant's professional experience when weighing the objective reasonableness of her belief that a law has been violated. *See Haley v. Dep't of Treasury*, 977 F.2d 553, 557 (Fed. Cir. 1992). In *Haley*, the court considered a plaintiff's claim under the Whistleblower Protection Act, 5 U.S.C. § 2302(b)(8), which also requires the reporting employee to have a reasonable belief in the information she discloses to management. *See* 977 F.2d at 556-57. Based upon the plaintiff's "extensive experience as an examiner of savings associations," the court held that he did not have a reasonable belief that his employer's conduct violated a law that clearly allowed for such conduct. *Id.* at 557. Although the regulation at issue in

11

this case may not be as clear, Ms. Harkness's extensive experience serving as in-house counsel for corporations indicates that she was familiar with researching the applicability of relevant statutes and regulations. As noted, she had access to outside counsel and an Assistant General Counsel as well who could have advised her regarding the applicability of Regulation FD.

Furthermore, Ms. Harkness's uncertainty about the contours of the law itself when she reported the alleged violation distinguishes this case from those in which courts have held the reporting of legal violations that are only potential nonetheless constitutes protected activity. Ms. Harkness cites the Ninth Circuit's opinion in *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989 (9th Cir. 2009) for the proposition that a plaintiff need not be completely certain at the time of reporting that a violation of the law has occurred in order to classify the report as protected activity. In *Van Asdale*, the plaintiffs, in-house counsel for the defendant company, reported two instances of potential fraud to the company's General Counsel. 577 F.3d at 991-93. The court held that even though the plaintiffs did not have conclusive proof of the existence of fraud when they reported the alleged violation, their reporting constituted protected activity under the Act. *Id.* at 1001-02. The court reasoned that the plaintiffs had correctly identified the elements of fraud and only needed to obtain further facts to ascertain whether the company had indeed committed fraud. *Id.* By contrast, Ms. Harkness was aware of the facts, but uncertain of the governing law when she telephoned Mr. Michael. Thus her uncertainty is distinguishable from that of the *Van Asdale* plaintiffs, who acted as reasonable attorneys in educating themselves as to the elements of their suspected legal violation before reporting it.

As Ms. Harkness's failure to investigate whether Regulation FD applied, even after Mr. Partlow and Mr. Argires suggested that this might be a threshold issue, is uncontested, the

disagreement between the parties' expert witnesses[6] as to the objective reasonableness of her

conduct is insufficient to create a triable issue of fact.[7] In light of Ms. Harkness's professional

experience and the legal resources available to her, Ms. Harkness's belief that Fieldstone was in

violation of Regulation FD was not objectively reasonable and, therefore, her January 2005 report

to Mr. Michael does not constitute protected activity under the Sarbanes-Oxley Act.[8]

      C-Bass next argues that the December 2006 incident, in which Ms. Harkness expressed

concern about Fieldstone not complying with legal obligations due to her increased isolation within

the company, also was not protected activity because it did not involve the reporting of fraud or

other illegal conduct. Instead, Ms. Harkness simply informed the Audit Committee of her concern

that by being regularly excluded from important company meetings and events, she would be

unable to verify that the company was complying with its legal obligations. Although an "employee

need not cite a code section he believes was violated in his communications to his employer, … the

employee's communications must identify the specific conduct that the employee believes to be

illegal." *Welch*, 536 F.3d at 276 (internal quotation marks omitted); *see also Platone v. U.S. Dep't

of Labor*, 548 F.3d 322, 326-27 (4th Cir. 2008) (holding that the complainant must "definitively and

specifically" allege a violation of the law in his communications with management).

      In *Welch*, the complainant, David Welch, served as the Chief Financial Officer ("CFO") of

his company and was responsible for reviewing the general ledger accounts and preparing

shareholder reports and financial statement. *Id.* at 272. After frequently being excluded from

---

[6] C-Bass has submitted a report from Anthony Djinis, a securities law expert, opining that Ms. Harkness's belief that Regulation FD had been violated was not objectively reasonable. (*See* Def.'s Mot. for Summ. J. Ex. KK.)

[7] Although Mr. Knauer posits that Ms. Harkness's initial uncertainty was reasonable, he does not state that her failure to research was reasonable.

[8] Given the conclusion that Ms. Harkness's January 2005 report was not protected activity, I need not address C-Bass's argument that this report could not be considered protected because it occurred prior to Fieldstone becoming a publicly-traded company.

communications between the company's Chief Executive Officer ("CEO") and its independent auditor, Mr. Welch expressed his concern about this practice, among several others he found problematic, to the CEO and the Board of Directors. *Id.* at 272-73. In particular, he reported that this exclusion "prevented him from performing his tasks as CFO and prevented him from confirming the accuracy of [the company's] financial reports." *Id.* at 273. The Fourth Circuit held that Mr. Welch's communications, including the complaint about his restricted access, did not constitute protected activity because he failed to explain how the alleged conduct violated a specific federal securities law. *Id.* at 279.

Ms. Harkness has similarly failed to allege which federal securities law or regulation she believed Fieldstone to be in violation of by excluding her from important meetings and events. Neither her amended complaint nor her opposition brief cite any specific law; instead, Ms. Harkness reasons that her exclusion put the company at an increased risk of legal violations. Although it is quite likely that a company which restricts its flow of pertinent information to its General Counsel is at a greater risk of flouting its legal obligations, such an enhanced risk does not in and of itself constitute a violation of federal securities law. *See Livingston*, 520 F.3d at 353-54 (holding that the plaintiff's reported concerns were supported by a "chain of speculation" as to his employer's possible non-compliance with a legally-required training program rather than by an underlying legal violation which would render the internal complaint protected activity). Thus Ms. Harkness's December 2006 communication does not constitute protected activity under the Act.

As Ms. Harkness has not engaged in protected activity, the court need not consider whether she has made a prima facie showing of causation.[9] Without the necessary element of protected activity, Ms. Harkness's claim of retaliation under the Sarbanes-Oxley Act must fail.

## **CONCLUSION**

For the foregoing reasons, the defendant's motion for summary judgment will be granted. A separate Order follows.

March  16, 2010                                                         _____/s/_____
Date                                                                           Catherine C. Blake
                                                                               United States District Judge

---

[9] C-Bass argued in its motion that Ms. Harkness failed to create an inference of causation given the 23-month gap between her call to Mr. Michael and her termination, the Chairman of the Board's independent negative opinion of Ms. Harkness and recommendation that she be replaced, and Mr. Sonnenfeld's contention that she failed to meet an important deadline in December 2006.